Outlook

---

## Jane Doe v. Ibanera, LLC, et al. - Case No. 1:25-cv-24118-DSL

---

**From** Daniel Barroukh <danielb@dereksmithlaw.com>

**Date** Thu 12/4/2025 2:32 PM

**To** bjornsnorrason@gmail.com <bjornsnorrason@gmail.com>; bjorn@ibanera.com <bjorn@ibanera.com>; bjorn@dalpay.com <bjorn@dalpay.com>; bjorn.snorrason@ibanera.com <bjorn.snorrason@ibanera.com>; bsnorra@internet.is <bsnorra@internet.is>

**Cc** David Rodriguez <David@dereksmithlaw.com>; Derek Smith <derek@dereksmithlaw.com>

📎 6 attachments (2 MB)

22 - Order Granting Alternative Service.pdf; Complaint (Icelandic).pdf; Complaint.pdf; Summons (Icelandic).pdf; Summons.pdf; 01-1 Civil Cover Sheet.pdf;

Mr. Bjorn Snorrason—

I am counsel of record for the Plaintiff, Jane Doe, in the above-noted matter.

Jane Doe has filed the attached Complaint, Summons, and Civil Cover Sheet in the Southern District of Florida against you and others. I have also attached a copy of the Complaint and Summons that have been translated to Icelandic.

Pursuant to the attached Order [ECF 22], service of process is hereby effectuated upon you, and you have 21 days to file a response or answer with the Court, absent an extension of time.

If you are engaging counsel, please have them contact me to discuss.

Best,
Daniel

**Daniel J. Barroukh, Esq.**

*Admitted in FL

DEREK SMITH LAW GROUP, PLLC

Toll Free (800) 807-2209 | Direct Dial (786) 688-2335

Email: danielb@dereksmithlaw.com

www.dereksmithlaw.com

**New York | New Jersey | Philadelphia | Miami | Los Angeles | San Francisco | San Diego | Washington D.C.**



EXHIBIT A



*The information contained in this transmission is privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, do not read it. Please immediately reply to the sender that you have received this communication in error and then delete it. Thank you. If you are a client of this firm and this email is directed to you, please do not forward to any other party, or you could be waiving the attorney-client privilege. Settlement Communication Notice: If this communication pertains to a settlement in any case, all settlement agreements are subject to final client approval and signature by all parties. Any cases and business handled in California are handled exclusively through the distinct entity, Derek Smith Law Group, LLP.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.  1:25-cv-24118-LEIBOWITZ

**JANE DOE,**

*Plaintiff,*

*v.*

**IBANERA, LLC,** *et al.,*

*Defendants.*

_____/

### ORDER

**THIS CAUSE** is before the Court upon Plaintiff's Expedited Motion for Leave To Serve Defendant Bjorn Snorrason by Alternative Method of Service and for an Enlargement of Time to Effect Service of Process (the "Motion") [ECF No. 20], filed on December 2, 2025.  In the Motion, Plaintiff asks for court permission to serve Defendant Bjorn Snorrason ("Snorrason")—who resides in Iceland—by electronic mail ("e-mail"), and Plaintiff requests an additional thirty (30) days to do so. [ECF No. 20 at 7–8].  In support of the Motion, Plaintiff represents as follows:

> Plaintiff has worked diligently to locate and serve Snorrason…. Her extensive efforts have included searching online database, collecting information in aid of service, translating the Complaint and Summons into the Icelandic language, sending a copy of the Summons and Complaint to Snorrason at his personal address, 9 Boggvisstaðir, 620 Dalvik, Iceland, *via* U.S. mail; sending a copy of the Summons and Complaint to Snorrason at his personal addresses, 9 Boggvisstaðir, 620 Dalvik, Iceland (the "Boggvisstaðir address") and 9 Boggvisbraut, 620 Dalvik, Iceland (the "Boggvisbraut address") *via* Fedex; and emailing Snorrason at his aforementioned email addresses for the purpose of providing notice of this action to him.  As of the date hereof, only Fedex has generated up-to-date proofs of delivery, confirming delivery to the Icelandic postal service (Íslandspóstur).  *See* Return of Service, ECF No. 19, and Declaration of Daniel Barroukh ("Barroukh Decl.") [ECF No. 21].

[*Id.*].

Rule 4(f)(3) of the Federal Rules of Civil Procedure, which governs service of an individual in a foreign country, provides: "Unless federal law provides otherwise, an individual—other than a minor, an incompetent person, or a person whose waiver has been filed—may be served at a place not within any judicial district of the United States … by other means not prohibited by international

agreement, as the court orders." Thus, service may be accomplished under Rule 4(f)(3) as long as it is (i) ordered by the court, and (ii) not prohibited by an international agreement. *See Rio Props., Inc. v. Rio Int'l Interlink,* 284 F.3d 1007, 1014 (9th Cir. 2002).

A court has discretion to determine what alternative means of service is appropriate in a particular case. *Rio Props., Inc.,* 284 F.3d at 1016 ("[W]e commit to the sound discretion of the district court the task of determining when the particularities and necessities of a given case require alternate service of process under Rule 4(f)(3)."). Courts have permitted alternative service of process through various means, including by e-mail and/or service on local counsel. *See, e.g., Rio Props., Inc.,* 284 F.3d at 1018 (affirming district court decision to permit service by e-mail and by regular mail to the defendant's U.S. subsidiary and U.S. attorney); *U.S. Commodity Futures Trading Comm'n v. Aliaga*, 272 F.R.D. 617, 619 (S.D. Fla. 2011) (authorizing service by e-mail and through service on local counsel); *TracFone Wireless, Inc. v. Distelec Distribuciones Electronicas, S.A.,* 268 F.R.D. 687, 690 (S.D. Fla. 2010) (permitting plaintiff to serve defendant *via* Fed–Ex and hand-delivery to defendant's U.S. attorney); *Chanel, Inc. v. Zhixian,* No. 10–60585, 2010 WL 1740695, at *4 (S.D. Fla. Apr. 29, 2010) (authorizing service *via* e-mail and public announcement); *In re Potash Antitrust Litig.,* 667 F. Supp. 2d 907, 931 (N.D. Ill. 2009) (directing substituted service on U.S. attorneys retained by Russian defendants); *Brookshire Bros. Ltd. v. Chiquita Brands, Int'l,* No. 05–21962, 2007 WL 1577771, at *2 (S.D. Fla. May 31, 2007) (authorizing service on foreign defendants through local counsel).

The alternative method of service, however, must comport with constitutional notions due process. To meet this requirement, the alternative method of service "must be reasonably calculated, under all the circumstances, to apprise the interested parties of the pendency of the action and afford them an opportunity to present their objections." *Rio Props., Inc.,* 284 F.3d at 1016–17 (quoting *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950)) (internal quotation marks omitted).

In the case at bar, Plaintiff has performed diligent searches and identified the following e-mail addresses linked to Snorrason: bjornsnorrason@gmail.com; bjorn.snorrason@ibanera.com; bjorn@ibanera.com; bjorn@dalpay.com; and bsnorra@internet.is. [*See* Barroukh Decl., ECF No. 21 ¶ 4]. None of the e-mails recently sent to these addresses bounced back. [*Id.* ¶ 5]. Plaintiff thus seeks an order authorizing it to serve Snorrason at these e-mail addresses. Upon review, the Court finds that Plaintiff has provided sufficient assurance that Snorrason can be reached *via* these e-mail addresses. Moreover, Plaintiff has provided the Court with FedEx proofs of delivery of the summons and complaint to the post office in Iceland that services Snorrason's residence. [*See* ECF Nos. 19-2; 19-3]. So, that effort combined with e-mail service of process seems sufficient to the Court.

Additionally, the Court finds that service by e-mail is not, in this case, prohibited by international agreement. Iceland is a signatory to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, which does not prohibit service by e-mail. *See Weiss Ratings, LLC v. The Individuals, Business Entities & Unincorporated Ass'ns*, Case No. 22-cv-23242-BLOOM/Otazo-Reyes, 2022 WL 17324856, at *1 (S.D. Fla. Nov. 29, 2022) (granting leave to proceed by alternate service for defendant that appeared to be located in Iceland). Consequently, service by e-mail does not violate an international agreement in this case.

Finally, Plaintiff has made a sufficient showing that service upon Snorrason *via* multiple e-mail addresses is reasonably calculated to apprise Snorrason of the pendency of this action and afford him an opportunity to present his objections. Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1. The Motion [**ECF No. 20**] is **GRANTED IN PART.**

2. Pursuant to Rule 4(f)(3) of the Federal Rules of Civil Procedure, Plaintiff is permitted to serve the Summons, Complaint, and other relevant filings in this matter upon Defendant Bjorn Snorrason *via* e-mail to the following e-mail addresses: bjornsnorrason@gmail.com;

bjorn.snorrason@ibanera.com; bjorn@ibanera.com; bjorn@dalpay.com; and

bsnorra@internet.is. **within fourteen (14) days of the date of this Order**.

**DONE AND ORDERED** in the Southern District of Florida on December 4, 2025.

_____

DAVID S. LEIBOWITZ
UNITED STATES DISTRICT JUDGE

cc: counsel of record

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| JANE DOE | IBANERA LLC, MICHAEL CARBONARA, BJORN SNORRASON, DAVID PARR, et al. |

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Daniel J. Barroukh, Esq., Derek Smith Law Group, PLLC
520 Brickell Key Drive, Suite O-301, Miami, FL 33131
Tel. (305)946-1884

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY**    **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane    [ ] 365 Personal Injury - | [ ] 690 Other | [ ] 423 Withdrawal | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product      Product Liability | |      28 USC 157 | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument |      Liability    [ ] 367 Health Care/ | | **INTELLECTUAL** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment    & Enforcement of Judgment | [ ] 320 Assault, Libel &      Pharmaceutical      Slander      Personal Injury | | **PROPERTY RIGHTS** [ ] 820 Copyrights | [ ] 430 Banks and Banking [ ] 450 Commerce |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers'      Product Liability | | [ ] 830 Patent | [ ] 460 Deportation |
| [ ] 152 Recovery of Defaulted    Student Loans    (Excludes Veterans) |      Liability    [ ] 368 Asbestos Personal [ ] 340 Marine      Injury Product [ ] 345 Marine Product      Liability | | [ ] 835 Patent - Abbreviated      New Drug Application [ ] 840 Trademark | [ ] 470 Racketeer Influenced and      Corrupt Organizations [ ] 480 Consumer Credit |
| [ ] 153 Recovery of Overpayment    of Veteran's Benefits |      Liability    **PERSONAL PROPERTY** [ ] 350 Motor Vehicle    [ ] 370 Other Fraud | **LABOR** [ ] 710 Fair Labor Standards | [ ] 880 Defend Trade Secrets      Act of 2016 |      (15 USC 1681 or 1692) [ ] 485 Telephone Consumer |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle    [ ] 371 Truth in Lending      Product Liability |      Act | **SOCIAL SECURITY** |      Protection Act |
| [ ] 190 Other Contract | [ ] 360 Other Personal    [ ] 380 Other Personal | [ ] 720 Labor/Management | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability |      Injury      Property Damage |      Relations | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ |
| [ ] 196 Franchise | [ ] 362 Personal Injury -    [ ] 385 Property Damage      Medical Malpractice      Product Liability | [ ] 740 Railway Labor Act [ ] 751 Family and Medical | [ ] 863 DIWC/DIWW (405(g)) [ ] 864 SSID Title XVI |      Exchange [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS**    **PRISONER PETITIONS** |      Leave Act [ ] 790 Other Labor Litigation | [ ] 865 RSI (405(g)) | [ ] 891 Agricultural Acts [ ] 893 Environmental Matters |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights    **Habeas Corpus:** | [ ] 791 Employee Retirement | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information |
| [ ] 220 Foreclosure | [ ] 441 Voting    [ ] 463 Alien Detainee |      Income Security Act | [ ] 870 Taxes (U.S. Plaintiff |      Act |
| [ ] 230 Rent Lease & Ejectment | [x] 442 Employment    [ ] 510 Motions to Vacate | |      or Defendant) | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/      Sentence | | [ ] 871 IRS—Third Party | [ ] 899 Administrative Procedure |
| [ ] 245 Tort Product Liability |      Accommodations    [ ] 530 General | |      26 USC 7609 |      Act/Review or Appeal of |
| [ ] 290 All Other Real Property | [ ] 445 Amer. w/Disabilities -    [ ] 535 Death Penalty      Employment    **Other:** | **IMMIGRATION** | |      Agency Decision [ ] 950 Constitutionality of |
| | [ ] 446 Amer. w/Disabilities -    [ ] 540 Mandamus & Other      Other    [ ] 550 Civil Rights | [ ] 462 Naturalization Application [ ] 465 Other Immigration | |      State Statutes |
| | [ ] 448 Education    [ ] 555 Prison Condition |      Actions | | |
| |    [ ] 560 Civil Detainee -      Conditions of      Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C. 1591, 18 U.S.C 1594, 42 U.S.C. § 2000e
Brief description of cause:
Civil suit for TVPA violations, employment discrimination and retaliation, sexual assault and battery, and negligence.

## VII. REQUESTED IN COMPLAINT:
[ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| September 9, 2025 | /s/ Daniel Jordan Barroukh |

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**  **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   **(b)**  **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   **(c)**  **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**  **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
   United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
   United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
   Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
   Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**.** (See Section III below**; NOTE: federal question actions take precedence over diversity cases.)**

**III.**  **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**  **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: <u>Nature of Suit Code Descriptions</u>.

**V.**  **Origin.** Place an "X" in one of the seven boxes.
   Original Proceedings. (1) Cases which originate in the United States district courts.
   Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
   Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
   Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
   Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
   Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
   Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
   **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.**  **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.**  **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
   Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
   Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**  **Related Cases.** This section of the JS 44 is used to reference related cases, if any. If there are related cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

AO 440 (Endurskoðað 06/12) Stefna í einkamáli

# HÉRAÐSDÓMSTÓLL BANDARÍKJANNA

fyrir

Suðurhérað Flórída

| | |
|---|---|
| JANE DOE | ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |
| *Stefnandi* | ) |
| gegn | ) |
| IBANERA LLC, MICHAEL CARBONARA, | ) |
| BJORNSNORRASON, DAVID PARR, o.fl. | ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |
| *Varnaraðilar* | ) |

Einkamál nr. 1:25-cv-24118-DSL

## STEFNA Í EINKAMÁLI

Til: *(Nafn og heimilisfang varnaraðila)*      BJÖRN SNORRASON
c/o Michaels Carbonara
102 NE 2nd Street, Suite 112
Boca Raton, FL 33432

Málsókn hefur verið höfðuð gegn þér.

Innan 21 dags frá því að þessi stefna var afhent þér (að undanskildum þeim degi sem þú móttekur hana) — eða 60 daga ef þú ert bandarísk stofnun eða bandarískur embættismaður, eða starfsmaður eða fulltrúi Bandaríkjanna eins og lýst er í Fed. R. Civ. Bls. 12 (a)(2) eða (3) — verður þú að afhenda stefnanda svar við meðfylgjandi kæru eða beiðni samkvæmt 12. reglu alríkisreglna um einkamál. Svarið eða beiðnin skal afhent stefnanda eða lögmanni stefnanda, en nafn og heimilisfang hans eru:

Derek Smith Law Group, PLLC
c/o Daniel J. Barroukh, Esq.
520 Brickell Key Drive, Suite 0-301
Miami, FL 33.131

Ef þú svarar ekki verður dómur kveðinn upp gegn þér til að fá þá bætur sem krafist er í kærunni. Þú verður einnig að leggja fram svar þitt eða beiðni fyrir dómstólinn.

### KVAÐNING

Dagsetning:      09/10/2025

[innsigli:] UNITED STATES
DISTRICT COURT
SOUTHERN DISTRICT OF
FLORIDA
Angela E. Noble
Dómritari

*s/ Micky Quezada*
_____
Aðstoðarritari
Héraðsdómstólar Bandaríkjanna

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | | |
|---|---|---|
| JANE DOE | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Plaintiff(s)* | ) | |
| v. | ) | Civil Action No. 1:25-cv-24118-DSL |
| | ) | |
| IBANERA LLC, MICHAEL CARBONARA, | ) | |
| BJORNSNORRASON, DAVID PARR, et al. | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   BJORN SNORRASON
c/o Michael Carbonara
102 NE 2nd Street, Suite 112
Boca Raton, FL 33432

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Derek Smith Law Group, PLLC
c/o Daniel J. Barroukh, Esq.
520 Brickell Key Drive, Suite O-301
Miami, FL 33131

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

**SUMMONS**

Date:  _____09/10/2025_____

*s/ Micky Quezada*
_____
Deputy Clerk
U.S. District Courts

Angela E. Noble
Clerk of Court

Case 1:25-cv-24118-DSL   Document 23-1   Entered on FLSD Docket 12/04/2025   Page 11 of
135
Mál 1:25-cv-24118-XXXX Skjal 1 Skráð á dómsskrá Flórída 09/09/2025 Síða 1 af 62

## HÉRAÐSDÓMSTÓLL BANDARÍKJANNA
## SUÐURUMDÆMI FLÓRÍDA

JANE DOE,

        Ákærandi,

v.

IBANERA LLC,2
MICHAEL CARBONARA,
BJÖRN SNORRASON,
DAVÍÐ PARR,
MARRIOTT INTERNATIONAL, INC.,
STARWOOD HOTELS & RESORTS
MANAGEMENT COMPANY, LLC, og
STARWOOD HOTELS & RESORTS
WORLDWIDE, LLC,

        Ákærðu.

MÁLSNR.:

KVIÐDÓMSMEÐFERÐAR
KRAFIST

_____ /

### ÁKÆRA OG KRAFA UM KVIÐDÓM

Ákærandi, JANE DOE („stefnandi" og/eða „frú Doe"), leggur hér með fram áskanir, fyrir

milligöngu undirritaðs lögmanns síns á hina ákærðu IBANERA LLC („IBANERA" og/eða

„félagið"), MICHAEL CARBONARA („CARBONARA"), BJÖRN SNORRASON

(„SNORRASON"), DAVÍÐ PARR („PARR"), MARRIOTT INTERNATIONAL, INC.

(„Marriott"), STARWOOD HOTELS & RESORTS MANAGEMENT COMPANY, LLC

(„Starwood Management") og STARWOOD HOTELS & RESORTS WORLDWIDE, LLC

(„Starwood Worldwide") (stefndu Marriott, Starwood Management og Starwood Worldwide eru

hér eftir sameiginlega nefnd „stefndu fyrir hönd hótelsins") og heldur fram eftirfarandi á grundvelli

upplýsinga og trúar sinnar:

Case 1:25-cv-24118-DSL   Document 23-1   Entered on FLSD Docket 12/04/2025   Page 12 of
135
Mál 1:25-cv-24118-XXXX Skjal 1 Skráð á dómsskrá Flórída 09/09/2025 Síða 2 af 62

## **FORMÁLI**

1.    Þetta er sorglegt og hræðilegt mál sem varðar endurtekna nauðgun á Jane Doe af hálfu SNORRASONAR, sem lokkaði hana til Singapúr í yfirskini viðskiptafundar, þar sem hann nauðgaði, barði og misþyrmdi Jane Doe ítrekað dögum saman. Ennfremur er með þessari málshöfðun leitast við að draga alla stefndu til ábyrgðar fyrir þátttöku sína í þessum hræðilegu verknaði.

2.    Stefnandi Jane Doe höfðar mál þetta til heimtingar skaðabóta og allar aðrar viðeigandi bætur að mati dómstólsins, á grundvelli Trafficking Victims Protection Reauthorization Act, 18 USC §§ 1591 og 1595 („TVPA" eða „lög um mansal"), sem og á grundvelli skaðabótaréttar ríkisins fyrir líkamsárás, ofbeldi og tilfinningalega vanlíðan, og krefst skaðabóta til að bæta fyrir ólöglega hegðun stefndu sem brýtur gegn 1591. gr. Að auki er þessi málshöfðun miðuð við að bæta fyrir sviptingu persónulegrar reisnar og sjálfræðis stefnanda yfir eigin líkama.

3.    Stefnandi höfðar enn fremur mál þetta samkvæmt VII. kafla Civil Rights Act frá 1964, 42 USC § 2000e („VII. kafli"), Florida Civil Rights Act frá 1992 § 760.01, í lögum Flórída („FCRA") og öðrum hefðbundnum málvenjum og fordæmum.

4.    Stefnandi er fórnarlamb kynferðisofbeldis og er hér auðkennd sem Jane Doe. *Doe gegn Blue Cross & Blue Shield United of Wisc.,* 112 F.3d 869, 872 (7. umdæmi 1997) („uppspuni nöfn eru leyfð þegar nauðsyn krefur til að vernda friðhelgi ... fórnarlamba nauðgunar og annarra sérstaklega viðkvæmra aðila eða vitna"); Sjá einnig *Doe gegn Cabrera*, 307 FRD 1 (DDC 2014); *EEOC gegn Spoa, LLC*, 2013 US Dist. LEXIS 148145, 2013 WL 5634337, á *3 (D.Md. 2013); *Roe gegn St. Louis háskóla*, 2009 US Dist. LEXIS 27716, 2009 WL 910738, á *3-5 (ED Mo. 2009); *Doe nr. 2 gegn Kolko*, 242 FRD 193, 196 (EDNY 2006)); *Doe gegn Compact Info. Systems, Inc.*, 2015 US Dist. LEXIS 178930, 2015 WL 11022761 (ND Tex. 26. janúar 2015). Að auki hefur

Case 1:25-cv-24118-DSL Document 23-1 Entered on FLSD Docket 12/04/2025 Page 13 of
Mál 1:25-cv-24118-XXXX Skjal 1 Skráð á dómsskrá Flórída 09/09/2025 Síða 3 af 62
135

„varðar það yfirhöfuð almannheill að vernda persónuupplýsingar fórnarlamba kynferðisofbeldis svo að önnur fórnarlömb láti ekki aftra sér frá því að tilkynna slík brot." *Doe nr. 2 gegn Kolko,* 242 FRD 193, 195 (EDNY 2006); *sjá einnig Doe gegn Evans,* 202 FRD 173, 176 (ED Pa. 2001) (veiting nafnleyndar fórnarlambs kynferðisofbeldis); *Doe gegn Penzato*, nr. 10 Civ. 5154 (MEJ), 2011 WL 1833007, á *3 (ND Cal. 13. maí 2011).

## AÐILAR

5.     Stefnandi er kona sem vann fyrir stefnda í Flórída-ríki.

6.     Stefndi IBANERA LLC, er hlutafélag í Wyoming með takmarkaða ábyrgð, með aðalskrifstofu að 8850 W. Oakland Blvd., 201, Sunrise, Flórída 33351.

7.     Á viðeigandi tímabili var stefnandi ráðinn til að vinna fyrir IBANERA á skrifstofu þeirra í Miami sem og í fjarvinnu.

8.     Nákvæmur fjöldi starfsmanna IBANERA er óþekktur, en samkvæmt upplýsingum og trú eru þeir mun fleiri en lögbundið lágmark samkvæmt VII. kafla og FCRA.

9.     Á viðeigandi tímabili var IBANERA „vinnuveitandi" í skilningi 42 USC § 2000e(b).

10.    Á viðeigandi tímabili var stefnandi „starfsmaður" IBANERA í skilningi 42 USC § 2000e(f).

11.    Á viðeigandi tímabili var IBANERA „aðili" í skilningi § 760.02(6) í lögum Flórída og „vinnuveitandi" í skilningi § 760.02(7) í lögum Flórída.

12.    Stefndi, MARRIOTT INTERNATIONAL, INC. („Marriott") er Delaware hlutafélag sem starfar í hagnaðarskyni með höfuðstöðvar að 7750 Wisconsin Avenue, Bethesda, MD 20814.

13.    STARWOOD HOTELS & RESORTS MANAGEMENT COMPANY, LLC ("Starwood Management"), er Delaware hlutafélag sem starfar í hagnaðarskyni með höfuðstöðvar að 7750 Wisconsin Avenue, Bethesda, MD 20814.

14.     STARWOOD   HOTELS   &   RESORTS   WORLDWIDE,   LLC   ("Starwood Worldwide"), er Delaware hlutafélag sem starfar í hagnaðarskyni með höfuðstöðvar að 7750 Wisconsin Avenue, Bethesda, MD 20814.

15.     Stefndu fyrir hönd hótelsins stunda samfellda og kerfisbundna starfsemi í öllum ríkjum Bandaríkjanna, þar á meðal Flórída, auk margra landa um allan heim.

## LÖGSAGA OG DÓMÞING

16.     Þessi dómstóll hefur lögsögu yfir kröfunum sem hér eru lagðar fram samkvæmt 28 USC §§ 1331 og 1343, og viðbótarlögsögu þar að lútandi, þar sem þetta mál varðar alríkismál varðandi sviptingu réttinda stefnanda Doe samkvæmt 1591. gr. TVPA og VII. kafla.

17.     Þessi dómstóll hefur viðbótarlögsögu samkvæmt 28 USC 1367 yfir öllum málsástæðum ríkja.

18.     Dómþing skal vera fyrir þessum dómstóli samkvæmt 28 USC §1391 þar sem kynferðisofbeldið og tengd hegðun, sem brýtur gegn alríkislögum, var framin innan lögsögu héraðsdómstóls Bandaríkjanna fyrir suðurumdæmi Flórída. Stefndu voru staðsettir í þessu dómsumdæmi og verulegur hluti atvika eða athafnaleysis sem leiddu til þessa máls, þar á meðal ólögmætra starfshátta sem hér eru fullyrt að áttu sér stað, áttu sér stað í þessu umdæmi.

## STJÓRNSÝSLUFORSENDUR

19.     Stefnandi hefur uppfyllt allar stjórnsýslulegar kröfur til að höfða mál þetta.

20.     Þann 5. desember 2024 eða þar um bil lagði stefnandi fram tvöfalda kæru um mismunun (kærunúmer 510-2025-02389) gegn stefnda bæði hjá U.S. Equal Employment Opportunity Commission (Jafnréttisnefnd atvinnumála í Bandaríkjunum („EEOC")) og Florida Commission on Human Relations (Mannréttindarnefnd Flórída („FCHR")).

21.     Þann 11. júní 2025 eða þar um bil sendi EEOC út tilkynningu stefnanda um rétt til að

Case 1:25-cv-24118-DSL   Document 23-1   Entered on FLSD Docket 12/04/2025   Page 15 of
Mál 1:25-cv-24118-XXXX Skjal 1 Skráð á dómsskrá Florida 09/09/2025 Síða 5 af 62
135

höfða mál gegn stefnda.

22.   Stefnandi höfðar mál sitt innan níutíu (90) daga frá móttöku tilkynningar EEOC um

rétt til að höfða mál.

23.   Stefnandi höfðar mál þetta tímanlega meira en eitt hundrað áttatíu (180) dögum eftir

að kæra hennar um mismunun var lögð fram.

24.   Þann 5. desember 2024 eða þar um bil lagði stefnandi fram kvörtun til Maryland

Commission on Civil Rights gegn stefndu hótelsins sem var lögð fram innan frests.

## STAÐREYNDAR SEM HALDIÐ ER FRAM

25.   Stefnandi var á viðeigandi tímabili kvennmaður og því verndaður aðili.

26.   CARBONARA var á viðeigandi tímabili karlmaður og starfaði hjá IBANERA sem

forstjóri og eigandi. CARBONARA hafði á viðeigandi tímabili eftirlitsvald yfir stefnanda, þar á

meðal vald til að ráða, reka, lækka eða hækka stefnanda í starfi.

27.   SNORRASON var á viðeigandi tímabili karlmaður og starfaði hjá IBANERA sem

eigandi. SNORRASON hafði á viðeigandi tímabili eftirlitsvald yfir stefnanda, þar á meðal vald til

að ráða, reka, lækka eða hækka stefnanda í starfi.

28.   David PARR var á viðeigandi tímabili karlmaður og starfaði hjá IBANERA sem

eigandi. David PARR hafði á viðeigandi tímabili eftirlitsvald yfir stefnanda, þar á meðal vald til

að ráða, reka, lækka eða hækka stefnanda í starfi.

## STEFNANDI HEFUR VIÐSKIPTASAMBAND SITT VIÐ IBANERA

29.   Um árið 2021 eða þar um bil varð stefnandi fyrst var við IBANERA þegar hún notaði

ráðgjafarþjónustu þess til að þróa greiðsluforrit fyrir korta-í-rafmynt greiðslumiðlun.

30.   IBANERA býður upp á vettvang sem einfaldar alþjóðlegar greiðslur og reglufylgni

fyrir fyrirtæki, með þeim aukna möguleika að meðhöndla bæði hefðbundin og dreifð fjármálakerfi.

31. Til að vera skýr, þá var stefnandi viðskiptavinur IBANERA og fjárfesti um það bil $300.000 hjá fyrirtækinu á tveimur (2) árum til að þróa verkefni sín.

32. Stefnandi vann með IBANERA að því að búa til markaðshæft forrit („forritið") sem gat unnið úr miklu magni af rafmyntafærslum og samþykkti sameiginlega að skipta öllum þóknunum frá forritinu.

33. Þar sem stefnandi vann með IBANERA við þróun forrits hennar, sáu stjórnendur IBANERA að hún hafði yfirgripsmikla þekkingu á þessu sviði og buðu henni starf hjá fyrirtækinu.

34. Í eða um september 2021 réð IBANERA stefnanda til að vinna fyrir fyrirtækið.

35. Stefnandi heldur því fram til vara að hún hafi verið sjálfstæður verktaki.

36. Í eða um september 2021 hóf stefnandi að vinna með CARBONARA og PARR, tveimur af þremur eigendum IBANERA.

37. Stefnandi hitti ekki SNORRASON, þriðja og síðasta eiganda IBANERA, fyrr en nokkrum árum eftir að hafa átt viðskipti við og unnið fyrir IBANERA.

38. SNORRASON, CARBONARA og PARR eru eigendur, umboðsmenn, stjórnendur og umboðsmenn margra fyrirtækja, félaga og aðila sem stefnandi vann fyrir.

39. Á viðeigandi tímabili krafðist IBANERA reglulega þess að stefnandi flýgi til Miami í Flórída til að vinna fyrir IBANERA innan Bandaríkjanna.

40. SNORRASON, CARBONARA og PARR greiddu stefnanda með þóknun, ferðum, viðburðarhaldi og framtíðarviðskiptum við IBANERA.

41. Í byrjun árs 2024 eða þar um bil vann stefnandi umfangsmikið starf fyrir IBANERA auk þess að gera verulegar framfarir í forriti sínu.

42. Í eða um mars 2024 flaug IBANERA með stefnanda til San Francisco á ráðstefnu leikjaframleiðanda til að vera fulltrúi IBANERA. IBANERA greiddi stefnanda ferðakostnað og

gistingu og IBANERA bað stefnanda um að eiga samskipti við viðskiptavini sína og hugsanlega viðskiptavini sem fulltrúi fyrirtækisins.

43.   Stefnandi stóð sig ávalt vel í starfi sínu fyrir IBANERA.

44.   Í eða um mars 2024 gaf IBANERA stefnanda fyrirtækisnetfang, nafnspjöld og undirskriftarmát, úthlutaði stefnanda tveimur (2) aðstoðarmönnum, upplýsti aðra starfsmenn fyrirtækisins um að hún væri nú viðskiptavinur og starfsmaður, veitti henni aðgang að vefgáttum fyrirtækisins og setti þóknunarkerfi og laun fyrir stefnanda.

45.   Í eða um júlí 2024 hækkaði IBANERA stefnanda í stöðu viðskiptavina- og árangursstjóra og veitti henni laun.

46.   Hins vegar, þegar stefnandi tók að sér þetta víðtækara hlutverk fyrir IBANERA, fóru hlutirnir að breytast til hins verra.

47.   Óvænt tilkynnti IBANERA stefnanda að þeir þyrftu að stöðva alla vinnu við forrit hennar og loka því tímabundið.

48.   Stefnandi var gáttaður því hann hafði eytt árum í að þróa forritið með fyrirtækinu og fjárfest hundruð þúsunda dollara í verkefnið, og allar mælikvarðar bentu til þess að forritið væri næstum fullgert.

49.   Forrit stefnanda hefur lokið öllum prófunarstigum og hafði miðlað á réttan hátt tugþúsundum dollara á þeim tímapunkti.

50.   Eftir að IBANERA stöðvaði vinnu við forrit stefnanda fór félagið að greiða stefnanda í ósamræmi þær greiðslur sem henni bar, vanrækti að greiða gjaldfallnar greiðslur og greiddi stefnanda lægri upphæðir en samið var um.

51.   Í byrjun september 2024 eða þar um ræddi stefnandi gremju sína gagnvart PARR. PARR sagði að nauðsynlegt væri að stefnandi færi til Singapúr í viðskiptaferð til að sækja

Case 1:25-cv-24118-DSL   Document 23-1   Entered on FLSD Docket 12/04/2025   Page 18 of
135
Mál 1:25-cv-24118-XXXX Skjal 1 Skráð á dómsskrá Florida 09/09/2025 Síða 8 af 62

rafmyntarráðstefnuna TOKEN2024.

52.    Stefnandi var hikandi við að fljúga til Singapúr, en PARR hélt því fram að IBANERA þyrfti á því að halda að hún færi til Singapúr til að hitta SNORRASON og halda viðskiptafundi til að skemmta núverandi og hugsanlegum viðskiptavinum.

53.    PARR staðfesti að stefnandi fengi greiðslu fyrir þessa viðskiptaferð og endurgreiddan allan kostnað sem hann hefði orðið fyrir.

54.    PARR keypti einnig flugmiða stefnanda til Singapúr til að tryggja að hann gæti sótt ráðstefnuna.

55.    Stefnandi hafði samband við CARBONARA til að spyrja hvort hann gæti fengið greitt fyrir brottför til Singapúr, sem hann samþykkti. Hins vegar fékk stefnandi aldrei þessa greiðslu.

56.    Nokkrum dögum áður en IBANERA sendi stefnanda til Singapúr kynnti PARR stefnanda og SNORRASON rafrænt í gegnum símtal og PARR sagði í síma: „Björn, þetta er kynþokkafyllsti, fróðasti og mest háklassa einstaklingurinn *sem ég get sent þér* í þessa ferð.“

57.    Stefnandinn varð órólegur yfir þessari óviðeigandi athugasemd en ákvað að hunsa hana.

### IBANERA SELDI STEFNANDA TIL SINGAPÚR

58.    Um eða í kringum 14. september 2024 flaug stefnandi til Singapúr.

59.    PARR sagði stefnanda að hann hefði bókað herbergi fyrir hann á Sheraton Towers í Singapúr, sem er staðsett á 39 Scotts RD, Singapúr 228230 (hér eftir nefnt „Sheraton“).

60.    Sheraton hótelið er í eigu og/eða rekið af stefndu fyrir hönd hótelsins.

61.    Við komuna á Sheraton reyndi stefnandi að innrita sig á hótelið, en starfsmaðurinn í móttökunni upplýsti hana um að ekki hefði verið greitt fyrir herbergið. Stefnandi hringdi í PARR, sem síðan fyrirskipaði honum að hringja í SNORRASON til að biðja um aðstoð.

Case 1:25-cv-24118-DSL   Document 23-1   Entered on FLSD Docket 12/04/2025   Page 19 of
135
Mál 1:25-cv-24118-XXXX Skjal 1 Skráð á dómsskrá Florída 09/09/2025 Síða 9 af 62

62. Skömmu síðar birtist SNORRASON í afgreiðslunni. Stefnandi var undrandi á vexti SNORRASONAR, þar sem hann var mjög hávaxinn og vöðvastæltur.

63. Það allra fyrsta sem SNORRASON sagði við stefnanda var að „[PARR] sagði mér að hann væri að senda kynþokkafyllsta starfsmanninn til Singapúr *fyrir mig* og hann var ekki að ljúga.“

64. Stefnandi fékk ógeðstilfinningu, þar sem hún hafði nýlega hitt SNORRASON sem átti að aðstoða hana við að skrá sig inn á hótelherbergi sitt. Stefnandi varð pirruð yfir því að þetta væri í annað sinn sem eigandi IBANERA væri að kyngera útlit hennar og henni fannst athugasemdirnar óþægilegar.

65. Á meðan stefnandi og SNORRASON töluðu við starfsmanninn í móttökunni á meðan þeir skráðu stefnanda inn í herbergið, sagði SNORRASON við stefnanda: „Þú ert líka með fallegan rass, þú ættir að gista í herberginu mínu.“

66. Aftur fannst stefnanda óþægilegt að heyra að yfirmaður hennar, eigandi IBANERA, væri að reyna við hana og áreita hana kynferðislega.

67. Engu að síður reyndi stefnandi sitt besta til að hunsa hin óvelkomnu kynni og einbeita sér að komandi viðskiptafundum.

68. Stefnandi greiddi fyrir sitt eigið herbergi þar sem hún neitaði að deila rúmi með SNORRASYNI, þrátt fyrir umleitun hans.

69. Seinna um kvöldið kom stefnandi í það sem hún hélt að yrði hefðbundinn viðskiptakvöldverður. Stefnandi, SNORRASON, viðskiptavinurinn, William Low („William“), og eiginkona Williams og þrjú börn voru viðstödd hina ríkulegu tólf rétta máltíð.

70. Meðan á máltíðinni stóð kynnti SNORRASON stefnanda fyrir William sem „fullnustuaðilanum“ sem myndi koma fyrirtækinu í lag bæði í Singapúr og Bandaríkjunum.

71.     Eftir að máltíðinni lauk fóru eiginkona viðskiptavinarins og börn hans og SNORRASON sagði að hann og William þyrftu að bjóða stefnanda „almennilega velkominn á singapúrskan hátt" í teymi fyrirtækisins í Singapúr.

72.     SNORRASON fór með stefnanda á nektardansklúbb/vændishús þar sem aðrir starfsmenn fyrirtækisins biðu þeirra. Eftir að hafa gengið inn á nektardansklúbbinn greip SNORRASON í hönd stefnanda og hélt í hana á meðan hann kynnti stefnanda fyrir teymi IBANERA í Singapúr sem „kærustu" sína. Í Singapúr teyminu voru Tuck [Last Name Unknown], Chan [Last Name Unknown] og Johnson [Last Name Unknown].

73.     Stefnandi reyndi að losa sig en SNORRASON kreisti hönd hennar og dró hana nær sér. Stefnandi var í áfalli og óttaðist um velferð sína þar sem hún var einangruð í erlendu landi með eiganda fyrirtækisins sem hafði skýran ásetning: SNORRASON vildi eiga í kynferðislegu sambandi við stefnanda.

74.     Meðan stefnandi var á nektardansstaðnum pantaði SNORRASON endalausar flöskur af áfengi og krafðist þess sérstaklega að stefnandi drykki. SNORRASON pantaði tvær flöskur af kampavíni og sagði stefnanda að hún þyrfti að taka eina. Stefnandi, sem hafði grun um áform SNORRASONAR, gætti þess að drekka vatn og takmarka áfengisneyslu sína.

75.     Í lok kvöldsins var SNORRASON orðinn mjög ölvaður og kvartaði við teymið yfir því hvernig Japman Kharbanda („Japman"), starfsmaður IBANERA, sakaði hann um að reyna að sofa hjá henni. SNORRASON útskýrði fyrir öllu teyminu að Japman hefði verið flogið til Singapúr vegna vinnu og að hún hefði ásakað hann um kynferðisbrot, sem IBANERA hafði áður verið tilkynnt um.

76.     SNORRASON hélt áfram og sagði að hann myndi aldrei sofa hjá Japman vegna þess að „hún væri ljót, feit tík" en hélt því fram að hann hefði komið með stefnanda til Singapúr vegna

þess að hún „væri með falleg brjóst".

77.    Stefnandi fylltist kvíða og ótta þegar hún áttaði sig á því að hún væri ekki lengur örugg.

78.    Skömmu síðar greip SNORRASON um andlit stefnanda og kyssti hana af krafti á varirnar áður en hann sagði: „Þú verður hin fullkomna vinnukærasta mín."

79.    Stefnandi dró sig frá SNORRASYNI er hann reyndi að halda áfram að kyssa hana og útskýrði að hún bæri engar tilfinningar til hans og væri ekki fylgdarkona, heldur fagmaður sem væri einfaldlega að reyna að gegna starfi sínu. SNORRASON sagði að það myndi sjá um stefnanda það sem eftir væri ævinnar og að hann myndi eignast „víkingabörn" með stefnanda.

80.    SNORRASON ræddi ítarlega að ljóst hár og blá augu stefnanda sýndu fram á erfðafræðilega yfirburði hennar og gerðu hana fullkomna til að eignast börn með.

81.    Stefnandi var í áfalli og fannst hún ekki geta farið á öruggan hátt af fúsum og frjálsum vilja. Einnig aftraði það stefnanda að IBANERA hafði hvorki greitt henni fyrir vinnu hennar á ráðstefnunni né endurgreitt henni fyrir hótelherbergið. SNORRASON var mjög ölvaður og stefnandi vissi ekki hvernig hann myndi bregðast við ef hún færi eða hvort hann myndi verða ofbeldisfullur við hana.

82.    Þegar SNORRASON kom aftur á Sheraton um klukkan 5:00 að morgni lokkaði hann stefnanda inn á hótel sitt. SNORRASON sagði stefnanda að hann þyrfti aðstoð hennar við að finna og gefa honum hjartalyf. Stefnanda, sem fannst hún vera föst og varnarlaus í erlendu landi, varð við kröfum hans. SNORRASON fór með stefnanda inn á hótelherbergi sitt þar sem hún fann hjartalyfið og gaf honum það.

83.    Þegar stefnandi undirbjó sig til að yfirgefa herbergið sárbændi SNORRASON hana um að hafa kynmök við sig. Stefnandi, fann til viðbjóðs og fylltist andstyggð vegna framkomu SNORRASONAR og neitaði. SNORRASON hélt áfram að biðja stefnanda um að vera um kyrrt

Case 1:25-cv-24118-DSL   Document 23-1   Entered on FLSD Docket 12/04/2025   Page 22 of
135
Mál 1:25-cv-24118-XXXX Skjal 1 Skráð á dómsskrá Florida 09/09/2025 Síða 12 af 62

og bað hana um að gista yfir nóttina jafnvel þótt hann gæti ekki stundað kynlíf með henni.

84.     Stefnandi fann fyrir mikilli óþægindum en hún óttaðist um öryggi sitt og hafði áhyggjur af fjárhagsstöðu sinni og gisti því í herbergi SNORRASONAR. Stefnandi svaf fullklædd, setti upp röð af koddum til að aðskilja sig frá yfirmanni sínum og fór áður en SNORRASON vaknaði.

85.     Fram að þessum tímapunkti hafði stefnandi þekkt SNORRASON í innan við sólarhring.

86.     Daginn eftir, þann 15. september 2024 eða þar um bil, svaf SNORRASON fram eftir en tilkynnti stefnanda að hann ætlaði að fara með hana í viðskiptakvöldverð það kvöld.

87.     Þegar stefnandi kom á veitingastaðinn til kvöldverðar komst hún að því að „viðskiptafundurinn" var einfaldlega kvöldverður SNORRASONAR og hennar sjálfrar – engir væntanlegir eða virkir viðskiptavinir voru viðstaddir.

88.     Við kvöldmatinn stærði SNORRASON sig af hinum ýmsu „barnsmæðrum" sínum við stefnanda og spurði hana út í fyrri ástarsambönd hennar. SNORRASON pantaði marga áfenga drykki handa sjálfum sér og þrýsti á stefnanda að drekka áfengi, sem hún takmarkaði við einn drykk með kvöldmatnum.

89.     Eftir kvöldmat krafðist SNORRASON þess að fá stefnanda í drykki og varð hann æ ölvaðri eftir því sem leið á kvöldið. SNORRASON hélt áfram að gera óviðeigandi athugasemdir við stefnanda um erfðafræðilega eiginleika hennar, löngun hans til að eignast börn með henni og að hafa hana sem kærustu.

90.     Stefnandi var í losti yfir þessum athugasemdum en taldi að besta leiðin til að komast heilu og höldnu heim úr vinnuferðinni væri að halda sig til hlés, hafna öllum kynferðislegum nálgunum og einbeita sér að viðskiptaþætti ferðarinnar.

91.     SNORRASON krafðist þess enn fremur að stefnandi tæki myndir með sér og brosti og

útskýrði að hann þyrfti að „senda góða mynd til [PARR]".

92.     Annað kvöldið í röð bað SNORRASON stefnanda um að koma aftur upp á herbergi sitt og gefa sér lyfin sín. Stefnandi hlýddi fyrirmælunum en eftir að hafa gefið SNORRASON lyfin sín fór hann aftur að biðja stefnanda um að stunda með sér kynlíf.

93.     Líkt og kvöldið áður hafnaði stefnandi beiðni SNORRASONAR en lagðist í rúmið fullklædd, lagði kodda í mitt rúmið og fór áður en hann vaknaði.

94.     Þann 16. september 2024 eða þar um bil eyddi stefnandi megninu af deginum í að reyna að vinna, þrátt fyrir stöðugar kröfur SNORRASONAR um að hún væri með honum og að þau eyddu tíma saman.

95.     Síðar sama dag tilkynnti SNORRASON henni að þau myndu halda fund með viðskiptavinum um kvöldið.

96.     Á fundinum með viðskiptavinunum greip SNORRASON í hönd stefnanda þegar hann gekk inn á fundinn. Stefnandi var niðurlægð þegar hún ætlaði að kynna sig sem fagmann hjá IBANERA, en SNORRASON kynnti stefnanda sem kærustu sína og útskýrði að hún gæti gert hvað sem hún vildi hjá fyrirtækinu þar sem hún væri að sofa hjá honum. SNORRASON hélt áfram að segja að þar sem hann væri „aðal maðurinn" hjá IBANERA myndi stefnandi fá hvað sem hún vildi.

97.     Sú nótt var mjög svipuð fyrri nóttum, þar sem hún endaði með því að stefnandi var tekinn út að fá sér drykk og neydd til að sofa í rúmi SNORRASONAR. Aftur neitaði stefnandi að stunda kynlíf með SNORRASYNI, lagðist í rúmið hans fullklædd aðskilin frá honum með koddda á milli og fór eins fljótt og hún gat.

### KYNFERÐISLEG MISNOTKUN SNORRASONAR Á STEFNANDA MAGNAST

98.     Þann 17. september 2024 eða þar um bil laumaðist stefnandi út úr herbergi SNORRASONAR snemma í þeirri trú að hún yrði óhult, en hún vissi ekki að hún myndi upplifa

verstu nótt lífs síns.

99.    Allan daginn leiddi SNORRASON stefnanda um með hendinni í gegnum ráðstefnuna, fyrir framan viðskiptavini og teymi IBANERA í Singapúr.

100.    SNORRASON reyndi að veita stefnanda vín á fundum með viðskiptavinum. Stefnandi gerði sitt besta til að afþakka drykkina en SNORRASON sagði henni að hann vildi að hún héldi áfram að drekka. Stefnandi drakk um það bil tvö (2) glös af víni yfir daginn með mat, en þá tilkynnti SNORRASON henni að hann myndi fara með hana á annan bar með viðskiptavini að nafni John Williams („John“).

101.    Söluaðstoðarmaður stefnanda, Daniel Baron („Daniel“), kom einnig til Singapúr þetta kvöld og fór út með SNORRASON og stefnanda.

102.    SNORRASON fór með stefnanda og Daníel á hverfiskrá í Clarke Quay í Singapúr. Hverfiskráin var dimm og full af reyk, með háværri tónlist.

103.    SNORRASON bað stefnanda að bjóða John á barinn.

104.    Auk tveggja (2) vínglasa sem stefnandi drakk yfir daginn, drakk hún einn (1) einfaldan drykk það kvöld.

105.    SNORRASON færði síðan stefnanda annan drykk. Þegar stefnandi tók sopa af seinni drykknum við barinn vissi hún að einhverju var mjög misfarið. Stefnanda leið skyndilega virkilega illa.

106.    Samkvæmt upplýsingum og eigin trú hafði SNORRASON sett nauðgunarlyf í annan drykk kvöldsins.

107.    SNORRASON fór að neyta meira og meira áfengis og hann varð æ pirrari yfir því að stefnandi væri að tala við John en ekki hann. SNORRASON byrjaði að hunsa hópinn sem þau komu með og gekk að lokum að stefnanda, greip hana að aftan og setti typpið upp að rassinum á

14

henni. SNORRASON hvíslaði í eyra stefnanda: „Ég kom ekki með þig hingað til að daðra við fjandans viðskiptavininn. Ég vil eitthvað sem enginn annar getur fengið.“

108.   SNORRASON fór út í fússi og John spurði stefnanda hvort hún væri í lagi. Stefnandi lýsti því að henni liði ekki vel og því fór John með hana út í frískt loft. Meðan þau voru úti brotnaði stefnandi niður og sagði John frá ógeðfelldri hegðun SNORRASONAR í ferðinni.

109. Í þessu samtali við John varð sjón stefnanda óskýr og hún fékk heyrnarerfiðleika. SNORRASON kom að stefnanda og John. John bauðst til að koma stefnanda á hótelherbergi þar sem hún væri örugg, en SNORRASON krafðist þess að stefnandi kæmi tafarlaust með sér á barinn.

110. SNORRASON var greinilega ölvaður og stefnandi var mjög hrædd við hann, sérstaklega í slíku veikburða ástandi þar sem hún gat varla haldið sér uppréttri, séð eða heyrt. Stefnandi íhugaði tillögu Johns en hafði áhyggjur af því hvað myndi gerast ef John, maður sem hún hafði þekkt í minna en 12 klukkustundir, væri á einhvern hátt verri en SNORRASON.

111. Eftir að SNORRASON dró stefnanda aftur inn í barinn áttaði hún sig á því að hún hafði ekki stjórn á líkama sínum vegna lyfsins sem SNORRASON hafði sett í drykk hennar. Stefnandi hrasaði og staulaðist upp á barstól þar sem hún gat varla séð eða heyrt og fékk síðan hræðilegan höfuðverk.

112.   Stefnandi bað aðstoðarmann sinn, Daniel, um að fara með hana aftur á hótelið þar sem hún hafði ekki stjórn á líkama sínum. Daniel var sammála en þegar hann aðstoðaði stefnanda að útihurðinni stóð SNORRASON upp, kreisti handlegg stefnanda og kippti henni að sér og sagði öllum að stefnandi myndi ekki fara án hans. John stóð upp og varaði SNORRASON við: „Ekki snerta hana á þennan hátt.“ Daniel reyndi einnig að grípa inn í til að aðstoða stefnanda.

113.   Annar viðskiptavinur á barnum, bresk kona, varð vitni að því að verið var að draga stefnanda í þrjár mismunandi áttir af þremur mismunandi mönnum, Daniel, John og

Case 1:25-cv-24118-DSL   Document 23-1   Entered on FLSD Docket 12/04/2025   Page 26 of
135
Mál 1:25-cv-24118-XXXX Skjal 1 Skráð á dómsskrá Florída 09/09/2025 Síða 16 af 62

SNORRASYNI. Þessari konu tókst að bola SNORRASYNI í burtu og fylgja stefnanda í leigubíl

með John og Daniel.

114.   Stefnandi sneri aftur á Sheraton hótelið og tímabundin hömlun hennar, blindni og

heyrnarleysi, jukust. Þegar stefnandi kom inn á hótelið hrópaði hún á hjálp. Hótelstjórinn og

starfsmenn Sheraton-hótelsins leiðbeindu stefnanda inn á herbergi hennar til að aðstoða hana við

bata.

115.   Skömmu síðar, að starfsfólki Sheraton-hótelsins viðstöddum, kom SNORRASON upp

á herbergi hennar og fullyrti ranglega að hann væri kærasti stefnanda, að stefnandi væri einfaldlega

ölvuð og að starfsmenn hótelsins ættu að fara svo að hann gæti annast hana. Stefnandi öskraði af

ótta og sárbændi starfsmenn Sheraton um að hleypa SNORRASYNI ekki inn á herbergi sitt þar

sem hann hafði gefið henni lyf. Starfsmenn Sheraton hundsuðu skyldur sínar gagnvart stefnanda

og leyfðu SNORRASYNI að fara inn á herbergið. Starfsmenn Sheraton lögðu til að kallað yrði á

sjúkraflutningamenn.

116.   SNORRASON hvíslaði í eyra stefnanda: „Þú ert með ranghugmyndir, þú vilt ekki að

sjúkraflutningamenn komi, ég læt þá senda þig á geðsjúkrahús.“ Stefnandi var skelfingu lostin.

Stefnandi hélt áfram að öskra á hjálp og sagðist ekki vita hver SNORRASON væri, þau væru ekki

í ástarsambandi, SNORRASON væri hættulegur og að hún gæti ekki verið ein með honum.

SNORRASON varð enn svekktari áður en hann hrópaði: „Þú ert með ranghugmyndir, ég elska

þig,“ fyrir framan starfsmenn Sheraton.

117.   Hótelstjórinn hringdi í sjúkraflutningamenn sem komu þegar í stað og mældu

áfengismagn í blóði stefnanda (Blood Alcohol Content, „BAC“). SNORRASON sagði

starfsmönnum hótelsins og sjúkraflutningamönnum að stefnandi væri einfaldlega ölvuð og að þeir

gætu farið.

Case 1:25-cv-24118-DSL   Document 23-1   Entered on FLSD Docket 12/04/2025   Page 27 of
135
Mál 1:25-cv-24118-XXXX Skjal 1 Skráð á dómsskrá Florida 09/09/2025 Síða 17 af 62

118.   Sjúkraflutningamennirnir létu stefnanda blása til að mæla áfengi í blóði, sem sannaði að SNORRASON var að ljúga, þar sem BAC mang í blóði hennar var næstum 0,00, sem benti til þess að nánast ekkert áfengi væri til staðar í líkama hennar. Sjúkraflutningamennirnir stungu síðan í fingur stefnanda og prófuðu blóð hennar fyrir lyfjum. Stefnandi drakk vatn að ráðleggingum sjúkraflutningamanna, sem töldu að hún væri að fá kvíðakast vegna astma og biðu eftir niðurstöðum rannsóknarinnar.

119.   Sjúkraflutningamennirnir báðu stefnanda um að koma á sjúkrahúsið en hún sagðist ekki vera með peninga og að hún hefði ekki efni á læknisaðstoð.

120.   SNORRASON tilkynnti sjúkraflutningamönnum og hótelstjórnendum að hann myndi vaka yfir henni á meðan hún hvíldi sig til að tryggja öryggi hennar. Stefnandi mótmælti aftur og sagði starfsmönnum Sheraton að þau væru ekki par og hún gæti ekki verið ein með honum. Þrátt fyrir að vera sárbeiðnir skildu starfsmenn Sheraton SNORRASON eftir einan með stefnanda inni á herbergi hennar í stað þess að vernda hana.

121.   Starfsmenn Sheraton brást því við að vernda stefnanda og veitti SNORRASYNI í raun ótakmarkaðan aðgang að stefnanda á hótelherbergi stefnanda.

122.   Starfsmenn Sheraton, sem skildu stefnanda eftir eina með SNORRASYNI, vissi eða hefði átt að vita að líkur væru á að stefnandi myndi hljóta tjón af því að vera ein með SNORRASYNI, eftir að hún bað þá um að skilja hana ekki eftir eina með SNORRASYNI, að hún þekkti SNORRASON ekki og að hann væri hættulegur.

123.   Starfsmenn Sheraton fór vísvitandi úr herbergi stefnanda á meðan hún var ein með SNORRASYNI þrátt fyrir beiðnir og mótmæli stefnanda.

124.   Kærandi varð mjög syfjuð og fór að dotta út.

125.   Þetta var eina nóttin sem stefnandi eyddi í herbergi sínu í ferðinni til Singapúr.

## SNORRASON LEMUR OG NAUÐGAR STEFNANDA

126.   Um morguninn 18. september 2024 vaknaði stefnandi við það sem henni fannst vera eins og hræðileg martröð.

127.   Stefnandi sneri höfðinu til hliðar og sá SNORRASON liggja nakinn við hliðina á sér.

128.   Stefnandi leit niður og áttaði sig á því að þótt hún hefði farið að sofa fullklædd var hún alveg nakin og líkami hennar var allur þakinn marblettum. Hér að neðan er ljósmynd af nokkrum af þessum marblettum.

[Rými vísvitandi skilið eftir autt]



129.   Brjóst, rasskinnar og leggöng stefnanda voru mjög aum og sár. Stefnandi átti erfitt með

að standa upp, ganga eða koma sér fyrir án þess að finna fyrir miklum óþægindum.

130.   Stefnandi viðurkenndi sér til ama að SNORRASON hefði nauðgað henni.

131.   SNORRASON nauðgaði stefnanda á meðan hún var sofandi og að jafna sig eftir

nauðgunarlyf sem hann kom inn í líkama hennar.

132.   Stefnandi fór inn á baðherbergið til að þvo sér og flýja frá SNORRASYNI, en þegar

hún kom út, var hann farinn og hafði tekið einn af herbergislyklunum hennar.

133.   Kærandi, sem var agndofa yfir áfallinu og fór ekki á fætur það sem eftir var dags.

SNORRASON kom tvisvar sinnum inn á herbergi stefnanda til að athuga með stefnanda en hún

Case 1:25-cv-24118-DSL   Document 23-1   Entered on FLSD Docket 12/04/2025   Page 30 of
135
Mál 1:25-cv-24118-XXXX Skjal 1 Skráð ádómsskrá Florída 09/09/2025 Síða 20 af 62

svaraði honum ekki.

134.  SNORRASON kom inn í herbergi hennar enn einu sinni og sagði henni að hann hefði sagt PARR og CARBONARA að hún væri orðin mjög veik. SNORRASON sagði henni enn fremur að láta samstarfsmenn sína vita að hún hefði fengið matareitrun og fresta fundunum sínum.

135.  Þann 19. september 2024 eða þar um bil sendi stefnandi móður sinni og bestu vinkonu skilaboð til að láta þær vita hvað SNORRASON hafði gert henni.

136.  Stefnandi var einbeittur að því að komast heim og flug hennar frá Singapúr var á áætlun næsta dag. Stefnandi hélt áfram að segja við sjálfa sig að hún þyrfti aðeins að halda út í einn dag í viðbót áður en þessari eilífu martröð yrði lokið.

137.  Hins vegar sagði SNORRASON stefnanda að hann hefði ákveðið að framlengja ferð hennar vegna þess að hún hefði misst af viðskiptafundum sínum daginn áður og því þyrfti hún að vera lengur.

138.  SNORRASON lét enn fremur ítrekað ógeðslegar og brenglaðar athugasemdir falla við stefnanda: „**Ætlarðu síðan að halda barninu? Þú ert örugglega ólétt.**" SNORRASON reyndi ekki einu sinni að fela þá staðreynd að hann nauðgaði stefnanda meðvitundarlausri.

139.  Stefnandi var mjög hrædd um að SNORRASON myndi meiða hana, kannski drepa hana, ef hún reyndi að fara, svo hún varð við kröfum hans næstu daga.

140.  Nóttina 19. september 2024 skildi SNORRASON stefnanda eftir eina og sagði henni að hún „líti ógeðslega illa út".

141.  Þar sem stefnandi hafði ekki gert ráð fyrir að framlengja ferð sína, var herbergi hennar ekki bókað og þurfti hún að leita að öðru herbergi.

142.  Á meðan hún var að reyna að bóka annað herbergi á Sheraton, krafðist SNORRASON þess að hún bókaði ekki herbergi fyrir sjálfa sig, heldur yrði hún að gista í herbergi hans.

Case 1:25-cv-24118-DSL Document 23-1 Entered on FLSD Docket 12/04/2025 Page 31 of
135
Mál 1:25-cv-24118-XXXX Skjal 1 Skráð á dómsskrá Florida 09/09/2025 Síða 21 af 62

143. Meðan stefnandi dvaldi í herbergi SNORRASONAR, sagði hann henni að hún ætti ávalt að vera með honum og að hann ætti ekki að finna fyrir einmanaleika. SNORRASON krafðist þess meira að segja að stefnandi héldi salernishurðinni opinni þegar hún þurfti að nota salernið. Stefnandi gat ekki sofnað, þar sem hún var algjörlega skelfingu lostin og var því illa sofin.

144. Næstu daga varð stefnandi við kröfum SNORRASONAR til að lifa af.

145. SNORRASON nauðgaði stefnanda aftur þann 20. september.

146. Um eða eftir kvöldið 21. september 2024 tók SNORRASON stefnanda í annan viðskiptakvöldverð með tveimur írskum viðskiptamönnum að nafni Brendan [eftirnafn óþekkt] og Peter [eftirnafn óþekkt]. Í kvöldverðinum kynnti SNORRASON stefnanda sem „aðstoðarforstjóra" IBANERA á meðan hann hélt í hönd stefnanda.

147. Í þessum kvöldverði sagði SNORRASON stefnanda að hann hefði lagað appið hennar sem IBANERA hafði áður stöðvað vinnu við og að appið yrði komið í gang í næstu viku. Hin stefndi, SNORASSON sagði öruggur: „Sjáðu til, það hefur sína kosti að sofa hjá yfirmanninum."

148. Þegar SNORRASON fór á klósettið, spurði Peter hvernig samband hennar væri við SNORRASON en hún sagðist ekki vita það og vera að reyna að átta sig á því. SNORRASON kom aftur og samtalinu lauk.

149. Aftur neyddi SNORRASON stefnanda til að gista í herbergi sínu og nauðgaði stefnanda.

150. Þann 22. september 2024 eða þar um bil fór stefnandi í sundlaugina til að reyna að slaka á. SNORRASON svaf stærstan hluta dagsins og fylgdi síðar stefnanda að sundlauginni. Stefnandi ákvað að spyrja SNORRASON um hlutverk hennar hjá fyrirtækinu. Stefnandi spurði um stöðu sína, laun, forrit og aðra fjárhagslega þætti starfsins.

151. SNORRASON sagði að hann hefði talað við PARR og CARBONARA og þau hefðu

Case 1:25-cv-24118-DSL   Document 23-1   Entered on FLSD Docket 12/04/2025   Page 32 of
135
Mál 1:25-cv-24118-XXXX Skjal 1 Skráð á dómsskrá Florida 09/09/2025 Síða 22 af 62

verið sammála um að stefnandi fengi hvað sem hún vildi nú þegar hún væri „kærasta"
SNORRASONAR. SNORRASON hélt áfram og sagði „þú ert að sofa hjá yfirmanninum, svo titill
þinn skipti ekki máli."

152.  Stefnandi bað um útskýringar og SNORRASON varð æ önugri. Þegar stefnandi sá reiði
og áreitni SNORRASONAR aukast, vissi hún að hún yrði að fara eins fljótt og auðið væri.

153.  SNORRASON gaf skýrt til kynna að svo lengi sem stefnandi stundaði kynferðislega
athafnir með SNORRASYNI, myndi hann tryggja að IBANERA héldi áfram að þróa forritið
hennar og leyfði henni að starfa sem hærra launuðum starfsmanni með hærri stöðu innan
fyrirtækisins.

154.  Stefnandi sendi vinkonu sinni í Miami sms þar sem hún útskýrði aðstæðurnar og að
hún væri ekki örugg, svo hann keypti flug heim handa henni morguninn eftir, þann 23. september
2024.

155.  Stefnandi ákvað að hún gæti ekki þolað aðra nótt af hendi SNORRASONAR, svo eftir
kvöldmat pakkaði hún saman dótinu sínu og hringdi í leigubíl á flugvöllinn. Á þessum tímapunkti
kom SNORRASON aftur og varð svo reiður, stóð á milli stefnanda og dyra hótelherbergisins og
hótaði „ef þú ferð núna, þá verður þetta það síðasta sem þú gerir." Stefnandi notaði ferðatöskurnar
sínar sem skjöld til að skapa bil á milli þeirra tveggja og hótaði að öskra ef hann snerti hana aftur.

156.  Stefnandi neitaði að hlýða fyrirmælum SNORRASONAR um að vera áfram í
herberginu en þegar hún var að fara sárbað hann hana um að fara ekki.

157.  Í leigubílnum var stefnandi greinilega í annarlegu ástandi og leigubílstjórinn spurði
hvort hún væri meidd. Þegar stefnandi staðfesti að hún hefði slasast ákvað hann að hjálpa stefnanda
og fara með hana á næstu lögreglustöð svo hún gæti lagt fram skýrslu. Stefnandi samþykkti það og
bílstjórinn fór með hana á lögreglustöðina.

Case 1:25-cv-24118-DSL   Document 23-1   Entered on FLSD Docket 12/04/2025   Page 33 of
135
Mál 1:25-cv-24118-XXXX Skjal 1 Skráð ájómsskrá Florida 09/09/2025 Síða 23 af 62

158. Eftir að hafa lagt fram lögregluskýrslu skoðaði stefnandi símann sinn og sá að hún hafði fengið skilaboð frá SNORRASYNI sem og skilaboð frá PARR sem hún hafði ekki séð.

159. PARR sendi stefnanda skilaboð og sagði: „Björn sagði mér að þú hefðir ruglað flugunum þínum, þú getur ekki verið á flugvellinum… Björn sagði að hann vildi að þú kæmir aftur á hótelið svo að flugið þitt væri tilbúið. **Við höfum áhyggjur af persónulegu öryggi þínu.**"

160. Stefnandi hunsaði þessi skilaboð og tók flugið sitt til Miami enda vissi hún að hún þurfti að flýja.

## IBANERA HÆTTIR ÖLLUM SAMSKIPTUM VIÐ
## STEFNANDA ÁÐUR EN HÚN ER REKIN

161. Dagana eftir að stefnandi flúði frá SNORRASYNI hafði hún samband við CARBONARA til að láta hann vita af því sem hafði gerst. CARBONARA gerði engar ráðstafanir til að aðstoða stefnanda.

162. Reyndar, eftir að stefnandi tilkynnti ólögmæta, glæpsamlega starfsemi SNORRASONAR, hunsaði CARBONARA stefnanda og fjarlægði hana af öllum samskiptaþöllum IBANERA.

163. CARBONARA svaraði aldrei einu einasta skilaboðum stefnanda eftir að hún flúði frá Singapúr, þar á meðal skilaboðum sem vísuðu beint til kynferðisofbeldis SNORRASONAR.

164. IBANERA, fyrir milligöngu umboðsmanna sinna, sagði stefnanda upp störfum vegna tilkynninga hennar um nauðgun, byrlan ólyfja, mismunun og annað ólöglegt atferli.

165. SNORRASON og PARR, sem umboðsmenn IBANERA og með vitund og samþykki CARBONARA, tóku þátt í og lögðu hönd á plóg um sameiginlega áætlun og verkefni til að ráða, tæla, flytja, afla og þvinga stefnanda og einstaklinga í svipaðri stöðu og stefnandi, með þeim ásetningi að stefnandi stundaði kynferðislegar athafnir með SNORRASYNI í skiptum fyrir

áframhaldandi ráðningu og viðskipti við IBANERA, þar á meðal en ekki takmarkað við þóknunargreiðslur, stjórnunarstöðu og þróun rafmyntaforrits hennar.

166.   Með vitneskju og trú á það, þá hafði IBANERA samsæri um árabil og stundaði hegðunarmynstur og tók þátt í kynferðislegri áreitni, þvingun, ráðningu, lokkun, flutning, leitun og hýsingu kvenna sem vildu vinna í rafmyntaiðnaðinum, þar á meðal starfsmanna og stjórnenda sem leituðu að atvinnutækifærum hjá IBANERA.

167.   Reyndar, samkvæmt upplýsingum og trú, hefur IBANERA þann hátt á að stunda mansal á kvenkyns starfsmönnum yfir fylkjamörk og kynferðislega áreita og misnota þessar einstaklinga.

168.   Í eða um lok september 2024 sagði IBANERA stefnanda ólöglega upp störfum fyrir að andmæla ólögmætri mismunun og háttsemi.

169.   Atvikin sem lýst er hér að ofan eru aðeins nokkur af dæmum um ólöglega mismunun, áreitni og hefnd sem stefndi beitti stefnanda stöðugt og ávallt alla starfstíð sína.

170.   Stefndi mismunaði stefnanda ólöglega vegna kyns og enginn karlmaður varð fyrir sömu hegðun og stefnandi.

171.   Stefndi hefndi sín gegn stefnanda fyrir að halda fram réttindum sínum og fyrir að andmæla kynjamismunun, áreitni og nauðgun.

172.   Stefndi braut gegn VII. kafla og FCRA með því að láta stefnanda lúta fjandsamlegu vinnuumhverfi, mismunandi meðferð og hefndum.

173.   Varnaraðili sýndi fram á stöðuga mismunun og stefnandi gerir því allar kröfur í þessari málshöfðun samkvæmt kenningunni um áframhaldandi brot.

174.   Vegna þeirra athafna og háttsemi sem hér eru kærð hefur stefnandi orðið fyrir og mun halda áfram að verða fyrir tekjutapi, launatapi, bónusatapi, tapi á fríðindum og annarri umbun sem

Case 1:25-cv-24118-DSL   Document 23-1   Entered on FLSD Docket 12/04/2025   Page 35 of
135
Mál 1:25-cv-24118-XXXX Skjal 1 Skráð á dómsskrá Florida 09/09/2025 Síða 25 af 62

slík ráðning hefur í för með sér, og stefnandi hefur einnig orðið fyrir framtíðar fjárhagslegu tjóni, tilfinningalegum sársauka, auðmýkingu, þjáningum, óþægindum, missi lífsgæða og öðru ófjárhagslegu tjóni. Kærandi hefur einnig upplifað mikla tilfinningalega og líkamlega vanlíðan.

175.   Vegna gjörða stefnda fannst stefnanda að hann hafi verið afar auðmýktur, niðurlægður, gerður að fórnarlambi, látinn finna fyrir skömm og tilfinningalegri vanlíðan.

## MÁLSÁSTÆÐUR

## ATRIÐI I

## Trafficking Victims Protection Act (Lög um vernd fórnarlamba mansals)

## (Gegn stefndu IBANERA, CARBONARA, PARR OG SNORRASYNI)

176.   Stefnandi endurtekur staðreyndir sem fram koma í 25. til 175. mgr.

177.   Auk þess sem fram kemur að ofan, stunduðu stefndu IBANERA, CARBONARA, PARR OG SNORRASON millifylkjaviðskipti eins og hér er lýst, meðal annars með notkun sinni á internetinu, símum, smáskilaboðum og millifylkja viðskiptum. Stefndu, IBANERA, CARBONARA, PARR OG SNORRASON, notuðu sambönd við viðskiptavini og árangursstýringu og samkomulag um að þróa forrit stefnanda til að ráða, tæla, hýsa, bjóða upp á og flytja stefnanda til kynferðislegra athafna sem stefndu, IBANERA, CARBONARA, PARR OG SNORRASON, þvinguðu hana upp á.

178.   Stefndu IBANERA, CARBONARA, PARR OG SNORRASON, með því að stunda millifylkjaviðskipti með því að stunda viðskipti og afla sér væntanlegra viðskiptavina, og með því að lokka til sín, flytja, hýsa, afla sér og ráða viðskiptavini, lokkuðu, báðu um og fengu stefnanda til að mæta á viðskiptaráðstefnu stefnda og verða fyrir kynferðisofbeldi og misþyrmingum.

179. Eftir það, þar sem stefnandi var ekki fús og áhugasamur þátttakandi í kynferðisofbeldinu og ofbeldinu, vanræktu stefndu að fá stefnanda til að taka þátt í neinum frekari

Case 1:25-cv-24118-DSL   Document 23-1   Entered on FLSD Docket 12/04/2025   Page 36 of
135
Mál 1:25-cv-24118-XXXX Skjal 1 Skráð á dómsskrá Florida 09/09/2025 Síða 26 af 62

verkefnum, sem kom í veg fyrir að stefnandi fengi frekari greitt fyrir vinnu sína.

180.  Stefndu, IBANERA, CARBONARA, PARR OG SNORRASON, fluttu, sóttust eftir, veittu, lokkuðu og fengu stefnanda til liðs við sig og frömdu kynferðislega árás og líkamsárás á stefnanda með valdi og/eða nauðung.

181.  Með kynferðisofbeldi sínu og líkamsárás hefðu stefndu IBANERA, CARBONARA, PARR OG SNORRASON hagnast á stefnanda og fengið tekjur af honum ef hún hefði unnið fyrir núverandi viðskiptavini eða fengið fleiri viðskiptavini.

182.  Stefnandi leggur fram þessa kröfu samkvæmt öllum viðeigandi kafla 18 USCA §§ 1591, 1595 þar sem „[e]n einstaklingur sem verður fyrir broti á 1589., 1590. eða 1591. grein 18. kafla bandarísku lagabókarinnar getur höfðað einkamál fyrir hvaða viðeigandi héraðsdómstóli sem er í Bandaríkjunum. Dómstóllinn getur dæmt raunverulegar skaðabætur, refsibætur, sanngjarna lögmannskostnað og annan málskostnað sem sanngjarnlega hefur verið stofnað til.“ 18 USCA §1595(a).

183.  Í 18 USC 1591, sem ber yfirskriftina „Mansal barna eða með valdi, svikum eða nauðung“ segir:

a.  Hver sem meðvitaður—
   i.  hefur áhrif á millifylkja- eða erlend viðskipti eða í slíkum viðskiptum […] ræður, lokkar, hýsir, flytur, útvegar, aflar, auglýsir, viðheldur, veitir viðskiptavinum eða leitar til einstaklings með hvaða hætti sem er; eða
   ii.  hefur ávinning, fjárhagslegan eða með því að taka við einhverju verðmætu, af þátttöku í fyrirtæki sem hefur framið athöfn sem lýst er sem brot á 1. mgr.
b.  vitandi, […] að valdbeiting, hótanir um valdbeitingu, svik, nauðung eins og lýst er í undirlið (e)(2), eða hvaða samsetning slíkra aðferða sem er, verður notuð til að fá viðkomandi til að taka þátt í viðskiptalegum kynferðislegum athöfnum […]
c.  Hugtakið „nauðung“ þýðir—
   i.  hótanir um alvarleg meiðsli á einstaklingi eða líkamlegar hömlur á eintaklingi;
   ii.  sérhver áætlun, áform eða mynstur sem ætlað er að fá einstakling til að trúa því að vanræksla á athöfn muni leiða til alvarlegs skaða eða líkamlegra hömlunar á einstaklingi; eða

Case 1:25-cv-24118-DSL   Document 23-1   Entered on FLSD Docket 12/04/2025   Page 37 of
135
Mál 1:25-cv-24118-XXXX Skjal 1 Skráð á dómsskrá Florida 09/09/2025 Síða 27 af 62

        iii. misnotkun eða hótun um misnotkun laga eða réttarfars.

    d.   Hugtakið „kynlífsathöfn í viðskiptalegum tilgangi" þýðir hvers kyns kynlífsathöfn þar sem einhverjum er gefið eða veitt eitthvað verðmætt fyrir.

    e.   Hugtakið „alvarlegur skaði" þýðir hvers kyns skaði, hvort sem hann er líkamlegur eða ekki, þar með talið sálrænt, fjárhagslegt eða mannorðstjón, sem er nægilega alvarlegt, miðað við aðstæður, til að neyða skynsaman einstakling af sama bakgrunni og við sömu aðstæður til að stunda eða halda áfram að stunda kynlífsathafnir í viðskiptalegum tilgangi til að forðast að verða fyrir álíka skaða.

184. 18 USC 1591 § (e)(3) skilgreinir „kynlífsathöfn í viðskiptalegum tilgangi" sem „hvers lags kynlífsathöfn þar sem einhverjum er gefið eða veitt eitthvað verðmætt fyrir."

185. Að auki, 18 USCA § 1595. Einkamálalöggjöf kveður svo um:

    a.   Einstaklingur sem verður fyrir broti á þessum kafla getur höfðað einkamál gegn geranda (eða þeim sem vitandi hagnast, fjárhagslega eða með því að þiggja verðmæti af þátttöku í verkefni sem viðkomandi vissi eða hefði átt að vita að hefði framið athæfi sem brýtur gegn þessum kafla) fyrir viðeigandi héraðsdómstóli í Bandaríkjunum og kann að fá skaðabætur og sanngjarna lögmannskostnað greiddan.

        i.   Öllum einkamálum sem höfðuð eru samkvæmt a-lið skal frestað á meðan sakamáli sem rís upp vegna sama atviks ef stefnandi er fórnarlamb í málinu sem er til meðferðar.

        ii.  Í þessari málsgrein felur „refsiverð málsókn" í sér rannsókn og saksókn og er í vinnslu þar til lokaúrskurður fellur fyrir héraðsdómi.

    b.   Ekki er heimilt að halda málshöfðun áfram samkvæmt a-lið nema hún sé hafin eigi síðar en seinni dagsetningu eftirfarandi tímabils—

        i.   10 árum eftir að málsástæðan kom upp; eða

        ii.  10 árum eftir að fórnarlambið nær 18 ára aldri, ef fórnarlambið var ólögráða þegar meint brot var framið.

186. Víðtækt og ítarlegt orðalag er notað í Trafficking Victims Protection Act (lögum um vernd fórnarlamba mansals, TVPA) og úrbótaákvæðum þeirra, sem heimila einkamál vegna skaðabóta. *Sjá Noble gegn Weinstein*, 335 F. Supp. 3d 504 (SDNY 2018).

187. Stefndu neyddu stefnanda til kynlífsathafna í viðskiptalegum tilgangi með valdi og nauðung, þar á meðal bæði líkamlegum og fjárhagslegum.

188. Kynlífsathöfn í viðskiptalegum tilgangi þýðir hvers kyns kynlífsathöfn þar sem

einhverjum er gefið eða veitt eitthvað verðmætt fyrir. Sérstök skilyrði eru valdbeiting, svik eða nauðung, eða háttsemi sem varðar einstaklinga yngri en 18 ára. Sjá skilgreiningu dómsmálaráðuneytisins:

> https://www.justice.gov/crt/involuntary-servitude-forced-labor-and-sex-trafficking-statutesenforced. „1591. kafli laganna gerir mansal refsivert, sem er skilgreint sem að valda því að einstaklingur taki þátt í kynlífsathöfnum í viðskiptalegum tilgangi við ákveðin lögbundin skilyrði." Kynlífsathöfn í viðskiptalegum tilgangi þýðir hvers kyns kynlífsathöfn þar sem einhverjum er gefið eða veitt eitthvað verðmætt fyrir. Sérstök skilyrði eru valdbeiting, svik eða nauðung, eða hegðun sem felur í sér einstaklinga yngri en 18 ára.

189. Stefndu IBANERA, CARBONARA, PARR OG SNORRASON, meðvitandi, í eða til að hafa áhrif á millifylkja- og erlend viðskipti, fengu stefnanda til liðs við sig, lokkuðu hann, veittu skjól fyrir og/eða fengu hann til að taka þátt í kynlífsathöfnum í viðskiptalegum tilgangi, vitandi að valdbeiting, hótanir valdbeitingu og nauðung yrði beitt til að fá hann til að taka þátt í þeim.

190. Stefndu, IBANERA, CARBONARA, PARR OG SNORRASON, brutu gegn þeim ákvæðum sem hér eru vitnað í og stefnandi varð fyrir tjóni af þeim sökum.

### ATRIÐI II
### Þátttaka í verkefni sem brýtur gegn 18 U.S.C. §1591
### (Gegn stefndu IBANERA, CARBONARA, PARR OG SNORRASYNI)

191. Stefnandi endurtekur staðreyndir sem fram koma í 25. til 175. mgr.

192. Auk þess sem fram kemur að ofan, stunduðu stefndu IBANERA, CARBONARA, PARR OG SNORRASON millifylkjaviðskipti eins og hér er lýst, meðal annars með notkun sinni á internetinu, símum, smáskilaboðum og millifylkja viðskiptum. Stefndu, IBANERA, CARBONARA, PARR OG SNORRASON, notuðu sambönd við viðskiptavini og árangursstýringu og samkomulag um að þróa forrit stefnanda til að ráða, tæla, hýsa, bjóða upp á og flytja stefnanda til kynferðislegra athafna sem stefndu, IBANERA, CARBONARA, PARR OG SNORRASON,

þvinguðu hana upp á.

193.  Stefndu IBANERA, CARBONARA, PARR OG SNORRASON, með því að stunda millifylkjaviðskipti með því að stunda viðskipti og afla sér væntanlegra viðskiptavina, og með því að lokka til sín, flytja, hýsa, afla sér og ráða viðskiptavini, lokkuðu, báðu um og fengu stefnanda til að mæta á viðskiptaráðstefnu stefnda og verða fyrir kynferðisofbeldi og misþyrmingum.

194.  Eftir það, þar sem stefnandi var ekki fús og áhugasamur þátttakandi í kynferðisofbeldinu og ofbeldinu, vanræktu stefndu að fá stefnanda til að taka þátt í neinum frekari verkefnum, sem kom í veg fyrir að stefnandi fengi frekari greitt fyrir vinnu sína.

195.  Stefndu, IBANERA, CARBONARA, PARR OG SNORRASON, fluttu, sóttust eftir, veittu, lokkuðu og fengu stefnanda til liðs við sig og frömdu kynferðislega árás og líkamsárás á stefnanda með valdi og/eða nauðung.

196.  Með kynferðisofbeldi sínu og líkamsárás hefðu stefndu IBANERA, CARBONARA, PARR OG SNORRASON hagnast á stefnanda og fengið tekjur af honum ef hún hefði unnið fyrir núverandi viðskiptavini eða fengið fleiri viðskiptavini.

197.  Í 18 USC 1591, sem ber yfirskriftina „Mansal barna eða með valdi, svikum eða nauðung" segir:

(1) Sá sem vísvitandi—
      i. hefur ávinning, fjárhagslegan eða með því að taka við einhverju verðmætu, af
        þátttöku í fyrirtæki sem hefur framið athöfn sem lýst er sem brot á 1. mgr.
      ii. vitandi […] að valdbeiting, hótanir um valdbeitingu, svik, nauðung eins og lýst er í
        lið (e)(2) eða hvaða samsetning slíkra aðferða sem er verður notuð til að fá
        viðkomandi til að taka þátt í kynlífsathöfnum í viðskiptalegum tilgangi […].

198.  Allir sakborningarnir höfðu fjárhagslegan ágóða, eða fengu eitthvað verðmætt, með því að taka þátt í verkefni sem felur í sér mansal með valdi og nauðung.

199. Stefndu, IBANERA, CARBONARA, PARR OG SNORRASON, brutu gegn þeim

ákvæðum sem hér eru vitnað í og stefnandi varð fyrir tjóni af þeim sökum.

## ATRIÐI III
### Samsæri í andstöðu við 18 U.S.C §1594
### (Gegn stefndu PARR OG SNORRASON)

200. Stefnandi endurtekur staðreyndir sem fram koma í 25. til 175. mgr.

201. 18 U.S.C. § 1594 kveður enn fremur á um ábyrgð fyrir „[hvern] sem gerir samsæri við annan til að brjóta gegn 1591. kafla."

202. Eins og fram kemur hér að ofan og hér, gerðu stefndu, PARR og SNORRASON, samsæri sín á milli um að brjóta gegn 18 U.S.C. § 1591 með því að stofna til sameiginlegs verkefnið meðvitað um eðli þess og umfang.

203. Stefndu, PARR og SNORRASON, áttu í sameiginlegri áætlun og verkefni þar sem þeir réðu, tældu, útveguðu, fluttu, báðu um og þvinguðu stefnanda og einstaklinga í svipaðri stöðu og stefnandi, með þeim ásetningi að stefnandi stundaði kynferðislegar athafnir með stefndu, PARR og SNORRASON, í skiptum fyrir aðgang að vinnu hjá stefndu, þar á meðal en ekki takmarkað við þróun forrits, vinnu fyrir núverandi viðskiptavini og öflun nýrra viðskiptavina.

204. Stefndu, PARR og SNORRASON, bera ábyrgð gagnvart stefnendum samkvæmt 18 U.S.C. §§ 1591, 1594 og 1595.

205. Stefnandi á rétt á skaðabótum vegna háttsemi stefnda, að upphæð sem sanna þarf fyrir dómi.

## ATRIÐI IV
### Trafficking Victims Protection Act (Lög um vernd fórnarlamba mansals)
### (Gegn stefndu MARRIOTT, STARWOOD MANAGEMENT, STARWOOD WORLDWIDE)

206. Stefnandi endurtekur staðreyndir sem fram koma í 25. til 175. mgr.

207. Auk þess sem fram kemur hér að ofan, stunduðu stefndu MARRIOTT, STARWOOD

MANAGEMENT, STARWOOD WORLDWIDE (hér eftir nefnd „stefndu fyrir hönd hótelsins“) millifylkjaviðskipti eins og lýst er hér, meðal annars með notkun sinni á internetinu, símum, smáskilaboðum, skipulagningu millifylkjaviðburða og gistingu fyrir einstaklinga sem sækja viðskiptaráðstefnur. Stefndu fyrir hönd hótelsins, notuðu sambönd við viðskiptavini og árangursstýringu og samkomulag um að þróa forrit stefnanda til að ráða, tæla, hýsa, bjóða upp á og flytja stefnanda til kynferðislegra athafna sem stefndu, IBANERA, CARBONARA, PARR OG SNORRASON, þvinguðu hana upp á.

208.  Stefndu fyrir hönd hótelsins, með því að stunda millifylkjaviðskipti með því að stunda viðskipti og afla sér væntanlegra viðskiptavina, og með því að lokka til sín, hýsa, afla sér og ráða viðskiptavini, lokkuðu, báðu um og fengu stefnanda til að mæta á viðskiptaráðstefnu stefnda og verða fyrir kynferðisofbeldi og misþyrmingum.

209.  Eftir það, þar sem stefnandi var ekki fús og áhugasamur þátttakandi í kynferðisofbeldinu og ofbeldinu, vanræktu stefndu að fá stefnanda til að taka þátt í neinum frekari verkefnum, sem kom í veg fyrir að stefnandi fengi frekari greitt fyrir vinnu sína.

210.  Stefndu fyrir hönd hótelsins, fluttu, sóttust eftir, veittu, lokkuðu og fengu stefnanda til liðs við sig og frömdu kynferðislega árás og líkamsárás á stefnanda með valdi og/eða nauðung.

211.  Með kynferðisofbeldi og ofbeldi gegn stefnanda hefðu stefndu fyrir hönd hótelsins hagnast og aflað sér tekna af stefnanda. IBANERA sendi marga starfsmenn, vinnumenn og einstaklinga til að sækja viðskiptaráðstefnur í Sheraton Towers í Singapúr, sem er staðsett að 39 Scotts RD, Singapore 228230 („Sheraton“). Sheraton hótelið aflaði sér umtalsverðra tekna af leigu á herbergjum, sölu á mat og drykk, þjónustu bílastæða, þjórfé og fleiru, vegna viðveru IBANERA.

212.  Stefnandi leggur fram þessa kröfu samkvæmt öllum viðeigandi kafla 18 USCA §§ 1591, 1595 þar sem „[e]n einstaklingur sem verður fyrir broti á 1589., 1590. eða 1591. grein 18.

Case 1:25-cv-24118-DSL   Document 23-1   Entered on FLSD Docket 12/04/2025   Page 42 of
Mál 1:25-cv-24118-XXXX Skjal 1 Skráð á dómsskrá Florida 09/09/2025 Síða 32 af 62
135

kafla bandarísku lagabókarinnar getur höfðað einkamál fyrir hvaða viðeigandi héraðsdómstóli sem

er í Bandaríkjunum. Dómstóllinn getur dæmt raunverulegar skaðabætur, refsibætur, sanngjarna

lögmannskostnað og annan málskostnað sem sanngjarnlega hefur verið stofnað til.“ 18 USCA

§1595(a).

213. Í 18 USC 1591, sem ber yfirskriftina „Mansal barna eða með valdi, svikum eða

nauðung“ segir:

a. Hver sem meðvitaður—
   i. hefur áhrif á millifylkja- eða erlend viðskipti eða í slíkum viðskiptum […] ræður,
   lokkar, hýsir, flytur, útvegar, aflar, auglýsir, viðheldur, veitir viðskiptavinum eða
   leitar til einstaklings með hvaða hætti sem er; eða
   ii. hefur ávinning, fjárhagslegan eða með því að taka við einhverju verðmætu, af
   þátttöku í fyrirtæki sem hefur framið athöfn sem lýst er sem brot á 1. mgr.
b. vitandi, […] að valdbeiting, hótanir um valdbeitingu, svik, nauðung eins og lýst er í
   undirlið (e)(2), eða hvaða samsetning slíkra aðferða sem er, verður notuð til að fá
   viðkomandi til að taka þátt í viðskiptalegum kynferðislegum athöfnum […]
c. Hugtakið „nauðung“ þýðir—
   i. hótanir um alvarleg meiðsli á einstaklingi eða líkamlegar hömlur á einstakling;
   ii. sérhver áætlun, áform eða mynstur sem ætlað er að fá einstakling til að trúa því að
   vanræksla á athöfn muni leiða til alvarlegs skaða eða líkamlegra hömlunar á
   einstaklingi; eða
   iii. misnotkun eða hótun um misnotkun laga eða réttarfars.
d. Hugtakið „kynlífsathöfn í viðskiptalegum tilgangi“ þýðir hvers kyns kynlífsathöfn þar
   sem einhverjum er gefið eða veitt eitthvað verðmætt fyrir.
e. Hugtakið „alvarlegur skaði“ þýðir hvers kyns skaði, hvort sem hann er líkamlegur eða
   ekki, þar með talið sálrænt, fjárhagslegt eða mannorðstjón, sem er nægilega alvarlegt,
   miðað við aðstæður, til að neyða skynsaman einstakling af sama bakgrunni og við sömu
   aðstæður til að halda áfram að stunda kynlífsathafnir í viðskiptalegum
   tilgangi til að forðast að verða fyrir álíka skaða.

214. 18 USC 1591 § (e)(3) skilgreinir „kynlífsathöfn í viðskiptalegum tilgangi“ sem „hvers

lags kynlífsathöfn þar sem einhverjum er gefið eða veitt eitthvað verðmætt fyrir.“

215. Að auki, 18 USCA § 1595. Einkamálalöggjöf kveður svo um:

a. Einstaklingur sem verður fyrir broti á þessum kafla getur höfðað einkamál gegn

Case 1:25-cv-24118-DSL   Document 23-1   Entered on FLSD Docket 12/04/2025   Page 43 of
135
Mál 1:25-cv-24118-XXXX Skjal 1 Skráð á dómsskrá Florida 09/09/2025 Síða 33 af 62

geranda (eða þeim sem vitandi hagnast, fjárhagslega eða með því að þiggja verðmæti af þátttöku í verkefni sem viðkomandi vissi eða hefði átt að vita að hefði framið athæfi sem brýtur gegn þessum kafla) fyrir viðeigandi héraðsdómstóli í Bandaríkjunum og kann að fá skaðabætur og sanngjarna lögmannskostnað greiddan.

    i. Öllum einkamálum sem höfðuð eru samkvæmt a-lið skal frestað á meðan sakamáli sem rís upp vegna sama atviks ef stefnandi er fórnarlamb í málinu sem er til meðferðar.

    ii. Í þessari málsgrein felur „refsiverð málsókn" í sér rannsókn og saksókn og er í vinnslu þar til lokaúrskurður fellur fyrir héraðsdómi.

b.    Ekki er heimilt að halda málshöfðun áfram samkvæmt a-lið nema hún sé hafin eigi síðar en seinni dagsetningu eftirfarandi tímabils—

    i. 10 árum eftir að málsástæðan kom upp; eða

    ii. 10 árum eftir að fórnarlambið nær 18 ára aldri, ef fórnarlambið var ólögráða þegar meint brot var framið.

216.  Víðtækt og ítarlegt orðalag er notað í Trafficking Victims Protection Act (lögum um vernd fórnarlamba mansals, TVPA) og úrbótaákvæðum þeirra, sem heimila einkamál vegna skaðabóta. *Sjá Noble gegn Weinstein*, 335 F. Supp. 3d 504 (SDNY 2018).

217. Stefndu neyddu stefnanda til kynlífsathafna í viðskiptalegum tilgangi með valdi og nauðung, þar á meðal bæði líkamlegum og fjárhagslegum.

218. Kynlífsathöfn í viðskiptalegum tilgangi þýðir hvers kyns kynlífsathöfn þar sem einhverjum er gefið eða veitt eitthvað verðmætt fyrir. Sérstök skilyrði eru valdbeiting, svik eða nauðung, eða háttsemi sem varðar einstaklinga yngri en 18 ára. Sjá skilgreiningu dómsmálaráðuneytisins:

https://www.justice.gov/crt/involuntary-servitude-forced-labor-and-sex-trafficking-statutesenforced. „1591. kafli laganna gerir mansal refsivert, sem er skilgreint sem að valda því að einstaklingur taki þátt í kynlífsathöfnum í viðskiptalegum tilgangi við ákveðin lögbundin skilyrði." Kynlífsathöfn í viðskiptalegum tilgangi þýðir hvers kyns kynlífsathöfn þar sem einhverjum er gefið eða veitt eitthvað verðmætt fyrir. Sérstök skilyrði eru valdbeiting, svik eða nauðung, eða hegðun sem felur í sér einstaklinga yngri en 18 ára.

219. Stefndu fyrir hönd hótelsins, meðvitandi, í eða til að hafa áhrif á millifylkja- og erlend

viðskipti, fengu stefnanda til liðs við sig, lokkuðu hann, veittu skjól fyrir og/eða fengu hann til að taka þátt í kynlífsathöfnum í viðskiptalegum tilgangi, vitandi að valdbeiting, hótanir valdbeitingu og nauðung yrði beitt til að fá hann til að taka þátt í þeim.

220.  Stefndu fyrir hönd hótelsins, brutu gegn þeim ákvæðum sem hér eru vitnað í og stefnandi varð fyrir tjóni af þeim sökum.

[PLÁSS VILJANDI SKILIÐ EFTIR AUTT]

<b><u>ATRIÐI V</u></b><br>
<b>42 USC § 2000e-2</b><br>
<b>Mismunun í VII. kafla</b><br>
<b>(Gegn stefnda IBANERA)</b>

221.  Stefnandi endurtekur staðreyndir sem fram koma í 25. til 175. mgr.

222.  Í VII. kafla er kveðið á um, að hluta til, að „það skal vera ólögleg ráðningarvenja fyrir vinnuveitanda ... að mismuna einstaklingi hvað varðar laun, kjör, starfskjör eða réttindi vegna kynþáttar, litarháttar, trúarbragða, kyns eða þjóðernisuppruna.“ 42 USC § 2000e-2(a)(1).

223.  Í VII. kafla er kveðið á um að „ólöglegt ráðningarferli telst vera staðfest þegar sá aðili sem kvartar sýnir fram á að kynþáttur, litarháttur, trúarbrögð, kyn eða þjóðerni hafi verið hvati fyrir ráðningarferlinu, jafnvel þótt aðrir þættir hafi einnig hvatt hana til.“ 42 USC § 2000e-2(m).

224.  Stefnandi var kona og því verndaður hópmeðlimur.

225.  Þættir sem mynda málsástæður fyrir mismunandi meðferð eru sveiganlegir og sniðnir að mismunandi staðreyndum í hverju tilviki fyrir sig.

226.  Stefndi beitti stefnanda mismunun vegna kyns. Mismunun stefnda fól t.d. í sér, 1) að gera óviðeigandi athugasemdir um útlit stefnanda, þar á meðal „þetta er kynþokkafyllsti, fróðasti og mest háklassa einstakklingurinn *sem ég get sent þér* í þessa ferð,“ „[PARR] sagði mér að hann væri að senda kynþokkafyllsta starfsmanninn til Singapúr *fyrir mig*, og hann var ekki að ljúga,“

„Þú ert líka með fallegan rass, þú ættir að gista í herberginu mínu,“ „„Þú verður hin fullkomna vinnukærasta mín,“ „þú ert að sofa hjá yfirmanninum, svo titill þinn skipti ekki máli,“ „ætlarðu síðan að halda barninu,“ SNORRASON vísaði til stefnanda sem „kærustu“ sinnar á vinnustað og sagði henni að þau myndu búa til „víkingabörn“, meðal annars, 2) að beita stefnanda ítrekað kynferðislegu ofbeldi og misþyrma henni á viðskiptafundi, 3) að gefa stefnanda lyf, 4) að krefjast þess að stefnandi svæfi í herbergi SNORRASONAR, 5) að hóta stefnanda til að hún færi ekki frá Singapúr, 6) að stöðva þróun forrits stefnanda nema hún leyfði SNORRASON að halda áfram að áreita hana kynferðislega og misnota hana, 7) hætta öllum samskiptum við stefnanda eftir að hún sneri aftur til Miami frá Singapúr og 8) segja upp starfi stefnanda ólöglega, meðal annars.

227. Stefndi beindi sjónum sínum að stefnanda vegna kyns hennar. Engir karlkyns starfsmenn í sambærilegri stöðu þoldu þá mismunun sem stefnandi var neydd til að þola.

228.  Mismunun stefnda gegn stefnanda, eins og lýst er og lýst er hér að ofan, teljast skaðleg meðferð í skilningi VII. kafla. Með því að beita stefnanda skaðlegri ráðningu mismunaði stefndi stefnanda vísvitandi hvað varðar laun, kjör, starfsskilyrði eða réttindi í starfi hennar.

229.  Jafnvel þótt stefndi gæti fært fram lögmætar ástæður fyrir neikvæðum aðgerðum sínum gegn stefnanda, þá var staða hennar sem verndaður aðili, að minnsta kosti, hvati fyrir mismunandi hegðun stefnda og stefnandi áskilur sér sérstaklega rétt til að færa fram kenningu um blandaðar ástæður gegn stefnda.

230.  Sem bein og nálæg afleiðing af vísvitandi mismunun stefnda í andstöðu við VII. kafla hefur stefnandi orðið fyrir og mun halda áfram að verða fyrir fjárhagslegu tjóni vegna tapaðra launa (í framtíð og fortíð) og tapaðs ávinnings. Stefnandi hefur einnig orðið fyrir og mun halda áfram að þjást af tilfinningalegri vanlíðan, andlegum kvölum, virðingarmissi og öðru óáþreifanlegu tjóni. Stefnandi krefst því bóta vegna fjárhagslegs tjóns, tapaðra launa, eftirstöðvagreiðslna, vaxta,

Case 1:25-cv-24118-DSL   Document 23-1   Entered on FLSD Docket 12/04/2025   Page 46 of
135
Mál 1:25-cv-24118-XXXX Skjal 1 Skráð í dómsskrá Florida 09/09/2025 Síða 36 af 62

framtíðar greiðslna, verðmætis og/eða efnahagslegra áhrifa tapaðs ávinnings og bóta.

231.  Aðgerðir stefnda voru vísvitandi, af ásetningi, illgirni og gáleysi gagnvart réttindum stefnanda samkvæmt VII. kafla, sem réttlættir álagningu refsibóta, auk bóta.

232.  Hegðun stefnda svipti stefnanda lögbundnum réttindum hennar samkvæmt VII. kafla.

233.  Stefnandi krefst þess enn fremur að lögmannskostnaður og málskostnaður verði greiddur eins og lög gera ráð fyrir.

**ATRIÐI VI**
**42 USC § 2000e-3**
**Titill VII fjandsamlegt vinnuumhverfi**
**(Gegn stefnda IBANERA)**

234.  Stefnandi endurtekur staðreyndir sem fram koma í 25. til 175. mgr.

235.  VII. kafli bannar einnig fjandsamlegt áreiti í vinnuumhverfi, sem er skilgreint sem óæskilegar athugasemdir eða hegðun varðandi verndaða eiginleika stefnanda sem hefur þann tilgang eða áhrif að trufla óeðlilega starfskjör stefnanda.

236.  Stefnandi var kona og því í vernduðum flokki.

237.  Áreitni og mismunun sakborningsins var nógu alvarleg eða útbreidd til að láta alla skynsama einstaklinga í sama lögverndaða hópi trúa því að ráðningarkjör hefðu verið breytt og að vinnuumhverfið væri ógnandi, fjandsamlegt eða ofbeldisfullt.

238.  Alvarleg og nauðungar stefnda fól t.d. í sér, 1) að gera óviðeigandi athugasemdir um útlit stefnanda, þar á meðal „þetta er kynþokkafyllsti, fróðasti og mest háklassa einstakklingurinn *sem ég get sent þér* í þessa ferð," „[PARR] sagði mér að hann væri að senda kynþokkafyllsta starfsmanninn til Singapúr *fyrir mig*, og hann var ekki að ljúga," „Þú ert líka með fallegan rass, þú ættir að gista í herberginu mínu," „„Þú verður hin fullkomna vinnukærasta mín," „þú ert að sofa hjá yfirmanninum, svo titill þinn skipti ekki máli," „ætlarðu síðan að halda barninu"

SNORRASON vísaði til stefnanda sem „kærustu" sinnar á vinnustað og sagði henni að þau myndu

búa til „víkingabörn", meðal annars, 2) að beita stefnanda ítrekað kynferðislegu ofbeldi og

misþyrma henni á viðskiptafundi, 3) að gefa stefnanda lyf, 4) að krefjast þess að stefnandi svæfi í

herbergi SNORRASONAR, 5) að hóta stefnanda til að hún færi ekki frá Singapúr, 6) að stöðva

þróun forrits stefnanda nema hún leyfði SNORRASON að halda áfram að áreita hana kynferðislega

og misnota hana, 7) hætta öllum samskiptum við stefnanda eftir að hún sneri aftur til Miami frá

Singapúr og 8) segja upp starfi stefnanda ólöglega, meðal annars.

239.   Stefndi beindi sjónum sínum að stefnanda af því hún er kvennmaður. Engir karlkyns

starfsmenn í sambærilegri stöðu þoldu það áreiti sem stefnandi var neydd til að þola.

240.   Stefnandi tók ekki vel í áreitni stefnanda sem hafði ekki annað val en að þola

mismununina.

241.   Áreitni og mismunun stefnda gagnvart stefnanda hafði neikvæð og veruleg áhrif á líf

stefnanda. Hegðun stefnda olli því að stefnandi fann fyrir einangrun, lítillækkun og skömm.

242.   Sem bein og nálæg afleiðing af vísvitandi mismunun stefnda í andstöðu við VII. kafla

hefur stefnandi orðið fyrir og mun halda áfram að verða fyrir fjárhagslegu tjóni vegna tapaðra launa

(í framtíð og fortíð) og tapaðs ávinnings. Stefnandi hefur einnig orðið fyrir og mun halda áfram að

þjást af tilfinningalegri vanlíðan, andlegum kvölum, virðingarmissi og öðru óáþreifanlegu tjóni.

Stefnandi krefst því bóta vegna fjárhagslegs tjóns, tapaðra launa, eftirstöðvagreiðslna, vaxta,

framtíðar greiðslna, verðmætis og/eða efnahagslegra áhrifa tapaðs ávinnings og bóta.

243.   Aðgerðir stefnda voru vísvitandi, af ásetningi, illgirni og gáleysi gagnvart réttindum

stefnanda samkvæmt VII. kafla, sem réttlættir álagningu refsibóta, auk bóta.

244.   Hegðun stefnda svipti stefnanda lögbundnum réttindum hennar samkvæmt VII. kafla.

245.   Stefnandi krefst þess enn fremur að lögmannskostnaður og málskostnaður verði

greiddur eins og lög gera ráð fyrir.

**ATRIÐI VII**
**42 USC § 2000e-3**
**Hefndaraðgerðir samkvæmt VII. kafla**
**(Gegn stefnda IBANERA)**

246.   Stefnandi endurtekur staðreyndir sem fram koma í 25. til 175. mgr.

247.   Í VII. kafla er bannað að grípa til hefnda á nokkurn hátt gegn einstaklingi sem hefur

andmælt mismunun eða tekið þátt í rannsókn, málsmeðferð eða úrskurði sem tengist ólöglegri

mismunun. 42 USC § 2000e-3(a).

248.   Stefnandi var kona og því verndaður hópmeðlimur.

249.   Stefnandi átti í vernduðum athöfnu þegar hún stóð gegn mismunun og ólöglegum

athöfnum stefnda t.d., 1) að gera óvíðeigandi athugasemdir um útlit stefnanda, þar á meðal „þetta

er kynþokkafyllsti, fróðasti og mest háklassa einstakklingurinn *sem ég get sent þér* í þessa ferð,“

„[PARR] sagði mér að hann væri að senda kynþokkafyllsta starfsmanninn til Singapúr *fyrir mig*,

og hann var ekki að ljúga,“ „Þú ert líka með fallegan rass, þú ættir að gista í herberginu mínu,“

„„Þú verður hin fullkomna vinnukærasta mín,“ „þú ert að sofa hjá yfirmanninum, svo titill þinn

skipti ekki máli,“ „ætlarðu síðan að halda barninu,“ SNORRASON vísaði til stefnanda sem

„kærustu“ sinnar á vinnustað og sagði henni að þau myndu búa til „víkingabörn“, meðal annars, 2)

að beita stefnanda ítrekað kynferðislegu ofbeldi og misþyrma henni á viðskiptafundi, 3) að gefa

stefnanda lyf, 4) að krefjast þess að stefnandi svæfi í herbergi SNORRASONAR, 5) að hóta

stefnanda til að hún færi ekki frá Singapúr, 6) að stöðva þróun forrits stefnanda nema hún leyfði

SNORRASON að halda áfram að áreita hana kynferðislega og misnota hana, 7) hætta öllum

samskiptum við stefnanda eftir að hún sneri aftur til Miami frá Singapúr og 8) segja upp starfi

stefnanda ólöglega, meðal annars.

250.   Stefnandi sagði stefnda sérstaklega að aðgerðir hans væru mismunun og ólöglegar og

hún kvartaði yfir aðgerðum stefnda til PARR, CARBONARA og SNORRASONAR.

251.   Til að svara því að stefnandi hélt í rétt sinn til að njóta sömu starfskjara og aðrir starfsmenn, beitti stefndi hefndum gegn stefnanda.

252.   Stefndi hefndi sín gegn stefnanda með því að hætta samskiptum við stefnanda og að lokum segja henni upp starfi sínu.

253.   Stefndi greip til ofangreindra neikvæðra aðgerða, meðal annars gegn stefnanda vegna athafna hennar sem lúta vernd, meðal annars gegn tilkynningu hennar um ólöglega mismunun sama dag og stefndi sagði henni ólöglega upp starfi sínu.

254.   Sérhver sanngjarn starfsmaður í stöðu stefnanda myndi láta af því að andmæla mismunun ef hann vissi að hann yrði beittur þeirri meðferð sem stefnandi var beittur.

255.   Meint rök stefnda fyrir athöfnum sínum gegn stefnanda í starfi eru yfirskin og hafa aðeins verið færð fram til að hylma yfir hefndir gegn athöfnum stefnanda.

256.   Sem bein og nálæg afleiðing af hefndum stefnda í andstöðu við VII. kafla hefur stefnandi orðið fyrir og mun halda áfram að verða fyrir fjárhagslegu tjóni vegna tapaðra launa (í framtíð og fortíð) og tapaðs ávinnings. Stefnandi hefur einnig orðið fyrir og mun halda áfram að þjást af tilfinningalegri vanlíðan, andlegum kvölum, virðingarmissi og öðru óáþreifanlegu tjóni. Stefnandi krefst því bóta vegna fjárhagslegs tjóns, tapaðra launa, eftirstöðvagreiðslna, vaxta, framtíðar greiðslna, verðmætis og/eða efnahagslegra áhrifa tapaðs ávinnings og bóta.

257.   Aðgerðir stefnda voru vísvitandi, af ásetningi, illgirni og gáleysi gagnvart réttindum stefnanda samkvæmt VII. kafla, sem réttlættir álagningu refsibóta, auk bóta.

258.   Hegðun stefnda svipti stefnanda lögbundnum réttindum hennar samkvæmt VII. kafla.

259.   Stefnandi krefst þess enn fremur að lögmannskostnaður og málskostnaður verði greiddur eins og lög gera ráð fyrir.

Case 1:25-cv-24118-DSL   Document 23-1   Entered on FLSD Docket 12/04/2025   Page 50 of
Mál 1:25-cv-24118-XXXX Skjal 1 Skráð a dómsskrá Florida 09/09/2025 Síða 40 af 62
135

**ATRIÐI VIII**
**§ 760,10(1), Fla. Stat.**
**FCRA kynjamismunun**
**(Gegn stefnda IBANERA)**

260.   Stefnandi endurtekur staðreyndir sem fram koma í 25. til 175. mgr.

261.   Lög um FCRA banna mismunun gegn einstaklingum í atvinnulífinu m.t.t. launa, starfskjara, skilyrða eða réttinda vegna kyns einstaklingsins eða meðgöngu. § 760.10(1)(a), Flórída. Stat.

262.   Stefnandi var kona og því verndaður hópmeðlimur.

263.   Þættir sem mynda málsástæður fyrir mismunandi meðferð eru sveiganlegir og sniðnir að mismunandi staðreyndum í hverju tilviki fyrir sig.

264.   Stefndi beitti stefnanda mismunun vegna kyns. Mismunun stefnda fól t.d. í sér, 1) að gera óviðeigandi athugasemdir um útlit stefnanda, þar á meðal „þetta er kynþokkafyllsti, fróðasti og mest háklassa einstakklingurinn *sem ég get sent þér* í þessa ferð,“ „[PARR] sagði mér að hann væri að senda kynþokkafyllsta starfsmanninn til Singapúr *fyrir mig*, og hann var ekki að ljúga,“ „Þú ert líka með fallegan rass, þú ættir að gista í herberginu mínu,“ „„Þú verður hin fullkomna vinnukærasta mín,“ „þú ert að sofa hjá yfirmanninum, svo titill þinn skipti ekki máli,“ „ætlarðu síðan að halda barninu,“ SNORRASON vísaði til stefnanda sem „kærustu“ sinnar á vinnustað og sagði henni að þau myndu búa til „víkingabörn“, meðal annars, 2) að beita stefnanda ítrekað kynferðislegu ofbeldi og misþyrma henni á viðskiptafundi, 3) að gefa stefnanda lyf, 4) að krefjast þess að stefnandi svæfi í herbergi SNORRASONAR, 5) að hóta stefnanda til að hún færi ekki frá Singapúr, 6) að stöðva þróun forrits stefnanda nema hún leyfði SNORRASON að halda áfram að áreita hana kynferðislega og misnota hana, 7) hætta öllum samskiptum við stefnanda eftir að hún sneri aftur til Miami frá Singapúr og 8) segja upp starfi stefnanda ólöglega, meðal annars.

Case 1:25-cv-24118-DSL   Document 23-1   Entered on FLSD Docket 12/04/2025   Page 51 of
135
Mál 1:25-cv-24118-XXXX Skjal 1 Skráð a dómsskrá Florida 09/09/2025 Síða 41 af 62

265. Stefndi beindi sjónum sínum að stefnanda vegna kyns hennar. Engir karlkyns starfsmenn í sambærilegri stöðu þoldu þá mismunun sem stefnandi var neydd til að þola.

266. Mismunun stefnda gegn stefnanda, eins og lýst er og lýst er hér að ofan, teljast skaðleg meðferð í skilningi FCRA. Með því að beita stefnanda skaðlegri ráðningu mismunaði stefndi stefnanda vísvitandi hvað varðar laun, kjör, starfsskilyrði eða réttindi í starfi hennar.

267. Jafnvel þótt stefndi gæti fært fram lögmætar ástæður fyrir neikvæðum aðgerðum sínum gegn stefnanda, þá var staða hennar sem verndaður aðili, að minnsta kosti, hvati fyrir mismunandi hegðun stefnda og stefnandi áskilur sér sérstaklega rétt til að færa fram kenningu um blandaðar ástæður gegn stefnda.

268. Sem bein og nálæg afleiðing af vísvitandi mismunun stefnda í andstöðu við FCRA hefur stefnandi orðið fyrir og mun halda áfram að verða fyrir fjárhagslegu tjóni vegna tapaðra launa (í framtíð og fortíð) og tapaðs ávinnings. Stefnandi hefur einnig orðið fyrir og mun halda áfram að þjást af tilfinningalegri vanlíðan, andlegum kvölum, virðingarmissi og öðru óáþreifanlegu tjóni. Stefnandi krefst því bóta vegna fjárhagslegs tjóns, tapaðra launa, eftirstöðvagreiðslna, vaxta, framtíðar greiðslna, verðmætis og/eða efnahagslegra áhrifa tapaðs ávinnings og bóta.

269. Aðgerðir stefnda voru vísvitandi, af ásetningi, illgirni og gáleysi gagnvart réttindum stefnanda samkvæmt FCRA, sem réttlættir álagningu refsibóta, auk bóta.

270. Hegðun stefnda svipti stefnanda lögbundnum réttindum hennar samkvæmt FCRA.

271. Stefnandi krefst þess enn fremur að lögmannskostnaður og málskostnaður verði greiddur eins og lög gera ráð fyrir.

### ATRIÐI IX
### § 760,10(7), Fla. Stat.
### FCRA fjandsamlegt vinnuumhverfi
### (Gegn stefnda IBANERA)

272. Stefnandi endurtekur staðreyndir sem fram koma í 25. til 175. mgr.

273. FCRA bannar mismunun í atvinnulífinu hvað varðar kjör, starfskjör og réttindi einstaklings vegna kyns hans. § 760,10(1), Fla. Stat.

274. Stefnandi var kona og því í vernduðum flokki.

275. Áreitni og mismunun sakborningsins var nógu alvarleg eða útbreidd til að láta alla skynsama einstaklinga í sama lögverndaða hópi trúa því að ráðningarkjör hefðu verið breytt og að vinnuumhverfið væri ógnandi, fjandsamlegt eða ofbeldisfullt.

276. Alvarleg og nauðungar stefnda fól t.d. í sér, 1) að gera óviðeigandi athugasemdir um útlit stefnanda, þar á meðal „þetta er kynþokkafyllsti, fróðasti og mest háklassa einstaklingurinn *sem ég get sent þér* í þessa ferð," „[PARR] sagði mér að hann væri að senda kynþokkafyllsta starfsmanninn til Singapúr *fyrir mig*, og hann var ekki að ljúga," „Þú ert líka með fallegan rass, þú ættir að gista í herberginu mínu," „„Þú verður hin fullkomna vinnukærasta mín," „þú ert að sofa hjá yfirmanninum, svo titill þinn skipti ekki máli," „ætlarðu síðan að halda barninu," SNORRASON vísaði til stefnanda sem „kærustu" sinnar á vinnustað og sagði henni að þau myndu búa til „víkingabörn", meðal annars, 2) að beita stefnanda ítrekað kynferðislegu ofbeldi og misþyrma henni á viðskiptafundi, 3) að gefa stefnanda lyf, 4) að krefjast þess að stefnandi svæfi í herbergi SNORRASONAR, 5) að hóta stefnanda til að hún færi ekki frá Singapúr, 6) að stöðva þróun forrits stefnanda nema hún leyfði SNORRASON að halda áfram að áreita hana kynferðislega og misnota hana, 7) hætta öllum samskiptum við stefnanda eftir að hún sneri aftur til Miami frá Singapúr og 8) segja upp starfi stefnanda ólöglega, meðal annars.

277.   Stefndi beindi sjónum sínum að stefnanda af því hún er kvennmaður. Engir karlkyns starfsmenn í sambærilegri stöðu þoldu það áreiti sem stefnandi var neydd til að þola.

278.   Stefnandi tók ekki vel í áreitni stefnanda sem hafði ekki annað val en að þola mismununina.

279.   Áreitni og mismunun stefnda gagnvart stefnanda hafði neikvæð og veruleg áhrif á líf stefnanda. Hegðun stefnda olli því að stefnandi fann fyrir einangrun, lítillækkun og skömm.

280.   Sem bein og nálæg afleiðing af vísvitandi mismunun stefnda í andstöðu við FCRA hefur stefnandi orðið fyrir og mun halda áfram að verða fyrir fjárhagslegu tjóni vegna tapaðra launa (í framtíð og fortíð) og tapaðs ávinnings. Stefnandi hefur einnig orðið fyrir og mun halda áfram að þjást af tilfinningalegri vanlíðan, andlegum kvölum, virðingarmissi og öðru óáþreifanlegu tjóni. Stefnandi krefst því bóta vegna fjárhagslegs tjóns, tapaðra launa, eftirstöðvagreiðslna, vaxta, framtíðar greiðslna, verðmætis og/eða efnahagslegra áhrifa tapaðs ávinnings og bóta.

281.   Aðgerðir stefnda voru vísvitandi, af ásetningi, illgirni og gáleysi gagnvart réttindum stefnanda samkvæmt FCRA, sem réttlættir álagningu refsibóta, auk bóta.

282.   Hegðun stefnda svipti stefnanda lögbundnum réttindum hennar samkvæmt FCRA.

283.   Stefnandi krefst þess enn fremur að lögmannskostnaður og málskostnaður verði greiddur eins og lög gera ráð fyrir.

### ATRIÐI X
### § 760,10(7), Fla. Stat.
### Hefnd í FCRA
### (Gegn stefnda IBANERA)

284.   Stefnandi endurtekur staðreyndir sem fram koma í 25. til 175. mgr.

285.   FCRA bannar að grípa til hefnda á nokkurn hátt gegn einstaklingi sem hefur andmælt mismunun eða tekið þátt í rannsókn, málsmeðferð eða úrskurði sem tengist ólöglegri mismunun. §

760,10(7), Fla. Stat.

286. Stefnandi var kona og því verndaður hópmeðlimur.

287. Stefnandi átti í vernduðum athöfnu þegar hún stóð gegn mismunun og ólöglegum athöfnum stefnda t.d., 1) að gera óviðeigandi athugasemdir um útlit stefnanda, þar á meðal „þetta er kynþokkafyllsti, fróðasti og mest háklassa einstakklingurinn *sem ég get sent þér* í þessa ferð,“ „[PARR] sagði mér að hann væri að senda kynþokkafyllsta starfsmanninn til Singapúr *fyrir mig*, og hann var ekki að ljúga,“ „Þú ert líka með fallegan rass, þú ættir að gista í herberginu mínu,“ „„Þú verður hin fullkomna vinnukærasta mín,“ „þú ert að sofa hjá yfirmanninum, svo titill þinn skipti ekki máli,“ „ætlarðu síðan að halda barninu,“ SNORRASON vísaði til stefnanda sem „kærustu“ sinnar á vinnustað og sagði henni að þau myndu búa til „víkingabörn“, meðal annars, 2) að beita stefnanda ítrekað kynferðislegu ofbeldi og misþyrma henni á viðskiptafundi, 3) að gefa stefnanda lyf, 4) að krefjast þess að stefnandi svæfi í herbergi SNORRASONAR, 5) að hóta stefnanda til að hún færi ekki frá Singapúr, 6) að stöðva þróun forrits stefnanda nema hún leyfði SNORRASON að halda áfram að áreita hana kynferðislega og misnota hana, 7) hætta öllum samskiptum við stefnanda eftir að hún sneri aftur til Miami frá Singapúr og 8) segja upp starfi stefnanda ólöglega, meðal annars.

288. Stefnandi sagði stefnda sérstaklega að aðgerðir hans væru mismunun og ólöglegar og hún kvartaði yfir aðgerðum stefnda til PARR, CARBONARA og SNORRASONAR.

289. Til að svara því að stefnandi hélt í rétt sinn til að njóta sömu starfskjara og aðrir starfsmenn, beitti stefndi hefndum gegn stefnanda.

290. Stefndi hefndi sín gegn stefnanda með því að hætta samskiptum við stefnanda og að lokum segja henni upp starfi sínu.

291. Stefndi greip til ofangreindra neikvæðra aðgerða, meðal annars gegn stefnanda vegna

athafna hennar sem lúta vernd, meðal annars gegn tilkynningu hennar um ólöglega mismunun sama dag og stefndi sagði henni ólöglega upp starfi sínu.

292. Sérhver sanngjarn starfsmaður í stöðu stefnanda myndi láta af því að andmæla mismunun ef hann vissi að hann yrði beittur þeirri meðferð sem stefnandi var beittur.

293. Meint rök stefnda fyrir athöfnum sínum gegn stefnanda í starfi eru yfirskin og hafa aðeins verið færð fram til að hylma yfir hefndir gegn athöfnum stefnanda.

294. Sem bein og nálæg afleiðing af hefndum stefnda í andstöðu við FCRA hefur stefnandi orðið fyrir og mun halda áfram að verða fyrir fjárhagslegu tjóni vegna tapaðra launa (í framtíð og fortíð) og tapaðs ávinnings. Stefnandi hefur einnig orðið fyrir og mun halda áfram að þjást af tilfinningalegri vanlíðan, andlegum kvölum, virðingarmissi og öðru óáþreifanlegu tjóni. Stefnandi krefst því bóta vegna fjárhagslegs tjóns, tapaðra launa, eftirstöðvagreiðslna, vaxta, framtíðar greiðslna, verðmætis og/eða efnahagslegra áhrifa tapaðs ávinnings og bóta.

295. Aðgerðir stefnda voru vísvitandi, af ásetningi, illgirni og gáleysi gagnvart réttindum stefnanda samkvæmt FCRA, sem réttlættir álagningu refsibóta, auk bóta.

296. Hegðun stefnda svipti stefnanda lögbundnum réttindum hennar samkvæmt FCRA.

297. Stefnandi krefst þess enn fremur að lögmannskostnaður og málskostnaður verði greiddur eins og lög gera ráð fyrir.

### ATRIÐI XI
### Vanræksla
### (Gegn stefnda IBANERA)

298. Stefnandi endurtekur staðreyndir sem fram koma í 25. til 175. mgr.

299. Stefnandi heldur því fram til vara að ef hún sé ekki skilgreind sem starfsmaður IBANERA, þá hafi hún verið sjálfstæður verktaki fyrir IBANERA á viðeigandi tímabili.

300. IBANERA bar skyldu til að gæta eðlilegrar varúðar til að vernda öryggi, umönnun,

vellíðan og heilsu stefnanda á meðan hún vann fyrir IBANERA í vinnutengdum störfum.

301. IBANERA bar skyldu gagnvart stefnanda til að skapa og viðhalda öruggu og traustu umhverfi þar sem stefnandi gæti unnið störf sín laus við kynferðislegt ofbeldi, annarsháttar ofbeldi, áreitni og mismunun af hálfu félaga eða starfsmanna IBANERA.

302. IBANERA bar skyldu til að gæta hæfilegrar varúðar við ráðningu, þjálfun, eftirlit og starfsmannahald, þar á meðal eigenda, til að tryggja að þeir stofnuðu ekki starfsmönnum eða sjálfstæðum verktökum í hættu.

303. Eins og fram kemur að ofan var stefnandi beitt kynferðislegu ofbeldi, líkamsárás og kynferðislegri áreitni af hálfu SNORRASONAR.

304. IBANERA braut gegn fyrrnefndum skyldum umönnunar á einn eða fleiri af eftirfarandi háttum, þar á meðal:

a)     að hafa ekki verndað stefnanda fyrir kynferðislegri áreitni og ofbeldi á meðan hún var undir umsjá og forsjá IBANERA á vinnutíma og í tengslum við starfsemi IBANERA;

b)     að hafa ekki veitt nægilegt eftirlit eða umsjón með stefnanda;

c)     að hafa ekki veitt stefnanda öruggt umhverfi á meðan hún var í viðskiptaferð fyrir IBANERA;

d)     að vanrækja að þjálfa eigendur sína nægilega vel í eftirliti með starfsmönnum og sjálfstæðum verktaka og í að vernda starfsmenn sína gegn kynferðislegu ofbeldi af hálfu eiganda fyrirtækisins;

e)     að hafa ekki veitt sanngjarnar ráðstafanir eða verklagsreglur til að verjast eða koma í veg fyrir skaða eins og þann sem stefnandi hefur orðið fyrir;

f)     að hafa ekki haft nægjanlegt eftirlit með SNORRASYNI meðan hann hafði samskipti við starfsmenn og sjálfstæða verktaka, þar á meðal stefnanda;

g) að bregðast ekki við á viðeigandi hátt viðvörunarmerkjum, tilkynningum og/eða misferlis hegðun af hálfu SNORRASONAR, sem hefði átt að vekja athygli IBANERA á hættu á skaða fyrir starfsmenn og sjálfstæða verktaka;

h) vanræksla að koma á fót og framfylgja fullnægjandi stefnu og verklagsreglum sem ætlaðar eru til að koma í veg fyrir og greina ofbeldi, þrátt fyrir þekkta hættu á slíku ofbeldi á vinnustað;

i) vanræksla á að grípa til agaaðgerða gegn SNORRASYNI;

j) vanræksla á að taka á, greina frá eða rannsaka sönnunargögn um óviðeigandi sambönd milli SNORRASONAR og kvenkyns undirmanna hans, þar á meðal stefnanda;

k) vanræksla á að fjarlægja SNORRASON úr starfi þrátt fyrir að vita eða hafa ástæðu til að vita um hættulega og óviðeigandi hegðun hans;

l) vanræksla á að bregðast tímanlega við til að vernda stefnanda fyrir hugsanlegu kynferðislegum skaða í framtíðinni eða draga úr þekktri hættu á kynferðislegum skaða stefnanda í framtíðinni;

m) vanræksla á að bregðast tímanlega við vegna þekkts tjóns sem stefnandi hefur orðið fyrir; og

n) vanræksla á að hindra SNORRASON.

305. Sem bein og nálæg afleiðing af gáleysi og athafnaleysi IBANERA var SNORRASON gert og leyft að beita stefnanda kynferðislegu ofbeldi.

306. Vanræksla IBANERA að grípa til eðlilegra ráðstafana til að koma í veg fyrir eða stöðva misnotkunina olli stefnanda alvarlegu tilfinningalegu áfalli, sálrænu áfalli og öðru tjóni.

307. Sem bein og nálæg afleiðing af gáleysi og athafnaleysi IBANERA var SNORRASON gert og leyft að beita stefnanda kynferðislegu ofbeldi.

Case 1:25-cv-24118-DSL   Document 23-1   Entered on FLSD Docket 12/04/2025   Page 58 of
Mál 1:25-cv-24118-XXXX Skjal 1 Skráð á dómsskrá Florida 09/09/2025 Síða 48 af 62
135

308. Sem bein og óbein afleiðing af vanrækslu IBANERA varð stefnandi fyrir kynferðisofbeldi af hálfu SNORRASONAR og varð fyrir ítrekuðum meiðslum og varð fyrir tjóni.

309. Sem bein og óbein afleiðing af brotum IBANERA á lögum sem hér er lýst hefur stefnandi orðið fyrir og mun halda áfram að þjást af líkamlegum meiðslum, sálrænum áföllum, alvarlegri tilfinningalegri vanlíðan, móðgun, skömm, auðmýkingu, tilfinningalegum sársauka, þjáningum, óþægindum, smánun og öðru óáþreifanlegu tjóni.

310. Stefnandi krefst þess enn fremur að lögmannskostnaður og málskostnaður verði greiddur eins og lög gera ráð fyrir.

### ATRIÐI XII
### Vanræksla á brotrekstri
### (Gegn stefnda IBANERA)

311. Stefnandi endurtekur staðreyndir sem fram koma í 25. til 175. mgr.

312. Stefnandi heldur því fram til vara að ef hún sé ekki skilgreind sem starfsmaður IBANERA, þá hafi hún verið sjálfstæður verktaki fyrir IBANERA á viðeigandi tímabili.

313. Stefnandi heldur fram vanrækslu á brottrekstri gagnvart IBANERA.

314. SNORRASON var á viðeigandi tímabili starfandi hjá IBANERA.

315. Eins og fram kemur að ofan, þá sýndi SNORRASON óviðeigandi, ofbeldisfulla og ólöglega kynferðislega hegðun gagnvart stefnanda á meðan hann gegndi starfi sínu.

316. IBANERA vissi eða hefði átt að vita að SNORRASON væri hættulegur undirmönnum samkvæmt vísbendingum, þar á meðal vegna: (a) sönnunum um óviðeigandi hegðun SNORRASONAR sem tengdist stefnanda og öðrum undirmönnum og (b) viðvörunarmerkjum, skýrslum, óviðeigandi hegðunarmynstri eða öðrum viðvörunarmerkjum sem bentu til þess að SNORRASON væri óhæfur til að gegna valdsviði yfir undirmönnum sínum.

317. Þrátt fyrir að vita eða hafa ástæðu til að vita að SNORRASON væri hættulegur

nemendum, hélt IBANERA í SNORRASON sem eiganda af gáleysi og veitti honum þannig áframhaldandi og óheftan aðgang að stefnanda og öðrum undirmönnum.

318.   IBANERA bar skyldu til að gæta hæfilegrar varúðar við að halda í starfsmenn sem höfðu samskipti við þá og tryggja að þeir væru hæfir til að gegna faglegri ábyrgð sinni án þess að ógna öryggi og vellíðan starfsmannanna.

319.   IBANERA braut skyldu sína með því að ráða SNORRASON þrátt fyrir að vita eða hafa ástæðu til að vita um hættulega og óviðeigandi hegðun hans, sem gerði það fyrirsjáanlegt að starfsmenn, þar á meðal stefnandi, gætu orðið fyrir skaða af völdum þessa.

320.   Ákvörðun IBANERA um að ráða SNORRASON án þess að rannsaka eða bregðast við fyrri viðvörunum, skýrslum og/eða sönnunargögnum um óviðeigandi hegðun SNORRASON stuðlaði beint að þeim skaða sem stefnandi varð fyrir.

321.   Sem bein og nálæg afleiðing af gáleysi IBANERA varðandi SNORRASON gat SNORRASON beitt stefnanda kynferðisofbeldi.

322.   Það að IBANERA hafi ekki vikið SNORRASON úr starfi skapaði hættulegt umhverfi fyrir stefnanda, sem leiddi til tilfinningalegs og sálfræðilegs skaða sem stefnandi varð fyrir.

323.   Sem afleiðing af vanrækslu IBANERA við að víkja SNORRAYNI úr starfi varð stefnandi fyrir kynferðisofbeldi af hálfu SNORRASONAR og varð fyrir ítrekuðum meiðslum og varð fyrir skaða.

324.   Sem afleiðing af brotum IBANERA við að víkja SNORRASYNI úr starfi eins og hér er lýst hefur stefnandi orðið fyrir og mun halda áfram að þjást af líkamlegum meiðslum, sálrænum áföllum, alvarlegri tilfinningalegri vanlíðan, móðgun, skömm, auðmýkingu, tilfinningalegum sársauka, þjáningum, óþægindum, smánun og öðru óáþreifanlegu tjóni.

325.   Stefnandi krefst þess enn fremur að lögmannskostnaður og málskostnaður verði

Case 1:25-cv-24118-DSL   Document 23-1   Entered on FLSD Docket 12/04/2025   Page 60 of
Mál 1:25-cv-24118-XXXX Skjal 1 Skráð á dómsskrá Florida 09/09/2025 Síða 50 af 62
135

greiddur eins og lög gera ráð fyrir.

[PLÁSS VILJANDI SKILIÐ EFTIR AUTT]

## ATRIÐI XIII
### Vanrækslufullt eftirlit
### (Gegn stefnda IBANERA)

326.  Stefnandi endurtekur staðreyndir sem fram koma í 25. til 175. mgr.

327.  Stefnandi heldur því fram til vara að ef hún sé ekki skilgreind sem starfsmaður IBANERA, þá hafi hún verið sjálfstæður verktaki fyrir IBANERA á viðeigandi tímabili.

328.  Stefnandi heldur fram vanrækslu á umsjón gagnvart IBANERA.

329.  IBANERA bar skyldu til að gæta eðlilegrar varúðar við eftirlit með starfsmönnum sínum, sérstaklega eigendum sem eiga samskipti við viðkvæma starfsmenn, til að koma í veg fyrir fyrirsjáanlegt tjón.

330.  IBANERA brást skyldum sínum með því að hafa ekki nægjanlegt eftirlit með SNORRASYNI, sem leyfði SNORRASYNI að taka þátt í kynferðislegu ofbeldi gagnvart stefnanda.

331.  IBANERA vanrækti að gæta eðlilegrar varúðar við eftirlit með SNORRASYNI á einn eða fleiri af eftirfarandi háttum, þar á meðal:

a.   að hafa ekki eftirlit með SNORRASYNI í samskiptum hans við undirmenn, þar á meðal stefnanda, á vinnustað, viðskiptafundum eða í öðrum viðskiptatengdum aðstæðum;

b.   að ekki tekst að innleiða og framfylgja viðeigandi öryggisráðstöfunum, stefnu og verklagsreglum til að tryggja viðeigandi eftirlit með SNORRASYNI;

c.   að bregðast ekki við viðvörunum, rauðum fánum eða áhyggjum sem tengjast SNORRASYNI og/eða óviðeigandi hegðunarmynstri af hálfu SNORRASYNI, sem hefði átt að vara IBANERA við þeirri áhættu sem stafar af þessum eiganda;

d.      að hafa ekki brugðist við, tilkynnt eða rannsakað sönnunargögn um óviðeigandi hegðun SNORRASONAR gegn starfsmönnum, þar á meðal stefnanda; og

e.      að hafa ekki gripið til eðlilegra ráðstafana til að koma í veg fyrir óviðeigandi, eftirlitslaus samskipti milli SNORRASONAR og starfsmanna, þar á meðal stefnanda.

332.   IBANERA vissi eða hefði átt að vita að SNORRASON skapaði starfsmönnum hættu vegna (a) fyrri viðvarana, tilkynninga og/eða vísbendinga um óviðeigandi hegðun af hálfu SNORRASONAR og (b) athugunar á viðvörunarmerkjum, grunsamlegri hegðun eða annarra viðvörunarmerkja sem bentu til þess að SNORRASON væri óhæft til að hafa eftirlit með starfsmönnum.

333.   Með því að hafa ekki nægilega eftirlit með SNORRASYNI leyfði IBANERA af gáleysi að stefnandi yrði fyrir kynferðislegu ofbeldi og með því að valda tilfinningalegum og sálfræðilegum skaða sem af því hlýst.

334.   Sem bein og óbein afleiðing af gáleysi IBANERA undir stjórn hans gat SNORRASON beitt stefnanda kynferðisofbeldi.

335.   Vanræksla IBANERA við að hafa viðeigandi eftirlit olli stefnanda beint tilfinningalegri vanlíðan, sálrænum áföllum og öðrum meiðslum.

336.   Sem afleiðing af vanrækslu IBANERA við umsjónarskyldu sína varð stefnandi fyrir kynferðisofbeldi af hálfu SNORRASONAR og varð fyrir ítrekuðum meiðslum og varð fyrir skaða.

337.   Sem bein og óbein afleiðing af brotum vanrækslu IBANERA við umsjón, hefur stefnandi orðið fyrir og mun halda áfram að þjást af líkamlegum meiðslum, sálrænum áföllum, alvarlegri tilfinningalegri vanlíðan, móðgun, skömm, auðmýkingu, tilfinningalegum sársauka, þjáningum, óþægindum, smánun og öðru óáþreifanlegu tjóni.

338.   Stefnandi krefst þess enn fremur að lögmannskostnaður og málskostnaður verði

greiddur eins og lög gera ráð fyrir.

### ATRIÐI XIV
### Vanræksla á þjálfun
### (Gegn stefnda IBANERA)

339.  Stefnandi endurtekur staðreyndir sem fram koma í 25. til 175. mgr.

340.  Stefnandi heldur fram vanrækslu á þjálfun gagnvart IBANERA.

341.  IBANERA bar skyldu til að gæta eðlilegrar varúðar við þjálfun starfsmanna sinna, sérstaklega eigendum sem eiga samskipti við viðkvæma starfsmenn, til að koma í veg fyrir fyrirsjáanlegt tjón, þ.m.t. kynferðislega misnotkun.

342.  IBANERA brást skyldum sínum með því að þjálfa ekki SNORRASON og aðra meðlimi teymis síns nægilega vel, sem gerði SNORRASON kleift að taka þátt í ólöglegri og áreitandi hegðun gagnvart stefnanda.

343.  IBANERA braut gegn trúnaðarskyldu sinni gagnvart stefnanda með því að taka þátt í athöfnum sem meðal annars innihéldu:

(1)  vanræksla á að veita fullnægjandi þjálfun í að bera kennsl á viðvörunarmerki um óviðeigandi hegðun eða hugsanlega tælingu af hálfu eigenda;

(2)  vanræksla á að fræða eigendur um réttar aðferðir við að tilkynna grun um ofbeldi, lögbrot á landamærum eða annað misferli sem varðar undirmenn; vanræksla á að veita nægilega fræðslu um faglega og siðferðilega ábyrgð eigenda, sérstaklega varðandi samskipti við starfsmenn;

(3)  vanræksla á að innleiða og framfylgja stefnu sem krefst skyldubundinnar þjálfunar um forvarnir gegn kynferðislegu ofbeldi og misferli á vinnustað; og

(4)  að vanrækja að þjálfa starfsmenn í að fylgjast með og hafa eftirlit með samskiptum starfsmanna og yfirmanna til að koma í veg fyrir hættu á kynferðisofbeldi.

344.  Vanræksla IBANERA á að veita fullnægjandi þjálfun um hvernig koma ætti í veg fyrir,

greina og bregðast við kynferðislegri misferli starfsmanna sinna skapaði fyrirsjáanlega hættu á tjóni

fyrir starfsmenn, þar á meðal stefnanda.

345.  Sem bein og nálæg afleiðing af gáleysi IBANERA í þjálfun starfsmanna sína gat

SNORRASON beitt stefnanda kynferðisofbeldi.

346.  Vanræksla IBANERA við að viðhafa viðeigandi þjálfunaráætlun leiddi til beinnar

tilfinningalegrar vanlíðanar stefnanda, sálrænum áföllum og öðrum meiðslum.

347. Sem afleiðing af vanrækslu IBANERA við þjálfun varð stefnandi fyrir

kynferðisofbeldi af hálfu SNORRASONAR og varð fyrir ítrekuðum meiðslum og varð fyrir skaða.

348.  Sem afleiðing af vanrækslu IBANERA við þjálfun starfsmanna hefur stefnandi orðið

fyrir og mun halda áfram að þjást af líkamlegum meiðslum, sálrænum áföllum, alvarlegri

tilfinningalegri vanlíðan, móðgun, skömm, auðmýkingu, tilfinningalegum sársauka, þjáningum,

óþægindum, smánun og öðru óáþreifanlegu tjóni.

349. Stefnandi krefst þess enn fremur að lögmannskostnaður og málskostnaður verði

greiddur eins og lög gera ráð fyrir.

### ATRIÐI XV
### Kynferðisleg árás og líkamsárás
### (Gegn stefnda SNORRASYNI)

350.  Stefnandi endurtekur staðreyndir sem fram koma í 25. til 175. mgr.

351.  SNORRASON beitti stefnanda ítrekað kynferðislegri áreitni og misþyrmingum frá og

með 17. september 2024 til og með 23. september 2024, eins og fram kemur að ofan.

352.  SNORRASON snerti stefnanda ólöglega og óviðeigandi hátt, gegn vilja hennar og án

samþykkis hennar.

353.  SNORRASON hafi ólöglega og án vitundar stefnanda gefið henni lyf til að tryggja að

hún yrði ófær um að verjast kynferðislegri áras hans, gegn hennar vilja og án hennar samþykkis.

Case 1:25-cv-24118-DSL   Document 23-1   Entered on FLSD Docket 12/04/2025   Page 64 of
135
Mál 1:25-cv-24118-XXXX Skjal 1 Skráð á dómsskrá Florida 09/09/2025 Síða 54 af 62

354.  SNORRASON stakk með valdi, ítrekað, reistum getnaðarlim sínum inn í leggöng stefnanda, gegn vilja hennar og án samþykkis hennar.

355.  Vegna árása og barsmíða SNORRASONAR hlaut stefnandi alvarleg og varanleg meiðsli eins og fram kemur að ofan.

356.  Vegna framkomu SNORRASONAR var stefnandi hræddur og óttaðist um líkamlega velferð sína.

357.  SNORRASON framdi fyrrnefndar athafnir í þeim tilgangi að valda skaðlegri eða smánandi sambandi við náinn hluta af persónu stefnanda sem myndi misbjóða persónulegri reisn skynsamrar manneskju. Ennfremur ollu umræddar athafnir skaðlegri eða smánandi snertingu við náinn hluta af persónu stefnanda, á hátt sem myndi misbjóða persónulegri reisn sanngjarnrar manneskju.

358.  Vegna stöðu SNORRASONAR yfir stefnanda og andlegs og tilfinningalegs ástands hennar gat stefnandi ekki veitt löglegt samþykki fyrir slíkum athöfnum og gerði það ekki.

359.  Sem bein og óbein afleiðing af athöfnum SNORRASONAR hlaut stefnandi alvarlegan og varanlegan líkamsskaða og annan skaða sem verður sýnt fram á samkvæmt sönnunargögnum og innan lögsögu dómstólsins.

360.  Stefndu brutu gegn þeim ákvæðum sem hér eru vitnað í og stefnandi varð fyrir tjóni af þeim sökum.

### ATRIÐI XVI
### Fölsk fangelsun
### (Gegn stefnda SNORRASYNI)

361.  Stefnandi endurtekur staðreyndir sem fram koma í 25. til 175. mgr.

362.  Þættir málshöfðunar vegna rangrar fangelsunar eru meðal annars: (1) ólögmæt frelsissviptin einstaklings; (2) gegn vilja viðkomandi; (3) án lagalegrar heimildar eða „valdsviðs";

Case 1:25-cv-24118-DSL   Document 23-1   Entered on FLSD Docket 12/04/2025   Page 65 of
135
Mál 1:25-cv-24118-XXXX Skjal 1 Skráð á dómsskrá Florída 09/09/2025 Síða 55 af 62

og (4) sem er óraunhæf og óréttmæt miðað við aðstæður.

363. Þann 17. til 24. september 2024 eða þar um bil ákvað SNORRASON að beita stefnanda ítrekað kynferðislegu ofbeldi og misþyrma henni.

364. Aðfaranótt 17. september 2024 lokaði SNORRASON stefnanda inni á hótelherbergi sínu áður en hann nauðgaði henni án hennar samþykkis.

365. SNORRASON hélt stefnanda ítrekað niðri á meðan hann setti getnaðarlim sinn inn í leggöng hennar og skildi jafnvel eftir marbletti á fótleggjum hennar og líkama.

366. Þegar stefnandi reyndi að losa sig frá SNORRASYNI og brjótast úr greipum hans, herti SNORRASON takið og leyfði henni ekki að fara.

367. Stefnandi var máttlaus og gat ekki sloppið úr greipum SNORRASONAR, sama hversu mikið hún reyndi.

368. Með því að svipta stefnanda frelsi hennar eins og lýst er hér að ofan, fangelsaði SNORRASON stefnanda ranglega, gegn vilja hennar, án lagalegs heimildar né yfirvalds og var óæskileg, órökstudd og óréttlætanleg miðað við aðstæður.

369. Ólögmæt frelsissvipting SNORRASONAR, sem lýst er hér að ofan, olli stefnanda beint og með afleiðingum meiðslum á það hátt að hún leiddi beint til að framleiddi eða leiddi til slíkra meiðsla.

370. Á beinan hátt og sem bein afleiðing af rangri frelsissviptingu SNORRASONAR hefur stefnandi orðið fyrir og mun halda áfram að verða fyrir fjárhagslegu tjóni í formi tapaðra launa (í framtíð og fortíð) og tapaðs ávinnings. Stefnandi hefur einnig orðið fyrir og mun halda áfram að þjást af tilfinningalegum vanlíðan, andlegum kvölum, missi virðingar og öðru óefnislegu tjóni. Stefnandi krefst því skaðabóta fyrir fjárhagstjón, launataps, eftirstöðva greiðslna, vaxta, fyrirframgreiðslu, verðmætis og/eða efnahagslegra áhrifa tapaðs ávinnings og bóta.

Case 1:25-cv-24118-DSL  Document 23-1  Entered on FLSD Docket 12/04/2025  Page 66 of
135
Mál 1:25-cv-24118-XXXX Skjal 1 Skráð á dómsskrá Florída 09/09/2025 Síða 56 af 62

371.  Aðgerðir SNORRASONAR voru vísvitandi, af ásetningi, illgirni og gáleysi gagnvart réttindum stefnanda, sem réttlættir álagningu refsibóta, auk bóta.

372.  Stefnandi krefst þess enn fremur að lögmannskostnaður og málskostnaður verði greiddur eins og lög gera ráð fyrir.

### ATRIÐI XVII
### Vísvitandi tilfinningaleg vanlíðan
### (Gegn stefnda SNORRASYNI)

373.  Stefnandi endurtekur staðreyndir sem fram koma í 25. til 175. mgr.

374.  Til að koma á fót kröfu um vísvitandi tilfinningalega vanlíðan verður stefnandi að leggja fram sönnunargögn um: (1) öfgafulla og óhóflega hegðun stefnda, (2) ásetning eða gáleysi stefnda, (3) orsakasamhengi og (4) alvarlega tilfinningalega vanlíðan stefnanda. *Walsh gegn Taylor*, 263 Mich. App. 618, 634 (2004) (tilvísun sleppt).

375.  Hegðun varnaraðila var af ásettu ráði, persónulegs eðlis, í hefndartilgangi, öfgafull og svívirðileg svo að hún fór út fyrir öll hefðbundin siðferðismörk.

376.  Slík vísvitandi, öfgafull og óhófleg hegðun olli stefnanda auðmýkingu, mikilli skömm, ótta um velferð sína og öryggi og annarri alvarlegri tilfinningalegri vanlíðan og skaða.

377.  Vegna þess að SNORRASON valdi henni vísvitandi áföllum og tók algera sjálfræði yfir líkama hennar, hlaut stefnandi alvarleg og varanleg meiðsli af eins og fram kemur að ofan.

378.  SNORRASON framdi fyrrnefndar athafnir í þeim tilgangi að valda skaðlegri eða smánandi sambandi við náinn hluta af persónu stefnanda sem myndi misbjóða persónulegri reisn skynsamrar manneskju. Ennfremur ollu umræddar athafnir skaðlegri eða smánandi snertingu við náinn hluta af persónu stefnanda, á hátt sem myndi misbjóða persónulegri reisn sanngjarnrar manneskju.

379.  Vegna stöðu SNORRASONAR yfir stefnanda og andlegs og tilfinningalegs ástands

hennar gat stefnandi ekki veitt löglegt samþykki fyrir slíkum athöfnum og gerði það ekki.

380.   Sem bein og óbein afleiðing af athöfnum SNORRASONAR hlaut stefnandi alvarlegan og varanlegan líkamsskaða og annan skaða sem verður sýnt fram á samkvæmt sönnunargögnum og innan lögsögu dómstólsins.

## ATRIÐI XVIII
### Vísvitandi orsök tilfinningalegrar vanlíðunar
### (Sem og gegn stefndu IBANERA, CARBONARA, PARR OG SNORRASYNI)

381.   Stefnandi endurtekur staðreyndir sem fram koma í 25. til 175. mgr.

382.   Stefnandi er upplýstur og telur að PARR og CARBONARA hafi vitað eða átt að vita að þau væru að skapa menningu og umhverfi þar sem SNORRASON myndi beita stefnanda kynferðislegu ofbeldi.

383.   Stefnandi er upplýstur og telur að PARR og CARBONARA hafi ekki gripið til viðeigandi og/eða fyrirbyggjandi aðgerða gegn SNORRASYNI.

384.   Stefndu, PARR og CARBONARA, báru skyldu gagnvart stefnanda til að gæta þess að hegða sér á sanngjarnan og eðlilegan hátt til að valda stefnanda ekki fyrirsjáanlegum skaða.

385.   Stefndu, PARR og CARBONARA, sýndu ekki hefðbundna og sanngjarna varúð til að forðast skaða stefnanda.

386.   Stefndu, PARR og CARBONARA, slepptu eða gerðu ekki hæfilegar ráðstafanir til að koma í veg fyrir að SNORRASON gefi stefnanda lyf án vitundar hennar eða samþykkis og beitti hana síðan ítrekuðu ofbeldi og kynferðisofbeldi, sem olli stefnanda alvarlegri tilfinningalegri vanlíðan.

387.   Vegna gáleysis og skaðlegrar meðferðar og framkomu SNORRASONAR þjáðist stefnandi og þjáist enn af kvíða, áhyggjum, andlegri kvöl, svefnleysi, streitu, þunglyndi og alvarlegri tilfinningalegri vanlíðan.

Case 1:25-cv-24118-DSL   Document 23-1   Entered on FLSD Docket 12/04/2025   Page 68 of
135
Mál 1:25-cv-24118-XXXX Skjal 1 Skráð á dómsskrá Florida 09/09/2025 Síða 58 af 62

388.   Beint og sem bein afleiðing af athöfnum eða athafnaleysi stefnda hefur stefnandi m.a. orðið fyrir, tilfinningalegri vanlíðan, ótta, vandræði, kvíða, skömm, auðmýkingu, vanlíðan, áfalli og alvarlegri tilfinningalegri vanlíðan.

## ATRIÐI XIX
## Gáleysi (gegn stefndu MARRIOTT, STARWOOD MANAGEMENT, STARWOOD WORLDWIDE)

389.   Stefnandi endurtekur staðreyndir sem fram koma í 25. til 175. mgr.

390.   Stefnandi var boðsgestur stefnda MARRIOTT, STARWOOD MANAGEMENT, STARWOOD WORLDWIDE (hér eftir nefnd „stefndu fyrir hönd hótelsins"), þar sem hún dvaldi á Sheraton Towers í Singapúr, sem er staðsett að 39 Scotts RD, Singapúr 228230 („Sheraton").

391.   Stefndu fyrir hönd hótelsins eiga og reka sameiginlega Sheraton.

392.   Á öllum viðeigandi tímum markaðssettu stefndu hótelsins Sheraton virkan sem fyrsta flokks gistingu sem væri örugg.

393.   Á öllum tímum sem við áttu að eiga, höfðu stefndu fyrir hönd hótels, í gegnum umboðsmenn sína og starfsmenn, getu og skyldu til að leita til, skima, rannsaka og velja fullnægjandi öryggisverði til að tryggja öryggi gesta sinna á Sheraton hótelinu.

394.   Á öllum tímum sem við áttu að eiga, höfðu stefndu fyrir hönd hótelsins, í gegnum umboðsmenn sína og starfsmenn, getu og skyldu til að leita til, skima, rannsaka og setja upp fullnægjandi öryggismyndavélar og starfsmenn til að fylgjast með öryggismyndavélum sínum til að tryggja öryggi gesta sinna á Sheraton hótelinu.

395.   Hótelið, sem var stefnt af, bar, fyrir milligöngu umboðsmanna sinna og starfsmanna, skyldu gagnvart viðskiptavinum sínum og almenningi, þar á meðal stefnanda, til að gæta þess að tryggja öruggt umhverfi til að koma í veg fyrir meiðsli eða skaða á honum meðan stefnandi dvaldi á Sheraton hótelinu.

396. Stefndu fyrir hönd hótelsins báru skyldu gagnvart stefnanda til að gæta að öryggi hennar og velferð, þar á meðal að grípa til varúðarráðstafana sem nauðsynlegar voru til að vernda gesti sína og almenning fyrir fyrirsjáanlegri kynferðislegri misnotkun á meðan þeir voru á staðnum.

397. Hótelstefndu, fyrir milligöngu umboðsmanna sinna og starfsmanna, vissu eða hefðu, með hæfilegri fyrirsjá, átt að vita að líklegt væri að kynferðislegt ofbeldi yrði framið gegn viðskiptavinum stefndu fyrir hönd hótelsins og almenningi nema stefndi gerði ráðstafanir til að koma í veg fyrir það, framfylgja eigin reglum og tryggja slíkum einstaklingum, þar á meðal en ekki takmarkað við stefnanda, viðeigandi öryggi.

398. Stefndu fyrir hönd hótelsins báru skyldu til að gæta sanngjarnrar umönnunar gagnvart stefnanda, þar á meðal en ekki takmarkað við eftirfarandi:

    a. Að veita stefnanda öruggt umhverfi á meðan gestir Sheraton-hótelsins dvöldu þar;

    b. Að framfylgja eigin reglum gegn kynferðislegu ofbeldi eða ósæmilegri hegðun á hótelinu;

    c. Að veita öryggisráðstafanir til að tryggja viðeigandi og fullnægjandi öryggi fyrir gesti sem eru boðnir í fyrirtæki og almenning, þar á meðal stefnanda;

    d. Að vara stefnanda við, vernda hann og leiðbeina honum á fullnægjandi hátt;

    e. Að vara stefnanda og aðra við, vernda, leiðbeina eða ráðleggja þeim á fullnægjandi hátt um skort stefnda á fullnægjandi öryggi og vernd fyrir viðskiptagesti sína og almenning;

    f. Að leiðbeina, þjálfa og kenna starfsmönnum sínum, umboðsmönnum, augljósum umboðsmönnum, fulltrúum, yfirmönnum, starfsmönnu , verktökum og öðrum undir stjórn sinni, valdi eða rétti stefnda til að stjórna hvernig eigi að vernda viðskiptagesti og almenning á réttan hátt og fylgjast með einstaklingum með þekktar eða uppgötvanlegar hættulegar tilhneigingar, til að vernda aðra einstaklinga fyrir skaða, þar

á meðal stefnanda og aðra;

g.  Að ráða nægilegan fjölda hæfra öryggisstarfsmanna til að koma í veg fyrir að glæpir og kynferðislegt ofbeldi séu framið gegn viðskiptagestum, þar á meðal stefnanda Daniel;

h.  Að framkvæma fullnægjandi öryggisáætlun til að vara viðskiptagesti við og vernda þá, þar á meðal stefnanda og aðra;

i.  Að hafa löggæslu, eftirlit, gæta, fæla frá og á annan hátt veita viðskiptagestum sínum og almenningi fullnægjandi vernd þegar varnaraðili vissi eða hefði átt að vita um fyrirsjáanlegar refsiverðar athafnir;

j.  Að ráða og/eða halda einkaöryggisstarfsfólki og/eða lögreglumönnum utan vinnutíma til að vakta og/eða fylgjast með Sheraton, til að vernda gesti þess og almenning, þar á meðal stefnanda og aðra;

k.  Að innleiða fullnægjandi öryggisstefnu, öryggisráðstafanir og öryggisferla eins og nauðsynlegt er eru til að vernda stefnanda, aðra viðskiptagesti og almenning;

l.  Að gæta hæfilegrar varúðar við þjálfun starfsmanna sinna, umboðsmanna og fulltrúa til að tryggja að þeir hafi nægilega eftirlit með Tijuana Marriott til að hindra, koma í veg fyrir og stöðva glæpi og kynferðislegt ofbeldi, þar á meðal við endurteknar kynferðislegar árásir og líkamsárásir SNORRASONAR gegn stefnanda;

m. Að gæta hæfilegrar varúðar við þjálfun starfsmanna sinna, umboðsmanna og fulltrúa til að tryggja að þeir tilkynni stjórnendum sínum og yfirvöldum á réttan hátt um alla grunsamlega hegðun og einstaklinga á Sheraton hótelinu; og,

n.  Að gæta að öðru leyti eðlilegrar varúðar við að aðlaga húsnæði sitt til að draga úr hættu á tjóni fyrir viðskiptagesti og almenning, þar á meðal stefnanda og aðra.

399.   Stefndu fyrir hönd hótels vissu eða hefðu átt að vita að athafnir þeirra eða athafnaleysi, eins og fram kemur að ofan, sköpuðu hættu fyrir viðskiptagesti þess og almenning, þar á meðal stefnanda.

400.   Stefndu fyrir hönd hótels vissu eða áttu að vita að athafnir þeirra og athafnaleysi myndu valda stefnanda alvarlegum skaða.

401.   Skaði stefnanda var bein og óbein afleiðing af gáleysi hótelsins.

402.   Sem bein og yfirvofandi orsök athafna og athafnaleysis stefnda á hótelinu hlaut stefnandi alvarleg líkamleg meiðsli og hefur orðið fyrir og mun í framtíðinni halda áfram að þjást af völdum þessara sársauka og þjáninga, örorku, andlegum sársauka, þjáningum og angist, missi á lífsgleði, kostnaði vegna sjúkrahúsvistar, læknismeðferðar, tekjutaps, missi á getu til að afla sér tekna og missi á tekjumöguleikum. Tapið og tjónið er varanlegt og viðvarandi og stefnandi mun verða fyrir skaða og tjóni til framtíðar.

## **KVIÐDÓMS KRAFA**

Stefnandi krefst kviðdóms fyrir öll þau atriði sem á að taka fyrir.

## BEIÐNI UM UMBÆTUR

**ÞESS VEGNA** fer stefnandi með virðingu fram á að dómstóll felli úrskurð gegn stefnda vegna alls skaða sem stefnandi hefur orðið fyrir, þar á meðal fjárhagslegs tjóns, tapaðra launa (í fortíð og framtíð) og bóta, fastafjárhæða, lögbundinna skaðabóta, skaðabóta vegna tilfinningalegrar vanlíðan, vaxta, lögmannskostnaðar, málskostnaðar og annarra úrræða (fjárhagslegra og/eða sanngjarnra) sem heimil eru samkvæmt lögum vegna háttsemi stefnda í bága við TVPA, Title VII, FCRA og öll önnur gildandi alríkis- og fylkislög.

Dagsetning: Miami, Flórída
9. september 2025,

**DEREK SMITH LAW GROUP, PLLC**
*Lögmaður stefnanda*

*/s/ Derek T. Smith*
Derek T. Smith, Esq.
Lögmannsnúmer Flórída: 1014216
Derek Smith Law Group, PLLC
520 Brickell Key Drive, Suite O-301
Miami, FL 33131
Sími: (305) 946-1884
Derek@dereksmithlaw.com

*/s/ Daniel J. Barroukh*
Daniel J. Barroukh, Esq.
Lögmannsnúmer Flórída: 1049271
Derek Smith Law Group, PLLC
520 Brickell Key Drive, Suite O-301
Miami, FL 33131
Sími: (305) 946-1884
Danielb@dereksmithlaw.com

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

JANE DOE,

    Plaintiff,         CASE NO.:

v.                JURY TRIAL DEMANDED

IBANERA LLC,
MICHAEL CARBONARA,
BJORN SNORRASON,
DAVID PARR,
MARRIOTT INTERNATIONAL, INC.,
STARWOOD HOTELS & RESORTS
MANAGEMENT COMPANY, LLC, and
STARWOOD HOTELS & RESORTS
WORLDWIDE, LLC,

    Defendants.
_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

   Plaintiff, JANE DOE ("Plaintiff" and/or "Ms. Doe"), by and through her undersigned counsel, hereby complains of Defendants, IBANERA LLC ("IBANERA" and/or the "Company"), MICHAEL CARBONARA ("CARBONARA"), BJORN SNORRASON ("SNORRASON"), DAVID PARR ("PARR"), MARRIOTT INTERNATIONAL, INC. ("Marriott"), STARWOOD HOTELS & RESORTS MANAGEMENT COMPANY, LLC ("Starwood Management"), and STARWOOD HOTELS & RESORTS WORLDWIDE, LLC ("Starwood Worldwide") (Defendants Marriott, Starwood Management, and Starwood Worldwide are hereinafter collectively referred to as the "Hotel Defendants"), and alleges upon information and belief as follows:

## INTRODUCTION

1.     This is a sad and horrific case involving the repeated rape of Jane Doe by SNORRASON, who lured her to Singapore under the guise of a business meeting, where he repeatedly raped, beat, and battered Jane Doe for days on end. Furthermore, this action seeks to hold all Defendants liable for their role in contributing to these horrific acts.

2.     Plaintiff Jane Doe brings this is action for monetary damages and all other appropriate relief as deemed by the court, pursuant to the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §§ 1591 and 1595 ("TVPA" or "the Sex trafficking statute"), as well as for assault, battery, and infliction of emotional distress pursuant to state tort law, and hereby seeks monetary relief to redress Defendants unlawful practices in violation of Section 1591. Additionally, this action seeks to redress the deprivation of Plaintiff's personal dignity and autonomy over her own body.

3.     Plaintiff further brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"), the Florida Civil Rights Act of 1992, § 760.01, Florida Statutes ("FCRA"), and all common law causes of action.

4.     Plaintiff is a sexual assault victim and is identified herein as Jane Doe. *Doe v. Blue Cross & Blue Shield United of Wisc.,* 112 F.3d 869, 872 (7th Cir. 1997) ("fictitious names are allowed when necessary to protect the privacy of ... rape victims, and other particularly vulnerable parties or witnesses"); See also *Doe v. Cabrera*, 307 F.R.D. 1 (D.D.C. 2014); *EEOC v. Spoa, LLC*, 2013 U.S. Dist. LEXIS 148145, 2013 WL 5634337, at *3 (D.Md. 2013); *Roe v. St. Louis Univ.*, 2009 U.S. Dist. LEXIS 27716, 2009 WL 910738, at *3-5 (E.D. Mo. 2009); *Doe No. 2 v. Kolko*, 242 F.R.D. 193, 196 (E.D.N.Y. 2006)); *Doe v. Compact Info. Systems, Inc.*, 2015 U.S. Dist. LEXIS 178930, 2015 WL 11022761 (N.D. Tex. Jan. 26, 2015). Additionally, "the public generally has a

2

strong interest in protecting the identities of sexual assault victims so that other victims will not be deterred from reporting such crimes." *Doe No. 2 v. Kolko,* 242 F.R.D. 193, 195 (E.D.N.Y. 2006); *see also Doe v. Evans,* 202 F.R.D. 173, 176 (E.D. Pa. 2001) (granting anonymity to sexual assault victim); *Doe v Penzato*, No. 10 Civ. 5154 (MEJ), 2011 WL 1833007, at *3 (N.D. Cal. May 13, 2011).

## **PARTIES**

5.      Plaintiff is an individual female who performed work for Defendant in the State of Florida.

6.      Defendant, IBANERA LLC, is a Wyoming Limited Liability Corporation, with its principal place of business located at 8850 W. Oakland Blvd., 201, Sunrise, Florida 33351.

7.      At all times relevant, Plaintiff was employed to perform work for IBANERA from their Miami office in addition to remote work.

8.      The exact number of IBANERA's employees is unknown, but upon information and belief, there are well more than the statutory minimum under Title VII and the FCRA.

9.      At all relevant times, IBANERA was an "employer" within the meaning of, 42 U.S.C. § 2000e(b).

10.      At all times relevant, Plaintiff was an "employee" of IBANERA within the meaning of 42 U.S.C. § 2000e(f).

11.      At all relevant times, IBANERA was a "person" within the meaning of § 760.02(6), Florida Statutes, and an "employer" within the meaning of § 760.02(7), Florida Statutes.

12.      Defendant, MARRIOTT INTERNATIONAL, INC. ("Marriott"), is a Delaware for Profit Corporation with a principal place of business at 7750 Wisconsin Avenue, Bethesda, MD 20814.

13.     STARWOOD HOTELS & RESORTS MANAGEMENT COMPANY, LLC ("Starwood Management"), is a Delaware for Profit Corporation with a principal place of business at 7750 Wisconsin Avenue, Bethesda, MD 20814

14.     STARWOOD HOTELS & RESORTS WORLDWIDE, LLC ("Starwood Worldwide"), is a Delaware for Profit Corporation with a principal place of business at 7750 Wisconsin Avenue, Bethesda, MD 20814.

15.     The Hotel Defendants conduct continuous and systematic business is every state in America, including Florida, in addition to many countries globally.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction of the claims herein pursuant to 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction thereto, as this action involves federal questions regarding deprivation of Plaintiff Doe's rights under Section 1591 of the TVPA, and Title VII.

17.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. 1367 over all State causes of action.

18.     Venue is proper in this Court under 28 U.S.C. §1391 because the sexual assault and associated conduct in violation of Federal Law was committed within the jurisdiction of the United States District Court for the Southern District of Florida. Defendants were located in this judicial district and a substantial part of the events or omissions giving rise to this action, including the unlawful practices alleged herein occurred in this district.

## ADMINISTRATIVE PREREQUISITES

19.     Plaintiff has complied with all administrative requirements to file this action.

20. On or around December 5, 2024, Plaintiff timely dual-filed a charge of discrimination (Charge No. 510-2025-02389) against Defendant with the U.S. Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCHR").

21. On or around June 11, 2025, the EEOC issued Plaintiff's Notice of Right to Sue against Defendant.

22. Plaintiff is timely commencing this action within ninety (90) days of receipt of the EEOC's Notice of Right to Sue.

23. Plaintiff is timely commencing this action more than one-hundred eighty (180) days following the filing of her charge of discrimination.

24. On or around December 5, 2024, Plaintiff timely-filed a complaint with the Maryland Commission on Civil Rights against the Hotel Defendants.

**FACTUAL ALLEGATIONS**

25. At all times material, Plaintiff was a female and was therefore a protected class member.

26. At all times material, CARBONARA was an individual male who was employed by IBANERA as CEO and Owner. At all times material, CARBONARA held supervisory authority over Plaintiff, including the power to hire, fire, demote, and promote Plaintiff.

27. At all times material, SNORRASON was an individual male who was employed by IBANERA as Owner. At all times material, SNORRASON held supervisory authority over Plaintiff, including the power to hire, fire, demote, and promote Plaintiff.

28. At all times material, David PARR was an individual male who was employed by IBANERA as Owner. At all times material, David PARR held supervisory authority over Plaintiff, including the power to hire, fire, demote, and promote Plaintiff.

## PLAINTIFF BEGINS HER BUSINESS RELATIONSHIP WITH IBANERA

29.     In or around 2021, Plaintiff first became aware of IBANERA when she used its consulting services to develop her card-to-crypto payment purchasing widget and application.

30.     IBANERA provides a platform that simplifies global payments and compliance for businesses, with the added capability of handling both traditional and decentralized financial systems.

31.     To be clear, Plaintiff was a client of IBANERA, investing roughly $300,000.00 with the Company over two (2) years to develop her projects.

32.     Plaintiff collaborated with IBANERA to essentially create a marketable application (the "app") that was capable of processing high-volume cryptocurrency transactions and jointly agreed to split all commissions from the app.

33.     As Plaintiff worked alongside IBANERA in developing her app, IBANERA's management recognized her advanced skillset in the field and offered her employment with the company.

34.     In or around September of 2021, IBANERA brought Plaintiff in to perform work for the company.

35.     Plaintiff claims in the alternative that she was an independent contractor.

36.     In or around September of 2021, Plaintiff began to work alongside CARBONARA and PARR, two of three owners for IBANERA.

37.     Plaintiff did not meet SNORRASON, the third and final owner for IBANERA, until several years after conducting business with and performing work for IBANERA.

38.     SNORRASON, CARBONARA and PARR are the owners, agents, officers, and proxies for many businesses, corporations, and entities for which Plaintiff performed work.

6

39.     At all times material, IBANERA regularly required Plaintiff to fly to Miami, Florida, to perform work for IBANERA within the United States.

40.     SNORRASON, CARBONARA, and PARR compensated Plaintiff through commissions, transportation, event hosting, and future business with IBANERA.

41.     In or around early 2024, Plaintiff performed an extensive amount of work for IBANERA in addition to making significant advancements on her application.

42.     In or around March of 2024, IBANERA flew Plaintiff to San Francisco for the Game Developers Conference to represent IBANERA. IBANERA compensated Plaintiff's travel and accommodations, and IBANERA asked Plaintiff to interact with their clients and potential clients as a company representative.

43.     At all times material, Plaintiff maintained a record of positive performance for IBANERA.

44.     In or around March of 2024, IBANERA issued Plaintiff a company email address, business cards, a signature block, assigned Plaintiff two (2) assistants, informed the Company's other employees that she was now a client and employee, granted her access to the company's portals, and established a commission structure and stipend for Plaintiff.

45.     In or around July of 2024, IBANERA promoted Plaintiff to Client Relations and Success Manager and placed her on a salary.

46.     However, once Plaintiff took on this more expansive role for IBANERA, things began to change for the worse.

47.     Unexpectedly, IBANERA informed Plaintiff that they needed to halt all work on her application and temporarily shut it down.

48.     Plaintiff was confused because she had spent years developing the application with

7

the Company and invested hundreds of thousands of dollars into the project, and all metrics indicated the application was almost complete.

49.     Plaintiff's application completed all testing phases and successfully processed tens of thousands of dollars to this point.

50.     After IBANERA suspended work on Plaintiff's application, the Company began inconsistently paying Plaintiff her owed compensation, failing to complete due payments and paying Plaintiff lesser amounts than what was agreed to.

51.     In or around early September of 2024, Plaintiff discussed her frustration with PARR. PARR stated that he needed Plaintiff to go to Singapore for a business trip to attend the Crypto convention, TOKEN2024.

52.     Plaintiff was hesitant to fly to Singapore, but PARR insisted that IBANERA was requiring her to go to Singapore to meet with SNORRASON and conduct business meetings to entertain existing and potential clients.

53.     PARR confirmed that Plaintiff would be compensated for this business trip and reimbursed for any expenses incurred.

54.     PARR further purchased Plaintiff's plane ticket to Singapore to ensure she would attend the conference.

55.     Plaintiff contacted CARBONARA to ask if she could be paid prior to leaving for Singapore, which he agreed. However, Plaintiff never received this payment.

56.     Several days before IBANERA sent Plaintiff to Singapore, PARR virtually introduced Plaintiff and SNORRASON via a telephone call, and PARR stated over the phone, "Bjorn, this is the sexiest and most knowledgeable person with the most class *that I can send you* for this trip."

57.     Plaintiff was disturbed by this inappropriate comment but she decided to ignore it.

**IBANERA TRAFFICKED PLAINTIFF TO SINGAPORE**

58.     In or around September 14, 2024, Plaintiff flew in Singapore.

59.     PARR told Plaintiff that he booked her a room at the Sheraton Towers in Singapore, located at 39 Scotts RD, Singapore 228230 (the "Sheraton").

60.     The Sheraton is owned and/or operated by the Hotel Defendants.

61.     Upon arrival to the Sheraton, Plaintiff attempted to check into the hotel, but the front desk agent informed her that the room was not paid for. Plaintiff called PARR, who in-turn instructed her to call SNORRASON to ask for assistance.

62.     Shortly thereafter, SNORRASON appeared at the front desk. Plaintiff was surprised by SNORRASON's stature, as he was very tall and muscular.

63.     The very first thing SNORRASON said to Plaintiff was that "[PARR] told me he was sending the sexiest employee to Singapore *for me*, and he wasn't lying."

64.     Plaintiff was disgusted, as she had just met SNORRASON who was supposed to assist her in checking into her hotel room. Plaintiff became frustrated that this was the second time her physical appearance was sexualized by an Owner of IBANERA and she felt uncomfortable by the remarks.

65.     When Plaintiff and SNORRASON spoke to the front desk agent while checking Plaintiff into the room, SNORRASON told Plaintiff, "You have a nice ass too, you should stay in my room."

66.     Again, Plaintiff was repulsed to hear that her boss, the owner of IBANERA, was making sexual advances and sexually harassing comments to her.

67.     Regardless, Plaintiff tried her best to disregard the unwelcome introduction and

focus on the upcoming business meetings.

68.     Plaintiff proceeded to pay for her own room as she refused to share a bed with SNORRASON, despite his advances.

69.     Later that evening, Plaintiff arrived to what she believed would be a standard business dinner. Plaintiff, SNORRASON, the client, William Low ("William"), and William's wife and three children were present for the extravagant twelve-course meal.

70.     During the meal, SNORRASON introduced Plaintiff to William as "the Enforcer" who would straighten the Company out in both Singapore and the United States.

71.     After the meal concluded, the client's wife and children left, and SNORRASON stated that he and William needed to give Plaintiff a "proper Singaporean welcome," to the Company's Singapore team.

72.     SNORRASON took Plaintiff to a strip club/brothel where other Company employees were waiting for them. After entering the strip club, SNORRASON grabbed Plaintiff's hand and held onto her as he introduced Plaintiff to the IBANERA's Singapore team as his "girlfriend." The Singapore team included Tuck [Last Name Unknown], Chan [Last Name Unknown], and Johnson [Last Name Unknown].

73.     Plaintiff tried to pull away, but SNORRASON squeezed her hand and pulled her closer to him. Plaintiff was in shock and feared for her wellbeing as she was isolated in a foreign country with the owner of her Company who made his intentions clear: SNORRASON wanted to have a sexual relationship with Plaintiff.

74.     While at the strip club, SNORRASON ordered endless bottles of alcohol and explicitly demanded Plaintiff to drink. SNORRASON ordered two bottles of champagne and told Plaintiff that she needed to take one. Plaintiff, suspicious of SNORRASON's intentions, made sure

to drink water and limit her alcohol consumption.

75.     By the end of the night, SNORRASON had become extremely intoxicated and complained to the team about how Japman Kharbanda ("Japman"), an employee for IBANERA, accused him of trying to sleep with her. SNORRASON explained to the entire team that Japman was flown to Singapore for work and made accusations of sexual assault against him, which had been previously reported to IBANERA.

76.     SNORRASON continued to say that he would never sleep with Japman because "she was a ugly fat bitch," but proceeded to state that he brought Plaintiff to Singapore because she "has nice tits."

77.     Plaintiff became overwhelmed with anxiety and fear as she realized that she was no longer safe.

78.     Moments later, SNORRASON grabbed Plaintiff's face and forcefully kissed her on the lips, before saying, "you're going to be my perfect work girlfriend."

79.     Plaintiff pulled away from SNORRASON as he fought to continue kissing her, explaining that she had no feelings for him and was not an escort, rather she was a professional who was simply trying to perform her job duties. SNORRASON said that was going to take care of Plaintiff for the rest of her life and that he was going to have "Viking babies" with Plaintiff.

80.     SNORRASON discussed at length that Plaintiff's blonde hair and blue eyes made her genetically superior and a perfect candidate to procreate with.

81.     Plaintiff was in shock and did not feel safe leaving by her own volition. Plaintiff was further deterred from leaving as IBANERA had not paid her for her work at the conference, nor had they reimbursed her for the hotel room. SNORRASON was extremely intoxicated, and Plaintiff did not know how he would react if she left, or if he would become violent with her.

82.     Upon returning to the Sheraton around 5:00 A.M., SNORRASON lured Plaintiff into his hotel. SNORRASON told Plaintiff that he needed her help to find and administer his heart medication. Plaintiff, feeling trapped and vulnerable in a foreign country, complied with his demands. SNORRASON brought Plaintiff into his hotel room, where she found and gave him the heart medicine.

83.     As Plaintiff began to leave the room, SNORRASON begged her to have sex with him. Plaintiff, disgusted and revolted by SNORRASON's advanced, declined. SNORRASON continued begging Plaintiff to stay and asked her to stay the night even if he could not have sex with her.

84.     Plaintiff felt extremely uncomfortable, but she feared for her safety and was concerned about her financial stability, so she spent the night in SNORRASON's room. Plaintiff slept fully clothed, set up a row of pillows to separate her from her boss, and left before SNORRASON woke up.

85.     To this point, Plaintiff had known SNORRASON for less than 24 hours.

86.     The next day, on or around September 15, 2024, SNORRASON slept in late, but informed Plaintiff that he was taking her to a business dinner that evening.

87.     When Plaintiff arrived to the restaurant for dinner, she discovered that the "business meeting" was simply a dinner for SNORRASON and herself – no prospective or active clients were present.

88.     At dinner, SNORRASON bragged to Plaintiff about his various "baby mamas" and asked Plaintiff about her past romantic relationships. SNORRASON ordered many alcoholic drinks for himself and pressured Plaintiff to drink alcohol, which she limited to one drink at dinner.

89.     After dinner, SNORRASON insisted on taking Plaintiff for drinks, and he became

increasingly intoxicated as the night progressed. SNORRASON continued to make inappropriate comments to Plaintiff about her genetics, his desire to procreate with her, and for her to be his girlfriend.

90.     Plaintiff was in shock by these comments and believed that her best way to make it back home safely from her work trip was to keep her head down, decline any sexual advances, and focus on the business aspect of her trip.

91.     SNORRASON further demanded Plaintiff take pictures with him and smile, explaining that he needed to "send a good one over to [PARR]."

92.     For a second night in a row, SNORRASON asked Plaintiff to come back to his room and give him his medication. Plaintiff complied, but after giving SNORRASON his medication, he began begging again for Plaintiff to have sex with him.

93.     Similar to the night before, Plaintiff refused SNORRASON's request, but laid in his bed fully clothed, laid the pillows down the middle of the bed, and left before he awoke.

94.     On or around September 16, 2024, Plaintiff spent most of her day trying to work, despite SNORRASON's constant demands for her to be with him and spend time together.

95.     Later that day, SNORRASON informed her that they would be having a client meeting that evening.

96.     At the client meeting, SNORRASON grabbed Plaintiff's hand when walking into the meeting. Plaintiff was humiliated as she intended to introduce herself as a professional member of IBANERA, however SNORRASON introduced Plaintiff as his girlfriend and explained that she could do whatever she wanted at the Company because she was sleeping with him. SNORRASON continued that because he was the "top guy" for IBANERA, Plaintiff would get whatever she wanted.

97. That night was very similar to the previous nights, as it ended with Plaintiff being taken out for drinks and being forced to sleep in SNORRASON's bed. Again, Plaintiff refused to engage in sexual activity with SNORRASON, laid in his bed fully clothed with the pillows dividing them, and left as soon as she could.

### SNORRASON'S SEXUAL ABUSE OF PLAINTIFF ESCALATES

98. On or around September 17, 2024, Plaintiff snuck out of SNORRASON's room early, believing she would be safe, but little did she know she would have the worst night of her life.

99. Throughout the day, SNORRASON dragged Plaintiff around by the hand through the work conference, in front of clients and IBANERA's Singapore team.

100. SNORRASON attempted to ply Plaintiff with wine during client meetings. Plaintiff did her best to decline the drinks, but SNORRASON told her he wanted her to keep drinking. Plaintiff drank approximately two (2) glasses of wine during the day with food, but then SNORRASON informed her that he would be taking her out to another bar with a client named John Williams ("John").

101. Plaintiff's sales assistant, Daniel Baron ("Daniel") also arrived in Singapore that night and went out with SNORRASON and Plaintiff.

102. SNORRASON took Plaintiff and Daniel to a dive bar in Clarke Quay, Singapore. The dive bar was dark and smokey, with loud music playing.

103. SNORRASON instructed Plaintiff to invite John to the bar.

104. In addition to the two (2) glasses of wine that Plaintiff consumed during the day, she drank one (1) singular drink that night.

105. SNORRASON then brought Plaintiff a second drink. By the time Plaintiff took a

sip of the second drink at the bar, she knew something was very wrong. Plaintiff suddenly felt incredibly ill.

106.    Upon information and belief, SNORRASON put a date rape drug into her second drink of the night.

107.    SNORRASON started to consume more and more alcohol, and he became increasingly frustrated that Plaintiff was talking to John and not him. SNORRASON began ignoring the group they came with and eventually walked up to Plaintiff and grabbed her from behind, placing his penis against her butt. SNORRASON whispered into Plaintiff's ear, "I didn't bring you here to flirt with the fucking client. I want something no one else can have."

108.    SNORRASON stormed out, and John asked Plaintiff if she was okay. Plaintiff explained that she was not feeling well, so John took her outside to get some air. While they were outside, Plaintiff broke down and told John about SNORRASON's disgusting behavior during her trip.

109.    During this conversation with John, Plaintiff's vision became blurry and she developed difficulty hearing. SNORRASON approached Plaintiff and John. John was offering to put Plaintiff up in a hotel room for her safety, but SNORRASON demanded that Plaintiff go inside the bar with him immediately.

110.    SNORRASON was clearly intoxicated and Plaintiff was terrified of him, especially in her debilitated state where she could barely hold herself up, see, or hear. Plaintiff considered John's offer, but worried about what would happen if John, a man she knew for less than 12 hours, was somehow worse than SNORRASON.

111.    As SNORRASON dragged Plaintiff back into the bar, she realized that she did not have control over her body because of the drug that SNORRASON put into her drink. Plaintiff

tripped and stumbled her way onto a bar seat as she could barely see or hear, and she developed a horrible headache.

112.     Plaintiff asked her assistant, Daniel, to take her back to the hotel because she did not have control over her body. Daniel agreed, and as he assisted Plaintiff to the exit, SNORRASON stood up, squeezed Plaintiff's arm and yanked her towards him, telling everybody that Plaintiff would not be leaving without him. John stood up and warned SNORRASON, "do not touch her like that." Daniel further attempted to intervene to assist Plaintiff.

113.     Another customer in the bar, a British woman, witnessed Plaintiff being pulled in three different directions by three different men, Daniel, John, and SNORRASON. This lady was able to fend off SNORRASON and escort Plaintiff to a taxi with John and Daniel.

114.     Plaintiff returned to the Sheraton, and her temporary disability of blindness and deafness grew. Upon entering the hotel, Plaintiff screamed for help. The hotel manager and staff members from the Sheraton guided Plaintiff to her room to assist her recovery.

115.     Shortly thereafter, with the Sheraton staff present, SNORRASON arrived to her room, falsely stating that he was Plaintiff's boyfriend, Plaintiff was merely drunk, and the hotel staff should leave so he could take care of her. Plaintiff was screaming out of fear, begging the Sheraton staff not to SNORRASON into her room as he drugged her. The Sheraton staff ignored their duty to Plaintiff and allowed SNORRASON into the room. The Sheraton staff was suggesting that paramedics be called.

116.     SNORRASON whispered into Plaintiff's ear, "you are delusional, you do not want the paramedics to come, I will have them commit you to a mental institution." Plaintiff was terrified. Plaintiff continued screaming for help, stating she did not know who SNORRASON was, they were not romantically involved, SNORRASON was dangerous, and that she could not be left

alone with him. SNORRASON grew even more frustrated before yelling, "you are delusional, I love you," in front of the Sheraton staff.

117.    The hotel manager called the paramedics, who promptly arrived and tested Plaintiff's Blood Alcohol Content ("BAC"). SNORRASON told the hotel staff and the paramedics that Plaintiff was simply drunk and that they could leave.

118.    The paramedics had Plaintiff perform a breathalyzer test, which proved SNORRASON was lying, as she received a BAC result of nearly 0.00, indicating that almost no alcohol was present in her system. The paramedics then pricked Plaintiff's finger and tested her blood for substances. Plaintiff drank water at the recommendation of the paramedics, who believed she was having an asthma-induced panic attack and awaited her results.

119.    The paramedics asked Plaintiff to come to the hospital, but she stated she had no money and could not afford medical care.

120.    SNORRASON informed the paramedics and hotel managers that he would watch over her while she rested to make sure she was safe. Plaintiff again protested and told the Sheraton staff that they were not a couple and she could not be left alone with him. Despite her pleas, the Sheraton staff left SNORRASON alone with Plaintiff in her room instead of protecting her.

121.    The Sheraton staff failed to protect Plaintiff and effectively gave SNORRASON unrestricted access to Plaintiff in Plaintiff's hotel room.

122.    The Sheraton staff that left Plaintiff alone with SNORRASON knew or should have know that there was a likelihood of Plaintiff sustaining harm as a result of being left alone with SNORRASON, after she begged them not to leave her alone with SNORRASON, that she did not know SNORRASON and that he was dangerous.

123.    The Sheraton staff willfully exited Plaintiff's room while she was alone with

SNORRASON despite Plaintiff's pleas and protests.

124.    Plaintiff became incredibly drowsy and started falling asleep.

125.    This was the only night Plaintiff spent in her room during the Singapore trip.

## **SNORRASON BEATS AND RAPES PLAINTIFF**

126.    On or around the morning of September 18, 2024, Plaintiff woke up from what felt like a horrible nightmare.

127.    Plaintiff turned her head to the side and saw SNORRASON laying naked next to her.

128.    Plaintiff looked down and realized that although she went to sleep fully clothed, she was completely naked, and her entire body was covered in bruises. Below is a photograph of some of these bruises.

[Space Intentionally Left Blank]



129.     Plaintiff's breasts, buttocks, and vagina were extremely sore and in pain. Plaintiff struggled to get up, walk, or position herself without severe discomfort.

130.     Plaintiff defeatedly recognized that SNORRASON raped her.

131.     SNORRASON raped Plaintiff while she was asleep and recovering from a date rape drug that he slipped into her system.

132.     Plaintiff went into the bathroom to wash herself off and escape from SNORRASON, and went she came out, he was gone, and he had taken one of her room keys.

133.     Plaintiff, stunned by trauma, did not get out of bed for the rest of the day. SNORRASON came to Plaintiff's room twice to check on Plaintiff, but she did not answer.

134.     SNORRASON entered her room on one occasion and informed her that he had told

PARR and CARBONARA that she had become very ill. SNORRASON further informed her to tell her colleagues that she had food poisoning and to postpone her meetings.

135.    On or around September 19, 2024, Plaintiff messaged her mother and best friend to inform them of what SNORRASON had done to her.

136.    Plaintiff was solely focused on returning home, and her flight to leave Singapore was scheduled for the following day. Plaintiff kept telling herself that she only had to hold on for one more day before this everlasting nightmare would be over.

137.    However, SNORRASON told Plaintiff that he decided to extend her trip because she had missed her business meetings the day before and was therefore required to stay longer.

138.    SNORRASON further made sick, twisted remarks to Plaintiff on several occasions, "**so, are you going to keep the baby? You're definitely pregnant.**" SNORRASON did not even attempt to hide the fact that he raped Plaintiff's unconscious body.

139.    Plaintiff was mortified that SNORRASON would hurt her, maybe kill her, if she tried to leave, so she complied with his demands for the next few days.

140.    The night of September 19, 2024, SNORRASON left Plaintiff alone, telling her that she "looked like shit."

141.    As Plaintiff did not anticipate extending her trip, her room was not booked, and she had to look for another room.

142.    While trying to schedule a new room at the Sheraton, SNORRASON demanded she not book a room for herself, rather she needed to stay in his room.

143.    During Plaintiff's stay in SNORRASON's room, he told her that she was supposed to be with him at all times, and that he was not supposed to feel alone. SNORRASON even required Plaintiff to keep the restroom door open when she needed to use the restroom. Plaintiff could not

fall asleep, because she was completely terrified and was sleep-deprived as a result.

144.    For the next few days, Plaintiff complied with SNORRASON's demands to survive.

145.    SNORRASON raped Plaintiff again on September 20.

146.    On or around the night of September 21, 2024, SNORRASON took Plaintiff for another business dinner with two Irish businessmen named, Brendan [Last Name Unknown] and Peter [Last Name Unknown]. During the dinner, SNORRASON introduced Plaintiff as IBANERA's "Deputy Director" while holding Plaintiff's hand.

147.    During this dinner, SNORRASON told Plaintiff that he had fixed her app that IBANERA had previously halted work on, and that her app would be running by the following week. Defendant SNORASSON confidently stated, "see, sleeping with the boss has its perks."

148.    When SNORRASON went to the bathroom, Peter asked what her situation was with SNORRASON, and she said that she did not know and was trying to figure it out. SNORRASON returned, and the conversation ceased.

149.    Again, SNORRASON forced Plaintiff to spend the night in his room and raped Plaintiff.

150.    On or around September 22, 2024, Plaintiff went to the pool area to try relaxing. SNORRASON slept most of the day and later followed Plaintiff to the pool area. Plaintiff decided to ask SNORRASON about her role with the company. Plaintiff asked about her position, salary, application, and other financial aspects of her role.

151.    SNORRASON explained that he spoke to PARR and CARBONARA, and they agreed Plaintiff would get whatever she wanted now that she was SNORRASON's "girlfriend." SNORRASON continued to state that, "you're sleeping with the boss, so your title would not be

important."

152.    Plaintiff asked for clarification, and SNORRASON grew more and more upset. As Plaintiff saw SNORRASON's anger and aggression increasing, she knew she had to leave as soon as possible.

153.    SNORRASON made it clear that so long as Plaintiff engaged in sexual activity with SNORRASON, he would ensure IBANERA continued to develop her app and employ her as a more-highly-compensated employee with a higher status in the company

154.    Plaintiff texted her friend  in Miami, explaining the situation and that she was not safe, so he purchased her a flight home for the next morning on September 23, 2024.

155.    Plaintiff decided she could not suffer another night at the hands of SNORRASON, so after dinner she packed up her things and called a taxi to the airport. At this point, SNORRASON returned and became so angry, stood in between Plaintiff and the hotel room door, and threatened "if you leave now, this will be the last thing you do." Plaintiff used her suitcases as a shield to create space between the two of them and threatened to scream if he touched her again.

156.    Plaintiff refused to heed SNORRASON's instructions to stay in the room, and as she was leaving, he begged her not to leave.

157.    In the taxi, Plaintiff was clearly distraught, and the taxi driver asked if she was hurt. When Plaintiff confirmed she was hurt, he decided to help Plaintiff and take her to the closest police station so she could file a report. Plaintiff agreed and the driver took her to the police station.

158.    After filing a police report, Plaintiff checked her phone and saw that she had missed messages from SNORRASON as well as missed messages from PARR.

159.    PARR messaged Plaintiff, stating, "Bjorn told me that you've got your flights mixed up you can't s[t]ay in the airport… Bjorn said he would like for you to come back to the

hotel so your flight's ready. **We are concerned about your personal safety**."

160.    Plaintiff disregarded these messages and took her flight to Miami as she knew she needed to escape.

<b><u>IBANERA CEASES ALL COMMUNICATIONS<br>WITH PLAINTIFF BEFORE TERMINATING HER</u></b>

161.    In the days following Plaintiff's escape from SNORRASON, she contacted CARBONARA to inform him of what happened. CARBONARA did not take any steps to assist Plaintiff.

162.    In fact, as a result of Plaintiff reporting SNORRASON's unlawful, criminal activity, CARBONARA ignored Plaintiff and removed her from all of IBANERA's communication platforms.

163.    CARBONARA never responded to a single one of Plaintiff's messages after she fled Singapore, including messages that directly alluded to SNORRASON's sexual assault.

164.    IBANERA, by and through its agents, terminated Plaintiff as a result of her reports of rape, drugging, discrimination, and other unlawful activity.

165.    SNORRASON and PARR, as agents for IBANERA and with CARBONARA's knowledge and approval, engaged in and conspired in a common scheme and enterprise of recruiting, enticing, transporting, soliciting, and forcing Plaintiff and individuals similarly situated to Plaintiff, with the intent that Plaintiff engage in sexual activities with SNORRASON, in exchange for continued employment and business with IBANERA, including but not limited to commission-based payment, managerial status, and the development of her cryptocurrency app.

166.    Upon knowledge and belief, for years, IBANERA conspired and engaged in this pattern and practice of sexually harassing, forcing, recruiting, enticing, transporting, soliciting, and harboring females trying to work in the cryptocurrency industry, including associates and

managers seeking professional opportunities from IBANERA.

167. In fact, upon information and belief, IBANERA have a pattern and practice of engaging in trafficking female employees across state lines and sexually assaulting and exploiting these individuals.

168. In or around late September of 2024, IBANERA unlawfully terminated Plaintiff for opposing unlawful, discriminatory conduct.

169. The events described above are just some of the examples of unlawful discrimination, harassment, and retaliation that Defendant subjected Plaintiff to on a continuous and on-going basis throughout her employment.

170. Defendant unlawfully discriminated against Plaintiff because of her sex, and no male individuals were subjected to the same conduct as Plaintiff.

171. Defendant retaliated against Plaintiff for asserting her rights and for opposing sex discrimination, harassment, and rape.

172. Defendant violated the Title VII and the FCRA by subjecting Plaintiff to a hostile work environment, disparate treatment, and retaliation.

173. Defendant exhibited a continuous practice of discrimination, and Plaintiff therefore makes all claims herein under the continuing violations doctrine.

174. As a result of the acts and conduct complained herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits, and other compensation which such employment entails, and Plaintiff has also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff has further experienced severe emotional and physical distress.

175.    As a result of Defendant's actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

## CAUSES OF ACTION
### COUNT I
### Trafficking Victims Protection Act
**(As Against Defendants IBANERA, CARBONARA, PARR AND SNORRASON)**

176.    Plaintiff reincorporates the factual allegations in Paragraphs 25 through 175.

177.    In addition to what is stated above, Defendants IBANERA, CARBONARA, PARR, AND SNORRASON engaged in interstate commerce as described herein through, inter alia, their use of the internet, telephones, text messages, and interstate business events. Defendants IBANERA, CARBONARA, PARR, AND SNORRASON used the Client Relations and Success Manager position, and agreement to develop Plaintiff's app, to recruit, entice, harbor, solicit, and transport Plaintiff for sex acts that were forced upon her by Defendants IBANERA, CARBONARA, PARR, AND SNORRASON.

178.    Defendants IBANERA, CARBONARA, PARR, AND SNORRASON, in effecting interstate commerce by conducting business and soliciting prospective clients, and through the enticement, transportation, harboring, solicitation, and recruitment of clients, enticed, solicited, and recruited Plaintiff to appear at Defendants' business conference and be sexually assaulted and battered.

179.    Thereafter, because Plaintiff was not a willing and enthusiastic participant in the sexual assault and battery, Defendants failed to place Plaintiff in any future endeavors, preventing Plaintiff from additionally being compensated for her work.

180.    Defendants IBANERA, CARBONARA, PARR, AND SNORRASON transported, solicited, harbored, enticed, and recruited Plaintiff, and committed sexual assault and battery of Plaintiff by force and/or coercion.

181.     Through their sexual assault and battery, Defendants IBANERA, CARBONARA, PARR, AND SNORRASON would have profited and obtained revenue from Plaintiff if she had performed work for existing clients or signed up additional clients.

182.     Plaintiff brings this claim pursuant to all applicable sections of 18 U.S.C.A. §§ 1591, 1595 in that "[a]n individual who is a victim of a violation of Section 1589, 1590, or 1591 of title 18, United States Code, may bring a civil action in any appropriate district court of the United States. The court may award actual damages, punitive damages, reasonable attorneys' fees, and other litigation costs reasonably incurred." 18 U.S.C.A. §1595(a).

183.     18 U.S.C. 1591, entitled "Sex trafficking of children or by force, fraud, or coercion," states:

a.     Whoever knowingly—
    i.   in or affecting interstate or foreign commerce […] recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person;  or
    ii.  benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1)
b.     knowing, […] that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act […].
c.      The term "coercion" means—
    i.   threats of serious harm to or physical restraint against any person;
    ii.  any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or
    iii. the abuse or threatened abuse of law or the legal process.
d.     The term "commercial sex act" means any sex act, on account of which anything of value is given to or received by any person.
e.     The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

184.     18 U.S.C. 1591 § (e)(3) defines a "commercial sex act" as "any sex act, on account of which anything of value is given to or received by any person."

185.    Additionally, 18 USCA § 1595. Civil remedy states as follows:

a.    An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

    i.    Any civil action filed under subsection (a) shall be stayed during the pendency of any criminal action arising out of the same occurrence in which the claimant is the victim.

    ii.    In this subsection, a "criminal action" includes investigation and prosecution and is pending until final adjudication in the trial court.

b.    No action may be maintained under subsection (a) unless it is commenced not later than the later of—

    i.    10 years after the cause of action arose; or

    ii.    10 years after the victim reaches 18 years of age, if the victim was a minor at the time of the alleged offense.

186.    Broad, expansive language is employed in Trafficking Victims Protection Act (TVPA) and its remedial provision, which permits civil actions for damages. *See Noble v. Weinstein*, 335 F. Supp. 3d 504 (SDNY 2018).

187.    Defendants subjected Plaintiff to commercial sex acts by force and coercion, including both physical and financial.

188.    A commercial sex act means any sex act, on account of which anything of value is given to or received by any person. The specific conditions are the use of force, fraud, or coercion, or conduct involving persons under the age of 18. See the Department of Justice's definition:

https://www.justice.gov/crt/involuntary-servitude-forced-labor-and-sex-trafficking-statutesenforced. "Section 1591 criminalizes sex trafficking, which is defined as causing a person to engage in a commercial sex act under certain statutorily enumerated conditions. A commercial sex act means any sex act, on account of which anything of value is given to or received by any person. The specific conditions are the use of force, fraud, or coercion, or conduct involving persons under the age of 18."

189.     Defendants IBANERA, CARBONARA, PARR, AND SNORRASON, knowingly, in or affecting interstate and foreign commerce, solicited, recruited, enticed, harbored and/or obtained Plaintiff knowing the fact that the means of force, threats of force, and coercion would be used to cause Plaintiff to engage in a commercial sex act.

190.     Defendants IBANERA, CARBONARA, PARR, AND SNORRASON violated the sections cited hereto and Plaintiff suffered damage as a result.

**COUNT II**
**Participating in a Venture in Violation of 18 U.S.C. §1591**
**(As Against Defendants IBANERA, CARBONARA, PARR AND SNORRASON)**

191.     Plaintiff reincorporates the factual allegations in Paragraphs 25 through 175.

192.     In addition to what is stated above, Defendants IBANERA, CARBONARA, PARR, AND SNORRASON engaged in interstate commerce as described herein through, inter alia, their use of the internet, telephones, text messages, and interstate business events. Defendants IBANERA, CARBONARA, PARR, AND SNORRASON used the Client Relations and Success Manager position, and agreement to develop Plaintiff's app, to recruit, entice, harbor, solicit, and transport Plaintiff for sex acts that were forced upon her by Defendants IBANERA, CARBONARA, PARR, AND SNORRASON.

193.     Defendants IBANERA, CARBONARA, PARR, AND SNORRASON, in effecting interstate commerce by conducting business and soliciting prospective clients, and through the enticement, transportation, harboring, solicitation, and recruitment of clients, enticed, solicited, and recruited Plaintiff to appear at Defendants' business conference and be sexually assaulted and battered.

194.     Thereafter, because Plaintiff was not a willing and enthusiastic participant in the sexual assault and battery, Defendants failed to place Plaintiff in any future endeavors, preventing Plaintiff from additionally being compensated for her work.

195.     Defendants IBANERA, CARBONARA, PARR, AND SNORRASON transported, solicited, harbored, enticed, and recruited Plaintiff, and committed sexual assault and battery of Plaintiff by force and/or coercion.

196.     Through their sexual assault and battery, Defendants IBANERA, CARBONARA, PARR, AND SNORRASON would have profited and obtained revenue from Plaintiff if she had performed work for existing clients or signed up additional clients.

197.     18 U.S.C. 1591, entitled "Sex trafficking of children or by force, fraud, or coercion," states:

> (1) Whoever knowingly—
>> i.   benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1)
>> ii.  knowing […] that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act […].

198.     All Defendants benefitted financially, or by receiving something of value, from participating in a venture which has engaged in sex trafficking by force and coercion.

199.     Defendants IBANERA, CARBONARA, PARR, AND SNORRASON violated the sections cited hereto and Plaintiff suffered damage as a result.

### COUNT III
### Conspiracy in Violation of 18 U.S.C §1594
### (As Against Defendants PARR, AND SNORRASON)

200.     Plaintiff reincorporates the factual allegations in Paragraphs 25 through 175.

201.    18 U.S.C. § 1594 further provides liability for "[w]hoever conspires with another to violate section 1591."

202.    As stated above and herein, Defendants PARR and SNORRASON each further conspired with the other to violate 18 U.S.C. § 1591 by entering into a joint enterprise with consciousness of its general nature and extent.

203.    Defendants PARR and SNORRASON engaged and conspired in a common scheme and enterprise of recruiting, enticing, providing, transporting, soliciting, and forcing Plaintiff and individuals similarly situated to Plaintiff, with the intent that Plaintiff engage in sexual activities with Defendants PARR and SNORRASON, in exchange for access to employment with Defendants, including but are not limited to developing an app, performing work for existing customers, and procuring new clientele.

204.    Defendants PARR and SNORRASON are liable to Plaintiffs under 18 U.S.C. §§ 1591, 1594, and 1595.

205.    Plaintiff is entitled to damages as a result of Defendants' conduct, in amounts to be proven at trial.

### COUNT IV
### Trafficking Victims Protection Act
### (As Against Defendants MARRIOTT, STARWOOD MANAGEMENT, STARWOOD WORLDWIDE)

206.    Plaintiff reincorporates the factual allegations in Paragraphs 25 through 175.

207.    In addition to what is stated above, Defendants MARRIOTT, STARWOOD MANAGEMENT, STARWOOD WORLDWIDE (hereinafter the "Hotel Defendants") engaged in interstate commerce as described herein through, inter alia, their use of the internet, telephones, text messages, hosting interstate business events, and lodging individuals attending business conferences. The Hotel Defendants used the Client Relations and Success Manager position, and

agreement to develop Plaintiff's app, to recruit, entice, harbor, solicit, and transport Plaintiff for sex acts that were forced upon her by Defendants IBANERA, CARBONARA, PARR, AND SNORRASON.

208.   The Hotel Defendants, in effecting interstate commerce by conducting business and soliciting prospective clients, and through the enticement, harboring, solicitation, and recruitment of clients, enticed, solicited, and recruited Plaintiff to appear at Defendants' business conference and be sexually assaulted and battered.

209.   Thereafter, because Plaintiff was not a willing and enthusiastic participant in the sexual assault and battery, Defendants failed to place Plaintiff in any future endeavors, preventing Plaintiff from additionally being compensated for her work.

210.   The Hotel Defendants solicited, harbored, enticed, and recruited Plaintiff, and committed sexual assault and battery of Plaintiff by force and/or coercion.

211.   Through the sexual assault and battery of Plaintiff, the Hotel Defendants would have profited and obtained revenue from Plaintiff. IBANERA sent many employees, workers, and individuals to attend business conferences at the Sheraton Towers in Singapore, located at 39 Scotts RD, Singapore 228230 (the "Sheraton"). The Sheraton generated a substantial amount of revenue from the renting rooms, food and beverage sales, valet services, tips, and more, as a result of IBANERA's attendance.

212.   Plaintiff brings this claim pursuant to all applicable sections of 18 U.S.C.A. §§ 1591, 1595 in that "[a]n individual who is a victim of a violation of Section 1589, 1590, or 1591 of title 18, United States Code, may bring a civil action in any appropriate district court of the United States. The court may award actual damages, punitive damages, reasonable attorneys' fees, and other litigation costs reasonably incurred." 18 U.S.C.A. §1595(a).

213.  18 U.S.C. 1591, entitled "Sex trafficking of children or by force, fraud, or

coercion," states:

a.  Whoever knowingly—
    i.  in or affecting interstate or foreign commerce […] recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person;  or
    ii.  benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1);

b.  knowing, […] that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act […].

c.  The term "coercion" means—
    i.  threats of serious harm to or physical restraint against any person;
    ii.  any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or
    iii.  the abuse or threatened abuse of law or the legal process.

d.  The term "commercial sex act" means any sex act, on account of which anything of value is given to or received by any person.

e.  The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

214.  18 U.S.C 1591 § (e)(3) defines a "commercial sex act" as "any sex act, on account

of which anything of value is given to or received by any person."

215.  Additionally, 18 USCA § 1595. Civil remedy states as follows:

a.  An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.
    i.  Any civil action filed under subsection (a) shall be stayed during the pendency of any criminal action arising out of the same occurrence in which the claimant is the victim.
    ii.  In this subsection, a "criminal action" includes investigation and prosecution and is pending until final adjudication in the trial court.

b.  No action may be maintained under subsection (a) unless it is commenced not later than the later of—

     i.   10 years after the cause of action arose; or

    ii.   10 years after the victim reaches 18 years of age, if the victim was a minor at the time of the alleged offense.

216.    Broad, expansive language is employed in Trafficking Victims Protection Act (TVPA) and its remedial provision, which permits civil actions for damages. *See Noble v. Weinstein*, 335 F. Supp. 3d 504 (SDNY 2018).

217.    Defendants subjected Plaintiff to commercial sex acts by force and coercion, including both physical and financial.

218.    A commercial sex act means any sex act, on account of which anything of value is given to or received by any person. The specific conditions are the use of force, fraud, or coercion, or conduct involving persons under the age of 18. See the Department of Justice's definition:

> https://www.justice.gov/crt/involuntary-servitude-forced-labor-and-sex-trafficking-statutesenforced. "Section 1591 criminalizes sex trafficking, which is defined as causing a person to engage in a commercial sex act under certain statutorily enumerated conditions. A commercial sex act means any sex act, on account of which anything of value is given to or received by any person. The specific conditions are the use of force, fraud, or coercion, or conduct involving persons under the age of 18."

219.    The Hotel Defendants, knowingly, in or affecting interstate and foreign commerce, solicited, recruited, enticed, harbored and/or obtained Plaintiff knowing the fact that the means of force, threats of force, and coercion would be used to cause Plaintiff to engage in a commercial sex act.

220.    The Hotel Defendants violated the sections cited hereto and Plaintiff suffered damage as a result.

[SPACE INTENTIONALLY LEFT BLANK]

## COUNT V
### 42 U.S.C. § 2000e-2
### Title VII Discrimination
### (As Against Defendant IBANERA)

221.    Plaintiff reincorporates the factual allegations in Paragraphs 25 through 175.

222.    Title VII provides, in relevant part, that "it shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of his race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

223.    Title VII further provides that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

224.    Plaintiff was an individual female and was therefore a protected class member.

225.    The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

226.    Defendant subjected Plaintiff to discriminatory treatment on the basis of her sex. Defendant's discriminatory treatment included, but was not limited to, 1) making inappropriate remarks about Plaintiff's physical appearance, including but not limited to, "this is the sexiest and most knowledgeable person with the most class *that I can send you* for this trip," "[PARR] told me he was sending the sexiest employee to Singapore *for me*, and he wasn't lying," "you have a nice ass too, you should stay in my room," " you're going to be my perfect work girlfriend," "you're sleeping with the boss, so your title would not be important," "so, are you going to keep the baby," SNORRASON referring to Plaintiff as his, "girlfriend" at work events and telling her that they would make "Viking babies", among others, 2) repeatedly sexually assaulting and

34

battering Plaintiff at a business conference, 3) drugging Plaintiff, 4) demanding Plaintiff sleep in SNORRASON's room, 5) threatening Plaintiff not to leave Singapore, 6) halting the development of Plaintiff's app unless she allowed SNORRASON to continue sexually assaulting and battering her, 7) ceasing all communications with Plaintiff after she returned to Miami from Singapore, and 8) unlawfully terminating Plaintiff's employment, among others.

227.    Defendant targeted Plaintiff because of her sex. No similarly situated male employees endured the discriminatory conduct that Plaintiff was forced to endure.

228.    The discriminatory actions of the Defendant against Plaintiff, as described and set forth above, constitute an adverse employment action for the purposes of Title VII. In subjecting Plaintiff to adverse employment actions, the Defendant intentionally discriminated against Plaintiff with respect to the compensation, terms, conditions, or privileges of her employment.

229.    Even if Defendant could assert legitimate reasons for its adverse actions taken against Plaintiff, her protected class status, at a minimum, was a motivating factor for Defendant's discriminatory conduct and Plaintiff explicitly reserves the right to pursue a mixed-motive theory against Defendant.

230.    As a direct and proximate result of the Defendant's intentional discriminatory conduct in violation of Title VII, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Plaintiff has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. Plaintiff accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

231.    Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's rights under Title VII, warranting the imposition of punitive damages, in addition to compensatory damages.

232.    The conduct of the Defendant deprived Plaintiff of her statutory rights guaranteed under Title VII.

233.    Plaintiff further requests that her attorney's fees and costs be awarded as permitted by law.

## COUNT VI
### 42 U.S.C. § 2000e-3
### Title VII Hostile Work Environment
### (As Against Defendant IBANERA)

234.    Plaintiff reincorporates the factual allegations in Paragraphs 25 through 175.

235.    Title VII also prohibits hostile work environment harassment, defined as unwanted comments or conduct regarding the plaintiff's protected characteristics that have the purpose or effect of unreasonably interfering with the terms and conditions of the plaintiff's employment.

236.    Plaintiff was a woman and is therefore a protected class member.

237.    Defendant's harassment and discrimination was severe or pervasive enough to make any reasonable person of the same legally protected class believe that the conditions of employment were altered, and that the working environment was intimidating, hostile, or abusive.

238.    Defendant's severe and pervasive conduct included, but was not limited to, 1) making inappropriate remarks about Plaintiff's physical appearance, including but not limited to, "this is the sexiest and most knowledgeable person with the most class *that I can send you* for this trip," "[PARR] told me he was sending the sexiest employee to Singapore *for me*, and he wasn't lying," "you have a nice ass too, you should stay in my room," " you're going to be my perfect work girlfriend," "you're sleeping with the boss, so your title would not be important," "so, are

you going to keep the baby," SNORRASON referring to Plaintiff as his, "girlfriend" at work events and telling her that they would make "Viking babies", among others, 2) repeatedly sexually assaulting and battering Plaintiff at a business conference, 3) drugging Plaintiff, 4) demanding Plaintiff sleep in SNORRASON's room, 5) threatening Plaintiff not to leave Singapore, 6) halting the development of Plaintiff's app unless she allowed SNORRASON to continue sexually assaulting and battering her, 7) ceasing all communications with Plaintiff after she returned to Miami from Singapore, and 8) unlawfully terminating Plaintiff's employment, among others.

239.    Defendant targeted Plaintiff because she was a woman. No similarly situated male employees endured the harassing conduct that Plaintiff was forced to endure.

240.    Defendant's harassment was unwelcomed by Plaintiff, who had no choice but to endure the discriminatory treatment.

241.    Defendant's harassment and discrimination of Plaintiff negatively and significantly impacted Plaintiff's life. Defendant's conduct made Plaintiff feel isolated, embarrassed, and ashamed.

242.    As a direct and proximate result of the Defendant's intentional discriminatory conduct in violation of Title VII, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Plaintiff has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. Plaintiff accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

243.     Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's rights under Title VII, warranting the imposition of punitive damages in addition to compensatory damages.

244.     The conduct of Defendants deprived Plaintiff of her statutory rights guaranteed under Title VII.

245.     Plaintiff further requests that her attorney's fees and costs be awarded as permitted by law.

### COUNT VII
### 42 U.S.C. § 2000e-3
### Title VII Retaliation
### (As Against Defendant IBANERA)

246.     Plaintiff reincorporates the factual allegations in Paragraphs 25 through 175.

247.     Title VII prohibits retaliation in any manner against a person who has opposed a discriminatory practice, or who has participated in any investigation, proceeding or hearing related to an unlawful discriminatory practice. 42 U.S.C. § 2000e-3(a).

248.     Plaintiff was an individual female and was therefore a protected class member.

249.     Plaintiff engaged in a protected activity when she opposed Defendant's discriminatory and unlawful conduct, including but not limited to Defendant, 1) making inappropriate remarks about Plaintiff's physical appearance, including but not limited to, "this is the sexiest and most knowledgeable person with the most class *that I can send you* for this trip," "[PARR] told me he was sending the sexiest employee to Singapore *for me*, and he wasn't lying," "you have a nice ass too, you should stay in my room," " you're going to be my perfect work girlfriend," "you're sleeping with the boss, so your title would not be important," "so, are you going to keep the baby," SNORRASON referring to Plaintiff as his, "girlfriend" at work events and telling her that they would make "Viking babies", among others, 2) repeatedly sexually

assaulting and battering Plaintiff at a business conference, 3) drugging Plaintiff, 4) demanding Plaintiff sleep in SNORRASON's room, 5) threatening Plaintiff not to leave Singapore, 6) halting the development of Plaintiff's app unless she allowed SNORRASON to continue sexually assaulting and battering her, 7) ceasing all communications with Plaintiff after she returned to Miami from Singapore, and 8) unlawfully terminating Plaintiff's employment, among others.

250.    Plaintiff explicitly told Defendant that its actions were discriminatory and unlawful, and she complained about Defendant's actions to PARR, CARBONARA, and SNORRASON.

251.    In response to Plaintiff asserting her right to enjoy the same employment benefits as every other employee, Defendant retaliated against Plaintiff.

252.    Defendant retaliated against Plaintiff by ceasing communications with Plaintiff and ultimately terminating her employment.

253.    Defendant took the above-mentioned materially adverse action, among others, against Plaintiff because of her protected activities, including her report of unlawful discrimination on the same day Defendant unlawfully terminated her employment.

254.    Any reasonable employee in Plaintiff's position would be dissuaded from opposing discriminatory conduct if they knew that they would be subjected to the kind of treatment that Plaintiff was forced to endure.

255.    Defendant's alleged basis for its adverse employment actions against Plaintiff are pretextual and have been asserted only to cover up the retaliatory nature of Defendant's conduct.

256.    As a direct and proximate result of the Defendant's retaliatory conduct in violation of Title VII, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Plaintiff has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible

damages. Plaintiff accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

257.    Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of the Plaintiff's rights under Title VII, warranting the imposition of punitive damages in addition to compensatory damages.

258.    The conduct of the Defendant deprived Plaintiff of her statutory rights guaranteed under Title VII.

259.    Plaintiff further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT VIII**
**§ 760.10(1), Fla. Stat.**
**FCRA Sex Discrimination**
**(As Against Defendant IBANERA)**

260.    Plaintiff reincorporates the factual allegations in Paragraphs 25 through 175.

261.    The FCRA prohibits employment discrimination against an individual with respect to compensation, terms, conditions, or privileges of employment because of the individual's sex or pregnancy. § 760.10(1)(a), Fla. Stat.

262.    Plaintiff was an individual female and was therefore a protected class member.

263.    The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

264.    Defendant subjected Plaintiff to discriminatory treatment on the basis of her sex. Defendant's discriminatory treatment included, but was not limited to, 1) making inappropriate remarks about Plaintiff's physical appearance, including but not limited to, "this is the sexiest and most knowledgeable person with the most class *that I can send you* for this trip," "[PARR] told me he was sending the sexiest employee to Singapore *for me*, and he wasn't lying," "you have a

nice ass too, you should stay in my room," " you're going to be my perfect work girlfriend," "you're sleeping with the boss, so your title would not be important," "so, are you going to keep the baby," SNORRASON referring to Plaintiff as his, "girlfriend" at work events and telling her that they would make "Viking babies", among others, 2) repeatedly sexually assaulting and battering Plaintiff at a business conference, 3) drugging Plaintiff, 4) demanding Plaintiff sleep in SNORRASON's room, 5) threatening Plaintiff not to leave Singapore, 6) halting the development of Plaintiff's app unless she allowed SNORRASON to continue sexually assaulting and battering her, 7) ceasing all communications with Plaintiff after she returned to Miami from Singapore, and 8) unlawfully terminating Plaintiff's employment, among others.

265.    Defendant targeted Plaintiff because of her sex. No similarly situated male employees endured the discriminatory conduct that Plaintiff was forced to endure.

266.    The discriminatory actions of the Defendant against Plaintiff, as described and set forth above, constitute an adverse employment action for the purposes of the FCRA. In subjecting Plaintiff to adverse employment actions, the Defendant intentionally discriminated against Plaintiff with respect to the compensation, terms, conditions, or privileges of her employment.

267.    Even if Defendant could assert legitimate reasons for its adverse actions taken against Plaintiff, her protected class status, at a minimum, was a motivating factor for Defendant's discriminatory conduct and Plaintiff explicitly reserves the right to pursue a mixed-motive theory against Defendant.

268.    As a direct and proximate result of the Defendant's intentional discriminatory conduct in violation of the FCRA, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Plaintiff has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and

other intangible damages. Plaintiff accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

269.     Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's rights under the FCRA, warranting the imposition of punitive damages, in addition to compensatory damages.

270.     The conduct of the Defendant deprived Plaintiff of her statutory rights guaranteed under the FCRA.

271.     Plaintiff further requests that her attorney's fees and costs be awarded as permitted by law.

### COUNT IX
### § 760.10(7), Fla. Stat.
### FCRA Hostile Work Environment
### (As Against Defendant IBANERA)

272.     Plaintiff reincorporates the factual allegations in Paragraphs 25 through 175.

273.     The FCRA prohibits employment discrimination in an individual's terms, conditions, and privileges of employment because of the individual's sex. § 760.10(1), Fla. Stat.

274.     Plaintiff was a woman and is therefore a protected class member.

275.     Defendant's harassment and discrimination was severe or pervasive enough to make any reasonable person of the same legally protected class believe that the conditions of employment were altered, and that the working environment was intimidating, hostile, or abusive.

276.     Defendant's severe and pervasive conduct included, but was not limited to, 1) making inappropriate remarks about Plaintiff's physical appearance, including but not limited to, "this is the sexiest and most knowledgeable person with the most class *that I can send you* for this trip," "[PARR] told me he was sending the sexiest employee to Singapore *for me*, and he wasn't

lying," "you have a nice ass too, you should stay in my room," " you're going to be my perfect work girlfriend," "you're sleeping with the boss, so your title would not be important," "so, are you going to keep the baby," SNORRASON referring to Plaintiff as his, "girlfriend" at work events and telling her that they would make "Viking babies", among others, 2) repeatedly sexually assaulting and battering Plaintiff at a business conference, 3) drugging Plaintiff, 4) demanding Plaintiff sleep in SNORRASON's room, 5) threatening Plaintiff not to leave Singapore, 6) halting the development of Plaintiff's app unless she allowed SNORRASON to continue sexually assaulting and battering her, 7) ceasing all communications with Plaintiff after she returned to Miami from Singapore, and 8) unlawfully terminating Plaintiff's employment, among others.

277. Defendant targeted Plaintiff because she was a woman. No similarly situated male employees endured the harassing conduct that Plaintiff was forced to endure.

278. Defendant's harassment was unwelcomed by Plaintiff, who had no choice but to endure the discriminatory treatment.

279. Defendant's harassment and discrimination of Plaintiff negatively and significantly impacted Plaintiff's life. Defendant's conduct made Plaintiff feel isolated, embarrassed, and ashamed.

280. As a direct and proximate result of the Defendant's intentional discriminatory conduct in violation of the FCRA, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Plaintiff has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. Plaintiff accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

281.     Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's rights under the FCRA, warranting the imposition of punitive damages in addition to compensatory damages.

282.     The conduct of Defendants deprived Plaintiff of her statutory rights guaranteed under the FCRA.

283.     Plaintiff further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT X**
**§ 760.10(7), Fla. Stat.**
**FCRA Retaliation**
**(As Against Defendant IBANERA)**

284.     Plaintiff reincorporates the factual allegations in Paragraphs 25 through 175.

285.     The FCRA prohibits retaliation in any manner against a person who has opposed a discriminatory practice, or who has participated in any investigation, proceeding or hearing related to an unlawful discriminatory practice. § 760.10(7), Fla. Stat.

286.     Plaintiff was an individual female and was therefore a protected class member.

287.     Plaintiff engaged in a protected activity when she opposed Defendant's discriminatory and unlawful conduct, including but not limited to Defendant, 1) making inappropriate remarks about Plaintiff's physical appearance, including but not limited to, "this is the sexiest and most knowledgeable person with the most class *that I can send you* for this trip," "[PARR] told me he was sending the sexiest employee to Singapore *for me*, and he wasn't lying," "you have a nice ass too, you should stay in my room," " you're going to be my perfect work girlfriend," "you're sleeping with the boss, so your title would not be important," "so, are you going to keep the baby," SNORRASON referring to Plaintiff as his, "girlfriend" at work events and telling her that they would make "Viking babies", among others, 2) repeatedly sexually

assaulting and battering Plaintiff at a business conference, 3) drugging Plaintiff, 4) demanding Plaintiff sleep in SNORRASON's room, 5) threatening Plaintiff not to leave Singapore, 6) halting the development of Plaintiff's app unless she allowed SNORRASON to continue sexually assaulting and battering her, 7) ceasing all communications with Plaintiff after she returned to Miami from Singapore, and 8) unlawfully terminating Plaintiff's employment, among others.

288.    Plaintiff explicitly told Defendant that its actions were discriminatory and unlawful, and she complained about Defendant's actions to PARR, CARBONARA, and SNORRASON.

289.    In response to Plaintiff asserting her right to enjoy the same employment benefits as every other employee, Defendant retaliated against Plaintiff.

290.    Defendant retaliated against Plaintiff by ceasing communications with Plaintiff and ultimately terminating her employment.

291.    Defendant took the above-mentioned materially adverse action, among others, against Plaintiff because of her protected activities, including her report of unlawful discrimination on the same day Defendant unlawfully terminated her employment.

292.    Any reasonable employee in Plaintiff's position would be dissuaded from opposing discriminatory conduct if they knew that they would be subjected to the kind of treatment that Plaintiff was forced to endure.

293.    Defendant's alleged basis for its adverse employment actions against Plaintiff are pretextual and have been asserted only to cover up the retaliatory nature of Defendant's conduct.

294.    As a direct and proximate result of the Defendant's retaliatory conduct in violation of the FCRA, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Plaintiff has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible

damages. Plaintiff accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

295.    Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of the Plaintiff's rights under the FCRA, warranting the imposition of punitive damages in addition to compensatory damages.

296.    The conduct of the Defendant deprived Plaintiff of her statutory rights guaranteed under the FCRA.

297.    Plaintiff further requests that her attorney's fees and costs be awarded as permitted by law.

## COUNT XI
### Negligence
### (As Against Defendant IBANERA)

298.    Plaintiff reincorporates the factual allegations in Paragraphs 25 through 175.

299.    Plaintiff pleads in the alternative, that if she is not declared to have been an employee of IBANERA, she was an independent contractor for IBANERA during all times relevant.

300.    IBANERA had a duty to exercise reasonable care to protect the safety, care, well-being, and health of Plaintiff while she performed work for IBANERA during work-related activities.

301.    IBANERA owed a duty to Plaintiff to create and maintain a safe and secure environment in which Plaintiff could perform work free from sexual assault, abuse, harassment, and discrimination by IBANERA's members or employees.

302.     IBANERA had a duty to exercise reasonable care in hiring, training, supervising, and retaining employees, including owners, to ensure they did not pose a threat of harm to employees or independent contractors.

303.     As detailed above, Plaintiff was subjected to sexual abuse and battery, and sexual harassment by SNORRASON.

304.     IBANERA breached the aforesaid duties of care in one or more of the following ways, including without limitation:

a)     failing to protect Plaintiff from sexual harassment and abuse while she was under the care and custody of IBANERA during work hours and IBANERA-related activities;

b)     failing to provide adequate oversight or supervision over Plaintiff;

c)     failing to provide a safe environment for Plaintiff while on a business trip for IBANERA;

d)     failing to adequately train its owners in the supervision of employees and independent contractors, and in protecting its workers from sexual misconduct by an owner of the company;

e)     failing to provide reasonable measures or procedures to guard against or prevent harm such as that suffered by Plaintiff;

f)     failing to adequately supervise SNORRASON while he was interacting with employees and independent contractors, including Plaintiff;

g)     failing to respond appropriately to warning signs, reports, and/or patterns of misconduct by SNORRASON, which should have put IBANERA on notice of a risk of harm to employees and independent contractors;

h)      failing to institute and enforce adequate policies and procedures designed to prevent and detect abuse, despite the known risks of such abuse occurring in workplace environments;

i)      failing to take corrective action against SNORRASON;

j)      failing to address, report, or investigate evidence of inappropriate relationships between SNORRASON and female subordinates, including Plaintiff;

k)      failing to remove SNORRASON from his position despite knowing or having reason to know of his dangerous and inappropriate conduct;

l)      failing to act timely to protect Plaintiff from future potential sexual harm or to mitigate the known risk of future sexual harm to Plaintiff;

m)      failing to act timely in response to known harm to Plaintiff; and

n)      failing to deter SNORRASON.

305.    As a direct and proximate result of IBANERA's negligent acts and omissions, SNORRASON was enabled and permitted to engage in sexual abuse of Plaintiff.

306.    IBANERA's failure to take reasonable steps to prevent or stop the abuse caused Plaintiff to suffer severe emotional distress, psychological trauma, and other damages.

307.    As a direct and proximate result of IBANERA's negligent acts and omissions, SNORRASON was enabled and permitted to engage in sexual abuse of Plaintiff.

308.    As a direct and proximate result of IBANERA's negligence, Plaintiff was sexually assaulted by SNORRASON and exposed to repeated harm, and suffered damages.

309.    As a direct and proximate result of IBANERA's violations of law detailed herein, Plaintiff has suffered and will continue to suffer physical injury, psychological trauma, severe

emotional distress, insult, shame, humiliation, emotional pain, suffering, inconvenience, loss of dignity, and other intangible damages.

310.    Plaintiff further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT XII**
**Negligent Retention**
**(As Against Defendant IBANERA)**

311.    Plaintiff reincorporates the factual allegations in Paragraphs 25 through 175.

312.    Plaintiff pleads in the alternative, that if she is not declared to have been an employee of IBANERA, she was an independent contractor for IBANERA during all times relevant.

313.    Plaintiff alleges negligent retention against IBANERA.

314.    At all times material, IBANERA employed SNORRASON.

315.    As detailed above, during the course of his employment, SNORRASON engaged in inappropriate, abusive, and unlawful sexual conduct with Plaintiff.

316.    IBANERA knew or should have known that SNORRASON posed a danger to subordinates based on indicators including without limitation: (a) evidence of inappropriate conduct by SNORRASON involving Plaintiff and other subordinates and (b) warning signs, reports, patterns of inappropriate behavior, or other red flags indicating that SNORRASON was unfit to remain in a position of authority over subordinates.

317.    Despite knowing or having reason to know that SNORRASON was a risk to students, IBANERA negligently retained SNORRASON as an owner, thereby allowing him continued and unfettered access to Plaintiff and other subordinates.

318.     IBANERA had a duty to exercise reasonable care in retaining employees who interacted with its workers, ensuring that they were fit to carry out their professional responsibilities without posing a threat to the workers' safety and well-being.

319.     IBANERA breached its duty by retaining SNORRASON despite knowing or having reason to know of his dangerous and inappropriate conduct, making it foreseeable that workers, including Plaintiff, could be harmed as a result.

320.     IBANERA's decision to retain SNORRASON without investigating or acting upon prior warnings, reports, and/or evidence of inappropriate conduct by SNORRASON directly contributed to the harm suffered by Plaintiff.

321.     As a direct and proximate result of IBANERA's negligent retention of SNORRASON, SNORRASON was able to engage in sexual abuse of Plaintiff.

322.     IBANERA's failure to remove SNORRASON from his position created a dangerous environment for Plaintiff, which resulted in the emotional and psychological harm experienced by Plaintiff.

323.     As a result of IBANERA's negligent retention of SNORRASON, Plaintiff was sexually assaulted by SNORRASON and exposed to repeated harm and suffered damages.

324.     As a result of IBANERA's negligent retention of SNORRASON, Plaintiff has suffered and will continue to suffer physical injury, psychological trauma, severe emotional distress, insult, shame, humiliation, emotional pain, suffering, inconvenience, loss of dignity, and other intangible damages.

325.     Plaintiff further requests that her attorney's fees and costs be awarded as permitted by law.

[SPACE INTENTIONALLY LEFT BLANK]

## COUNT XIII
## Negligent Supervision
## (As Against Defendant IBANERA)

326.    Plaintiff reincorporates the factual allegations in Paragraphs 25 through 175.

327.    Plaintiff pleads in the alternative, that if she is not declared to have been an employee of IBANERA, she was an independent contractor for IBANERA during all times relevant.

328.    Plaintiff alleges negligent supervision against IBANERA.

329.    IBANERA had a duty to exercise reasonable care in the supervision of its employees, particularly owners who interact with vulnerable workers, to prevent foreseeable harm.

330.    IBANERA breached its duty by failing to adequately supervise SNORRASON, allowing SNORRASON to engage in sexual misconduct with Plaintiff.

331.    IBANERA failed to exercise reasonable care in supervising SNORRASON in one or more of the following ways, including without limitation:

a.      failing to monitor SNORRASON during his interactions with subordinates, including Plaintiff, in workplace environments, business meetings, or other business-related settings;

b.      failing to implement and enforce appropriate safeguards, policies, and procedures to ensure proper oversight of SNORRASON;

c.      failing to act on warnings, red flags, or concerns related to SNORRASON and/or patterns of inappropriate behavior by SNORRASON, which should have alerted IBANERA to the risk posed by this owner;

d.      failing to address, report, or investigate evidence of inappropriate conduct by SNORRASON against workers, including Plaintiff; and

e.      failing to take reasonable steps to prevent inappropriate, unsupervised interactions between SNORRASON and workers, including Plaintiff.

332.    IBANERA knew or should have known that SNORRASON posed a risk of harm to workers due to (a) prior warnings, reports, and/or evidence of inappropriate behavior by SNORRASON and (b) observations of warning signs, suspicious conduct, or other red flags indicating that SNORRASON was unfit for unsupervised access to workers.

333.    By failing to properly supervise SNORRASON, IBANERA negligently allowed Plaintiff to be subjected to sexual abuse and the resulting emotional and psychological harm.

334.    As a direct and proximate result of IBANERA's negligent supervision, SNORRASON was able to engage in sexual abuse of Plaintiff.

335.    IBANERA's failure to exercise proper oversight directly caused Plaintiff to suffer emotional distress, psychological trauma, and other injuries.

336.    As a result of IBANERA's negligent supervision, Plaintiff was sexually assaulted by SNORRASON and exposed to repeated harm and suffered damages.

337.    As a direct and proximate result of IBANERA's negligent supervision, Plaintiff has suffered and will continue to suffer physical injury, psychological trauma, severe emotional distress, insult, shame, humiliation, emotional pain, suffering, inconvenience, loss of dignity, and other intangible damages.

338.    Plaintiff further requests that her attorney's fees and costs be awarded as permitted by law.

## COUNT XIV
### Negligent Failure to Train
### (As Against Defendant IBANERA)

339.    Plaintiff reincorporates the factual allegations in Paragraphs 25 through 175.

340.    Plaintiff alleges negligent failure to train against IBANERA.

341.    IBANERA had a duty to exercise reasonable care in training its employees, particularly owners who have frequent interactions with workers, to prevent foreseeable harm, including sexual abuse.

342.    IBANERA breached its duty by failing to properly train SNORRASON and other members, which allowed SNORRASON to engage in unlawful and abusive conduct with Plaintiff.

343.    IBANERA breached its fiduciary duty to Plaintiff by engaging in conduct including without limitation:

(1)    failing to provide adequate training on identifying the warning signs of inappropriate behavior or potential grooming by owners;

(2)    failing to train owners on the proper procedures for reporting suspected abuse, boundary violations, or other misconduct involving subordinates; failing to provide sufficient education on the professional and ethical responsibilities of owners, particularly regarding interactions with workers;

(3)    failing to implement and enforce policies requiring mandatory training sessions on the prevention of sexual abuse and misconduct within the workplace; and

(4)    failing to train staff on monitoring and supervising interactions between workers and supervisors to prevent the risk of sexual misconduct.

344.    IBANERA's failure to provide adequate training on how to prevent, detect, and respond to sexual misconduct by its employees created a foreseeable risk of harm to workers, including Plaintiff.

345.    As a direct and proximate result of IBANERA's negligent failure to train its employees, SNORRASON was able to engage in sexual abuse of Plaintiff.

346. IBANERA's failure to provide appropriate training programs directly caused Plaintiff to suffer severe emotional distress, psychological trauma, and other injuries.

347. As a result of IBANERA's negligent failure to train, Plaintiff was sexually assaulted by SNORRASON and exposed to repeated harm and suffered damages.

348. As a result of IBANERA's negligent failure to train, Plaintiff has suffered and will continue to suffer physical injury, psychological trauma, severe emotional distress, insult, shame, humiliation, emotional pain, suffering, inconvenience, loss of dignity, and other intangible damages.

349. Plaintiff further requests that her attorney's fees and costs be awarded as permitted by law.

## COUNT XV
### Sexual Assault and Battery
### (As Against Defendant SNORRASON)

350. Plaintiff reincorporates the factual allegations in Paragraphs 25 through 175.

351. SNORRASON repeatedly sexually assaulted and battered Plaintiff on or around September 17, 2024, through September 23, 2024, as set forth above.

352. SNORRASON engaged in illegal and improper touching of Plaintiff, against her will and without her consent.

353. SNORRASON illegally and without Plaintiff's knowledge, drugged her to ensure she was incapacitated and unable to rebuke his sexual advances, against her will and without her consent.

354. SNORRASON forcibly, repeatedly inserted his erect penis inside Plaintiff's vagina, against her will and without her consent.

355.    As a result of SNORRASON's assaults and batteries, Plaintiff suffered serious and permanent injuries as set forth above.

356.    As a result of SNORRASON's conduct, Plaintiff was placed in apprehension and fear for her physical well-being.

357.    SNORRASON did the aforementioned acts with the intent to cause a harmful or offensive contact with an intimate part of Plaintiff's person that would offend a reasonable person's sense of personal dignity. Further, said acts did cause a harmful or offensive contact with an intimate part of Plaintiff's person such as would offend a reasonable person's sense of personal dignity.

358.    Because of SNORRASON's position of authority over Plaintiff, and her mental and emotional state, Plaintiff was unable to, and did not, give legal consent to such acts.

359.    As a direct and proximate result of the acts of SNORRASON's acts, Plaintiff sustained serious and permanent injuries to her person and other damage in an amount to be shown according to proof and within the jurisdiction of the Court.

360.    Defendants violated the sections cited hereto and Plaintiff suffered damage as a result.

<u>**COUNT XVI**</u>
**False Imprisonment**
**(As Against Defendant SNORRASON)**

361.    Plaintiff reincorporates the factual allegations in Paragraphs 25 through 175.

362.    The elements of a cause of action for false imprisonment include: (1) the unlawful detention and deprivation of liberty of a person; (2) against that person's will; (3) without legal authority or 'color of authority'; and (4) which is unreasonable and unwarranted under the circumstances.

363.     On or around September 17 through 24, 2024, SNORRASON repeatedly sexually assaulted and battered Plaintiff.

364.     On the night of September 17, 2024, SNORRASON confined Plaintiff to her hotel room before forcefully having sex with her, without her consent.

365.     SNORRASON repeatedly held Plaintiff down while he inserted his penis inter her vagina, even leaving bruises over her legs and body.

366.     As Plaintiff attempted to pull away from SNORRASON and break free from his grasp, SNORRASON tightened his grip and did not allow her to leave.

367.     Plaintiff was powerless and could not escape SNORRASON's grasp no matter how hard she tried.

368.     By detaining Plaintiff and depriving Plaintiff of her liberty as described above, SNORRASON falsely imprisoned Plaintiff, against her will, without legal authority nor color of authority and was unwanted, unreasonable, and unwarranted under the circumstances.

369.     SNORRASON's false imprisonment described above directly and proximately caused Plaintiff to sustain injuries in that it directly, and in a natural and continuous sequence, produced or contributed to such injuries.

370.     As a direct and proximate result of SNORRASON's false imprisonment, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Plaintiff has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages Plaintiff accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

371. SNORRASON's actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's rights, warranting the imposition of punitive damages in addition to compensatory damages.

372. Plaintiff further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT XVII**
**Intentional Infliction of Emotional Distress**
**(As Against Defendant SNORRASON)**

373. Plaintiff reincorporates the factual allegations in Paragraphs 25 through 175.

374. To establish a claim of intentional infliction of emotional distress, the plaintiff must present evidence of: (1) the defendant's extreme and outrageous conduct, (2) the defendant's intent or recklessness, (3) causation, and (4) the severe emotional distress of the plaintiff." *Walsh v. Taylor*, 263 Mich. App. 618, 634 (2004) (citation omitted).

375. The conduct of the Defendant was intentional, personal in nature, retaliatory, extreme and outrageous so as to go beyond all possible bounds of decency.

376. Such intentional, extreme and outrageous conduct caused Plaintiff to suffer humiliation, extreme embarrassment, fear for her well-being and safety, and other severe emotional distress and damages.

377. As a result of SNORRASON's actions in purposefully traumatizing her and taking absolute autonomy over her body, Plaintiff suffered serious and permanent injuries as set forth above.

378. SNORRASON did the aforementioned acts with the intent to cause a harmful or offensive contact with an intimate part of Plaintiff's person that would offend a reasonable person's sense of personal dignity. Further, said acts did cause a harmful or offensive contact with

an intimate part of Plaintiff's person such as would offend a reasonable person's sense of personal dignity.

379.    Because of SNORRASON's position of authority over Plaintiff, and her mental and emotional state, Plaintiff was unable to, and did not, give legal consent to such acts.

380.    As a direct and proximate result of the acts of SNORRASON's acts, Plaintiff sustained serious and permanent injuries to her person and other damage in an amount to be shown according to proof and within the jurisdiction of the Court.

## COUNT XVIII
### Negligent Infliction of Emotional Distress
### (As Against Defendant PARR and CARBONARA)

381.    Plaintiff reincorporates the factual allegations in Paragraphs 25 through 175.

382.    Plaintiff is informed and believes that PARR and CARBONARA knew or should have known that they were creating a culture and environment wherein Plaintiff would be sexually assaulted by SNORRASON.

383.    Plaintiff is informed and believes that PARR and CARBONARA failed to take appropriate and/or preventative action against SNORRASON.

384.    Defendants PARR and CARBONARA owed Plaintiff a duty of care to act in a reasonable and ordinary manner so as not to cause Plaintiff any foreseeable harm.

385.    Defendants PARR and CARBONARA failed to use ordinary and reasonable care in order to avoid injury to Plaintiff.

386.    Defendants PARR and CARBONARA released or failed to take reasonable measures to stop SNORRASON from drugging Plaintiff without her knowledge or consent, and thereafter subjecting her to repeated violence and sexual assault, causing Plaintiff severe emotional distress.

387. As a result of SNORRASON's negligent and intolerable treatment and conduct, Plaintiff suffered and continues to suffer from anxiety, worry, mental anguish, loss of sleep, stress, depression, and severe emotional distress.

388. As a direct and proximate result of Defendants' acts or omissions, Plaintiff has suffered, without limitation, emotional distress, fear, embarrassment, anxiety, shame, humiliation, distress, shock, and severe emotional distress.

## COUNT XIX
### Negligence
### (As Against Defendants MARRIOTT, STARWOOD MANAGEMENT, STARWOOD WORLDWIDE)

389. Plaintiff reincorporates the factual allegations in Paragraphs 25 through 175.

390. Plaintiff was an invitee of Defendants MARRIOTT, STARWOOD MANAGEMENT, STARWOOD WORLDWIDE (hereinafter the "Hotel Defendants"), as she stayed in the Sheraton Towers in Singapore, located at 39 Scotts RD, Singapore 228230 (the "Sheraton").

391. The Hotel Defendants collectively own and operate the Sheraton.

392. At all relevant times, the Hotel Defendants actively marketed the Sheraton as a premiere resort that was secure and sage.

393. At all relevant times, the Hotel Defendants, through its agents and employees had the ability and duty to solicit, screen, investigate, and select adequate security guards for the safety of its guests and invitees at the Sheraton.

394. At all relevant times, the Hotel Defendants, through its agents and employees had the ability and duty to solicit, screen, investigate and install adequate security cameras and personnel for monitoring its security cameras for the safety of its guests and invitees at the Sheraton.

395.    The Hotel Defendants, through its agents and employees, owed a duty to its business invitees, and the public, including Plaintiff, to use reasonable care to provide a safe and secure environment, so as to avoid injury or harm to him while Plaintiff was at the Sheraton.

396.    The Hotel Defendants owed a duty to Plaintiff of reasonable care concerning her safety and well-being, including taking precautions reasonably necessary to protect its business invitees, and the public, to protect them from reasonably foreseeable sexual abuse while on the premises.

397.    The Hotel Defendants, through its agents and employees, knew or in the exercise of reasonable care, should have known that sexual abuse was reasonably likely to be perpetrated on the Hotel Defendants' business invitees and the public unless the Defendant took steps to prevent them, enforce its own rules and to provide proper security for such individuals, including, but not limited to Plaintiff.

398.    The Hotel Defendants owed a duty to of reasonable care to Plaintiff, including but not limited to the following:

    a.  To provide a safe environment for Plaintiff while business invitees of the Sheraton resided;

    b.  To enforce its own rules against sexual abuse or misconduct in the hotel;

    c.  To provide security measures to ensure appropriate and adequate security to business invitees and the public, including Plaintiff;

    d.  To adequately warn, protect, instruct Plaintiff;

    e.  To adequately warn, protect, instruct, or advise instruct Plaintiff and others, of the Defendant's lack of adequate security and protection of its business invitees and of the public;

f. To instruct, train and teach their employees, agents, apparent agents, representatives, officers, servants, contractors and others under the direction, authority, control or right of control of the Defendant how to properly protect business invitees and the public and to properly monitor individuals with known or discoverable dangerous propensities, so as to protect other individuals from harm, including Plaintiff and others;

g. To hire an adequate number of qualified security personnel to deter crimes and sexual abuse from being committed upon business invitees, including Plaintiff Daniel;

h. To effectuate an adequate security plan to warn and protect business invitees, including Plaintiff and others;

i. To police, patrol, guard, deter and otherwise provide adequate protection for its business invitees, and the public, when Defendant knew or should have known of foreseeable criminal acts;

j. To hire and/or retain private security personnel and/or off duty police officers to patrol and/or monitor the Sheraton, to protect its business invitees and the public, including Plaintiff and others;

k. To implement adequate security policies, security measures, and security procedures necessary to protect Plaintiff and other business invitees and members of the public;

l. To use reasonable care in training its employees, agents, and representatives to ensure that they were adequately monitoring the Tijuana Marriott to deter, prevent

and stop crimes and sexual abuse from occurring, including but not limited to SNORRASON's repeated sexual assault and battery of Plaintiff;

m. To use reasonable care in training its employees, agents, and representatives to ensure that they were properly reporting to their managers and the authorities any suspicious behavior and individuals at the Sheraton; and,

n. To otherwise use reasonable care to adapt its premises to reasonably reduce the risk of harm to business invitees and the public, including Plaintiff and others.

399.     The Hotel Defendants knew or should have known that its acts or omissions, as set forth above, created a dangerous hazard to its business invitees and the public, including Plaintiff.

400.     The Hotel Defendants knew or should have known that its acts and omissions would cause serious injury to Plaintiff.

401.     Plaintiff's damages were a direct and proximate result of the Hotel Defendants' negligence.

402.     As a direct and proximate cause of the Hotel Defendants' acts and omissions, Plaintiff sustained serious physical injuries and has suffered and will in the future continue to suffer resulting pain and suffering, disability, mental pain, suffering and anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical treatment, loss of earnings, loss of ability to earn money, and loss of earning capacity. The losses and damages are permanent and continuing and Plaintiff will suffer the losses and damages in the future.

## **JURY DEMAND**

Plaintiff requests a jury trial on all issues to be tried.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment against Defendant for all damages suffered by Plaintiff, including economic damages, lost wages (back pay and front pay) and benefits, liquidated damages, statutory damages, compensatory damages, emotional distress damages, interest, attorney's fees and costs, disbursements of action, and any other remedies (monetary and/or equitable) allowable by law as a result of the Defendant's conduct in violation of the TVPA, Title VII, the FCRA, and all other applicable federal and state law.

Dated: Miami, Florida
  September 9, 2025,

**DEREK SMITH LAW GROUP, PLLC**
*Counsel for Plaintiff*

*/s/ Derek T. Smith*
Derek T. Smith, Esq.
Florida Bar No.: 1014216
Derek Smith Law Group, PLLC
520 Brickell Key Drive, Suite O-301
Miami, FL 33131
Tel: (305) 946-1884
Derek@dereksmithlaw.com

*/s/ Daniel J. Barroukh*
Daniel J. Barroukh, Esq.
Florida Bar No.: 1049271
Derek Smith Law Group, PLLC
520 Brickell Key Drive, Suite O-301
Miami, FL 33131
Tel: (305) 946-1884
Danielb@dereksmithlaw.com