# EXHIBIT C

# Tan Woo Thian
v
## PricewaterhouseCoopers Advisory Services Pte Ltd

[2021] SGCA 20

Court of Appeal — Civil Appeal No 93 of 2020
Sundaresh Menon CJ, Andrew Phang Boon Leong JCA and
Belinda Ang Saw Ean JAD
4 March 2021

*Tort* — Negligence — Causation — Plaintiff in negligence failing to establish causation — Reliance on bifurcation of trial — Whether bifurcation obviated need for plaintiff to establish that defendant's breach of duty of care caused loss to plaintiff

*Tort* — Negligence — Duty of care — Professional fact-finder investigating company's transactions and reporting on findings to company — Plaintiff involved in investigated transactions — Whether fact-finder owed plaintiff duty of care

**Facts**

The appellant was a former director and chief executive officer ("CEO") of SBI Offshore Ltd ("SBI"). In 2008, SBI acquired a 35% interest in a Chinese company known as Jiangyin Neptune Marine Appliance Co Ltd ("NPT"). In 2015, SBI disposed of its entire interest in NPT. The appellant was involved in structuring and executing both of these transactions (collectively, the "NPT Transactions").

In June 2016, SBI engaged the respondent to conduct an independent fact-finding review on the NPT Transactions. These findings and recommendations were published in a report and summarised in an executive summary (the "Executive Summary") which was issued to SBI's board of directors and shareholders. Certain matters were then brought to the attention of the law enforcement agencies by way of a report that was subsequently made by SBI's then-CEO, Mr John Chan, to the Commercial Affairs Department, stemming from the respondent's findings.

The appellant alleged that inaccurate and/or misleading statements had been made in the (allegedly) negligently prepared and/or presented Executive Summary and that these had caused him loss. The loss alleged in consequence of the respondent's alleged negligence included reputational loss, diminution in the value of the appellant's SBI shares, emotional trauma, and loss of influence in SBI.

The judge at first instance ("the Judge") found that the respondent did not owe the appellant any duty of care. Even if such a duty of care was owed, the respondent had not acted in breach of it. Furthermore, even if there had been breach of such a duty, the appellant had not shown that he had suffered loss flowing from any such breach. The appellant appealed.

**Held, dismissing the appeal but varying the Judge's order as to costs:**

(1) Even assuming, for the sake of argument, that a duty of care was owed by the respondent to the appellant, and that the respondent had breached that duty, the appeal inevitably failed at the hurdle of causation because the appellant had not proved that the respondent's (alleged) breach caused the loss he claimed to have suffered. A cause of action in negligence would be inchoate absent evidence of loss. This was distinct from the question of what the precise *quantum* of such loss was: at [6].

(2) The appellant's sole argument on causation was that the trial was bifurcated between liability and quantum, and that the case should go for assessment of damages if breach of a duty of care was made out. This was incorrect, and wrongly conflated the separate questions of whether the appellant was able to establish that the respondent's breach had *caused* loss, with the *quantum* of that loss. In order to even make out the tort of negligence, it had to first be shown that the defendant's breach had in fact *caused* loss. If a trial had been bifurcated between liability and quantum, the plaintiff would not be obliged to adduce evidence at the liability stage of the trial as to the quantification of the losses and injuries he claimed he suffered. But, he would nonetheless be obliged to show that he did, in fact, suffer one or more types of loss that was *causally connected* to the alleged breach. The appellant on the facts had not placed any evidence before the court of such loss with the requisite causal connection. Accordingly, this element of the cause of action was not made out, and that was fatal to the appellant's case: at [7], [8], and [11].

(3) The question of whether a professional party contracting with a client to carry out an investigation or a fact-finding exercise into the actions of a third party owed that third party a duty of care was one the Judge below answered in the negative. The Court of Appeal expressed neither agreement nor disagreement with the Judge's view. Rather, given the complexity of the point, and the significant commercial ramifications that it might have for professionals and their insurers, this issue was left for decision on a future occasion where it would in fact be necessary to make that determination. The existence of a duty of care in circumstances akin to the present facts should thus be regarded as an open question: at [14] and [19].

**Case(s) referred to**

*Spandeck Engineering (S) Pte Ltd v Defence Science & Technology Agency*
  [2007] 4 SLR(R) 100; [2007] 4 SLR 100 (folld)

*Spring v Guardian Assurance Plc* [1995] 2 AC 296 (refd)

Narayanan Vijya Kumar (Vijay & Co) for the appellant;
Kelvin Poon, Ang Peng Koon Patrick, Chew Xiang, Chow Jie Ying, Cheong Tian Ci, Torsten (Rajah & Tann Singapore LLP) for the respondent.

[Editorial note: This was an appeal from the decision of the High Court in [2020] SGHC 171.]

4 March 2021

**Sundaresh Menon CJ (delivering the judgment of the court *ex tempore*):**

### Introduction

1      This appeal arises out of a decision by the judge below (the "Judge") entirely dismissing the appellant's claim for negligence in HC/S 267/2017 ("Suit 267"): see *Tan Woo Thian v PricewaterhouseCoopers Advisory Services Pte Ltd* [2020] SGHC 171. The Judge found that the respondent did not owe the appellant any duty of care. Even if such a duty of care was owed, the respondent had not acted in breach of it. Furthermore, even if there had been breach of such a duty, the appellant had not shown that he had suffered loss flowing from any such breach.

2      While this appeal bears the trappings of an ordinary claim in negligence, it should be seen in the context of a wider dispute over the control of SBI Offshore Ltd ("SBI"), a Catalist-listed company, between its present and former management. The respondent had been engaged by SBI's management at that time, in particular its chief executive officer ("CEO") Mr Chan Lai Thong ("John Chan"), to conduct a fact-finding review in respect of certain transactions. Those transactions included a series of transactions SBI had entered into in connection with its acquisition and subsequent disposal of shares in a Chinese entity known as Jiangyin Neptune Marine Appliance Co Ltd ("NPT"). The appellant had been involved in these transactions pertaining to NPT in his capacity as SBI's former CEO. The respondent subsequently prepared a report on its findings, and an executive summary of the report (the "Executive Summary") was circulated to SBI's board of directors ("SBI's Board") and shareholders. Certain matters were then brought to the attention of the law enforcement agencies by way of a report that was subsequently made by John Chan to the Commercial Affairs Department ("CAD"), stemming from the respondent's findings.

3      The appellant, who holds 21.89% of SBI's shares, alleged that inaccurate and/or misleading statements had been made in the (allegedly) negligently prepared and/or presented Executive Summary and that these had caused him loss. The loss alleged in consequence of the respondent's alleged negligence included reputational loss, diminution in the value of the appellant's SBI shares, emotional trauma, and loss of influence in SBI. It is against this backdrop that this appeal arises.

### Substance of the appeals

4      The appellant appealed against the Judge's three main findings on the existence of a duty of care, breach of that duty, and whether that breach had caused loss. As all parties accepted, if the appellant failed on any one of these points, that would necessarily be fatal to its claim.

5       Apart from his substantive appeal, the appellant also appealed against the Judge's order as to costs. The Judge had ordered that the appellant pay S$240,000 in costs to the respondent. Specifically, an uplift of S$60,000 above the "baseline" costs of S$180,000 was ordered on grounds of the appellant's conduct at trial. The Judge also allowed the full sum of the respondent's disbursements, or S$277,141.09. The appellant challenged both the uplift of S$60,000 and the Judge's decision on disbursements.

**Decision**

6       This appeal may be dealt with swiftly even though we think a number of difficult issues arise in connection with the question of whether a duty of care arises. That is because even assuming, for the sake of argument, that a duty of care exists, and that the respondent had breached that duty, the appeal inevitably fails at the hurdle of causation. A cause of action in negligence is inchoate absent evidence of actual loss. This is distinct from the question of what the precise *quantum* of such loss is. The appellant's sole argument on causation, as set out in his Appellant's Case at [94], was that the trial was bifurcated between liability and quantum, and that the case should go for assessment of damages if breach of a duty of care was made out.

7       The appellant's contention in this regard is, with respect, incorrect. It wrongly conflates the separate questions of whether the appellant is able to establish that the respondent's breach has *caused* loss, with the *quantum* of that loss. In order to even make out the tort of negligence, it must first be shown that the defendant's breach has in fact *caused* loss. As observed in *Winfield & Jolowicz on Tort* (Sweet & Maxwell, 19th Ed, 2014) at para 7-002:

> Even if the claimant proves every other element in tortious liability he will lose the action or, in the case of torts actionable per se, normally fail to recover more than nominal damages, if what the defendant did is not treated as a legal cause of his loss. ***This issue is logically distinct from and anterior to the question of measure of damages which will be dealt with at a later stage***. Thus, in one of the leading cases, the issue was whether the defendants were liable for fire damage to a wharf which arose from a rather unusual chain of events after the defendants spilled oil into a harbour. If they had been liable (in fact they were not) the prima facie measure of damages would have been the cost of repairing the wharf plus consequential losses like loss of business … [emphasis added in bold italics]

8       It follows from this that if, and to the extent, the trial had been bifurcated between liability and quantum, then the plaintiff would not have been obliged to adduce evidence at the liability stage of the trial as to the quantification of the losses and injuries he claims he suffered. But, he would nonetheless have been obliged to show that he did, in fact, suffer one or more types of loss that was *causally connected* to the alleged breach.

9    In this regard, the *entirety* of the appellant's pleadings on causation consisted of the following:

> By reason of the matters aforesaid, Mr Tan has suffered loss and damage. Full particulars will be supplied on receipt of an accountant's report but the heads of damage are as follows:
>
> (1)    Loss of business reputation in Singapore and abroad with consequential diminution in business opportunities and loss of income and/or profits such as being unable to connect with existing clients, to enter into new deals, or to be employed by other companies.
>
> (2)    Diminution in the value of Mr Tan's shareholding in the Company as a consequence of the share price falling due to the publicity arising out of the [appellant's] Report and the submission of a report to the [CAD].
>
> (3)    Loss of influence in the Company and loss of ability to stabilise the Company or to bring lucrative business to the Company with resultant loss of dividend income. In the event that the five resolutions had been passed in the EGM on 16 July 2016, the new Board would almost certainly have appointed Mr Tan to his old position, which would have stabilised the Company and brought the share price of the Company upwards.

10    This was then largely repeated in the appellant's affidavit of evidence-in-chief. These pleadings, taking them at their highest, reflect at a *conceptual level*, the *sorts of losses* that the appellant intended to rely on to make good his cause of action and to claim damages said to have been suffered as a result of the respondent's breaches of duty. However, no evidence was placed before the court of any of these things having happened as a *causal consequence* of the alleged breaches. In particular, the appellant did not place before the court any evidence:

(a)    that there had in fact been some loss of business reputation and/or influence;

(b)    that there was a loss of income or profits;

(c)    that there was a loss of opportunity to be employed or to connect with clients;

(d)    that the share price fell because of the issuance of the report or the ensuing report to the CAD; or

(e)    that the appellant would have been reappointed and would then have been able to cause the share price of SBI to rise.

11    Even leaving aside for present purposes difficulties such as *whether* losses such as being able to "connect with clients" and/or "loss of influence" were actionable at all, it was patently obvious that the appellant had failed to discharge his burden of establishing that any of the alleged heads of loss had, as a matter of fact, been *caused* by the respondent's alleged breaches of

duty. By way of illustration, no evidence was led as to the appellant's business reputation before and after the report; nor was it established that the appellant had in fact lost income or profits. All that was placed before the court was a series of bare assertions which were wholly unsubstantiated. Particularly noteworthy were the appellant's bland assertions that: (a) the respondent's alleged breaches of duty caused the resolutions he supported at SBI's extraordinary general meeting to fail, (b) the passage of those resolutions would necessarily have meant that he would have been reappointed to his former role, (c) he would have necessarily achieved commercial success in his former role, (d) such commercial success would have caused SBI's share price to rise, and (e) he would have been able to profit from the foregoing. The difficulty, however, to put it quite simply, is that *no* evidence was adduced to any such effect. This was perhaps unsurprising if the appellant truly, even if erroneously, believed that a bifurcated trial entirely obviated the need to lead evidence as to the types of losses that were, in fact, caused by the alleged breaches of duty. However, the absence of any such evidence is fatal to the appellant's case.

12   That point, therefore, is the end of the substantive appeal. Even if we had been prepared to find that a duty of care existed and had been breached by the respondent, the failure of the appellant to lead any evidence to establish that the respondent's alleged breaches did in fact cause the types of losses he allegedly suffered is fatal to his claim, and the appeal is accordingly dismissed.

13   On the issue of costs, this is largely a matter of discretion for the trial Judge. He considered that the trial had been unnecessarily extended by reason of the appellant having taken points that were not germane or relevant to the central issue in this case. The Judge was certainly entitled to take this view, but he then assessed the respondent's costs on the basis of a ten-day hearing, which, in the event, was the actual extended duration of the trial. Having done so, and thus having compensated the respondent for the costs incurred for the extended duration of the trial, it was unclear to us why he then added an uplift of S$60,000 to the amount he arrived at. We therefore set aside the uplift of S$60,000. As for the expert evidence, it seemed to us difficult, on the material before us, to justify the aggregate sum of approximately S$126,000 that was charged by the respondent's Chinese law expert for two relatively brief reports. We accordingly reduced this amount to an aggregate sum of S$80,000, which is inclusive of the out-of-pocket expenses claimed by the Chinese law expert. Save as aforesaid, we do not disturb the other orders made as to costs and disbursements below.

**Duty of care**

14   While that suffices to dismiss the appeal in large part, we set out some thoughts on the difficult question of whether a duty of care ought to have been found in the circumstances. To recapitulate, the question in this

regard is whether a professional party (the "professional fact-finder") contracting with a client to carry out an investigation or a fact-finding exercise into the actions of a third party owes that third party a duty of care, particularly if findings adverse to that third party are made. The Judge held that such a duty of care did not exist. We express neither agreement nor disagreement with the Judge's view in this regard. Rather, given the complexity of the point, and the significant commercial ramifications that this might have for professionals and their insurers, we will leave that for decision on a future occasion when it is necessary to make that determination. Nonetheless, we think it might be helpful to set out a number of the considerations and arguments which might pull in one direction or the other.

15    We begin by setting out the applicable test for determining the existence of a duty of care. As is well established in *Spandeck Engineering (S) Pte Ltd v Defence Science & Technology Agency* [2007] 4 SLR(R) 100 ("*Spandeck*"), a duty of care will only be found if three conditions are satisfied:

 (a)    First, the defendant ought to have foreseen that the claimant would suffer damage due to the defendant's carelessness (*Spandeck* at [75]) (the requirement of "factual foreseeability"). This has been described as a "threshold question which the court must be satisfied is fulfilled, failing which the claim does not even take off" (*Spandeck* at [76]).

 (b)    Second, there must be sufficient legal proximity between the defendant and the claimant (*Spandeck* at [77]) (the requirement of "legal proximity").

 (c)    Third, the imposition of the duty of care should not be negated by countervailing policy considerations (*Spandeck* at [83]) (the "policy considerations").

16    The Judge concluded on the facts that the requirement of factual foreseeability was satisfied. We agree that, generally speaking, it would be within the contemplation of a party preparing a report specifically targeted at the actions of a third party that the third party might suffer at least reputational harm, if not also economic harm, in the event the report contained factually inaccurate and/or misleading information. The crux of the debate, however, centres on whether legal proximity arises, and if so, on whether any duty of care that might be found to be admissible as a matter of principle should be negated by countervailing policy considerations.

17    Some of the arguments militating *against* a finding that a duty of care arises in such circumstances include these:

 (a)    First, there is a potential clash between the scope of the contractual duties undertaken by the professional fact-finder to its

client on the one hand, and the tortious duties that are imposed on it in favour of the world at large, and in particular the target of an investigation, on the other. This may be seen as a subset of the real difficulty of imposing tortious duties in circumstances where a party is carrying out a contractual duty owed to another. This might apply with particular force in a setting like the present, where the contractual duty pertains to and has the very real prospect of affecting the third party, who then wishes to sue the investigator. Given that an investigator will likely have specifically imposed contractual restrictions on the scope of its work and on the permitted uses of its work product, and that any remuneration will have been agreed on the basis of such restrictions and limitations, tortious obligations which impose a *supervening* standard of care that might conceivably even *exceed* any duty taken on with respect to the contracting party ought to be scrutinised very closely. This may be said to apply in an even more pronounced manner in contexts where the very *object* of the contractual arrangement is to find a basis upon which the fact-finder's client can take a course of action that is adverse to the third party.

(b)   Second, there may exist other avenues for individuals who believe they have been wronged by the findings of professional fact-finders in such circumstances. Those who publish falsehoods may be liable in defamation, while the conduct of work in a dishonest manner or in a manner that no reasonable professional would have done could give rise to complaints of professional misconduct.

(c)   Third, and as suggested by the Judge below, recognising a duty of care in such contexts might engender defensive and excessively circumspect reporting, which could be deleterious for professional fact-finders and those who engage their services.

18   By contrast, the following arguments, among others, may be raised in *support* of a duty of care being found in facts akin to the present:

(a)   First, considerations of circumstantial and causal proximity clearly arise on the facts, and these militate in favour of a finding of legal proximity: *Spandeck* at [78] and [79]. Circumstantial proximity arises in so far as the professional fact-finder has procured and gained "special knowledge" of the third party, whether through canvassing information from the contracting party, or through the fact-finder's own perusal of documents and other objective evidence. Moreover, there is causal proximity in so far as loss to the third party would be a *direct and immediate*, or at least a highly foreseeable, consequence of the professional fact-finder's negligence in preparing and presenting his findings on the third party's *behaviour and conduct*. Unlike other situations, the professional fact-finder in circumstances such as the present is tasked with making factual findings and

drawing specific conclusions *directly* pertaining to the third party's conduct, and it is easy to see that erroneous findings can have harmful consequences on the target of the investigation. This might suggest that legal proximity should be found, and that a duty of care should arise.

(b) Second, there might not be any necessary or inevitable conflict between an investigator's contractual obligations and the duties that it would owe in tort if a duty of care were found. This will of course turn on the precise *content* of the duty, but it is often the case that a party acting under a contract, say a building contractor, may nonetheless owe a tortious duty to prevent foreseeable harm, say damage to a neighbouring property caused by careless work. Does this analysis necessarily change because the purpose of the contractual engagement is to do something that is in some ways likely to be adverse to the third party? If so, how and why? Does the notion of owing a duty to a third party necessarily present a potential for conflict with the professional fact-finder's duty to the appointing party?

(c) Third, the existence of alternative causes of action such as defamation need not preclude the finding of a duty of care. Defamation, which is aimed at the vindication of reputation, might not always address the mischief that a claim in negligence would. Professional fact-finders who make negligent or careless observations that give rise to loss may have done so inadvertently and/or in circumstances that do not affect the reputation of the claimant: see for example *Spring v Guardian Assurance Plc* [1995] 2 AC 296 at 160J and 172H. Defamation, therefore, may not actually address the wrong which the tort of negligence seeks to vindicate, and further, might be subject to defences that would *not* be available to a claim brought for the tort of negligence. As a result, denying the existence of a duty of care in these circumstances might give rise to a legal "black hole" in which loss suffered by a claimant as a consequence of a misdeed on the part of another might not be recoverable.

19    Ultimately, these arguments raise a number of difficult and important questions and issues. However, it was clear to us that this was not the case in which we needed to resolve them. We therefore reiterate that the existence of a duty of care in the present circumstances should be regarded as an open question which we will reach in an appropriate case in the future. Beyond the *existence* of such a duty of care, the precise *content* of such a duty may also be usefully considered at such a point.

**Conclusion**

20    As we have noted above, the appeal is dismissed with costs.

21     Having reviewed the parties' costs submissions, we fix the costs of the appeal in the aggregate sum of S$50,000, which is inclusive of all disbursements. We also make the usual consequential orders.

Reported by Jarret Huang.