## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

JANE DOE,

          Plaintiff,                        CASE NO.: 1:25-cv-24118-DSL

v.                                       JURY TRIAL DEMANDED

IBANERA LLC, MICHAEL CARBONARA,
BJORN SNORRASON, DAVID PARR,
MARRIOTT INTERNATIONAL, INC.,
STARWOOD HOTELS & RESORTS
MANAGEMENT COMPANY, LLC, and
STARWOOD HOTELS & RESORTS
WORLDWIDE, LLC,

          Defendants.
_____/

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, JANE DOE ("Plaintiff" and/or "Ms. Doe"), by and through her undersigned counsel, hereby complains of Defendants, IBANERA LLC ("IBANERA" and/or the "Company"), MICHAEL CARBONARA ("CARBONARA"), BJORN SNORRASON ("SNORRASON"), DAVID PARR ("PARR"), MARRIOTT INTERNATIONAL, INC. ("Marriott"), STARWOOD HOTELS & RESORTS MANAGEMENT COMPANY, LLC ("Starwood Management"), and STARWOOD HOTELS & RESORTS WORLDWIDE, LLC ("Starwood Worldwide") (Defendants Marriott, Starwood Management, and Starwood Worldwide are hereinafter collectively referred to as the "Hotel Defendants"), and alleges upon information and belief as follows:

## INTRODUCTION

1.      This is a sad and horrific case involving the repeated rape of Jane Doe by SNORRASON, who lured her to Singapore under the guise of a business meeting, where he

repeatedly raped, beat, and battered Jane Doe for days on end. Furthermore, this action seeks to hold all Defendants liable for their role in contributing to these horrific acts.

2.     Plaintiff Jane Doe brings this is action for monetary damages and all other appropriate relief as deemed by the court, pursuant to the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §§ 1591 and 1595 ("TVPA" or "the Sex trafficking statute"), as well as for assault, battery, and infliction of emotional distress pursuant to state tort law, and hereby seeks monetary relief to redress Defendants unlawful practices in violation of Section 1591. Additionally, this action seeks to redress the deprivation of Plaintiff's personal dignity and autonomy over her own body.

3.     Plaintiff further brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"), the Florida Civil Rights Act of 1992, § 760.01, Florida Statutes ("FCRA"), and all common law causes of action.

4.     Plaintiff is a sexual assault victim and is identified herein as Jane Doe. *Doe v. Blue Cross & Blue Shield United of Wisc.,* 112 F.3d 869, 872 (7th Cir. 1997) ("fictitious names are allowed when necessary to protect the privacy of ... rape victims, and other particularly vulnerable parties or witnesses"); See also *Doe v. Cabrera*, 307 F.R.D. 1 (D.D.C. 2014); *EEOC v. Spoa, LLC*, 2013 U.S. Dist. LEXIS 148145, 2013 WL 5634337, at *3 (D.Md. 2013); *Roe v. St. Louis Univ.*, 2009 U.S. Dist. LEXIS 27716, 2009 WL 910738, at *3-5 (E.D. Mo. 2009); *Doe No. 2 v. Kolko*, 242 F.R.D. 193, 196 (E.D.N.Y. 2006)); *Doe v. Compact Info. Systems, Inc.*, 2015 U.S. Dist. LEXIS 178930, 2015 WL 11022761 (N.D. Tex. Jan. 26, 2015). Additionally, "the public generally has a strong interest in protecting the identities of sexual assault victims so that other victims will not be deterred from reporting such crimes." *Doe No. 2 v. Kolko,* 242 F.R.D. 193, 195 (E.D.N.Y. 2006); *see also Doe v. Evans,* 202 F.R.D. 173, 176 (E.D. Pa. 2001) (granting anonymity to sexual assault

victim); *Doe v Penzato*, No. 10 Civ. 5154 (MEJ), 2011 WL 1833007, at *3 (N.D. Cal. May 13, 2011).

## PARTIES

5.      Plaintiff is an individual female who performed work for Defendant in the State of Florida.

6.      Defendant, IBANERA LLC, is a Wyoming Limited Liability Corporation, with its principal place of business located at 8850 W. Oakland Blvd., 201, Sunrise, Florida 33351.

7.      At all times relevant, Plaintiff was employed to perform work for IBANERA from their Miami office in addition to remote work.

8.      The exact number of IBANERA's employees is unknown, but upon information and belief, there are well more than the statutory minimum under Title VII and the FCRA.

9.      At all relevant times, IBANERA was an "employer" within the meaning of, 42 U.S.C. § 2000e(b).

10.     At all times relevant, Plaintiff was an "employee" of IBANERA within the meaning of 42 U.S.C. § 2000e(f).

11.     At all relevant times, IBANERA was a "person" within the meaning of § 760.02(6), Florida Statutes, and an "employer" within the meaning of § 760.02(7), Florida Statutes.

12.     Defendant, MARRIOTT INTERNATIONAL, INC. ("Marriott"), is a Delaware for Profit Corporation with a principal place of business at 7750 Wisconsin Avenue, Bethesda, MD 20814.

13.     STARWOOD HOTELS & RESORTS MANAGEMENT COMPANY, LLC ("Starwood Management"), is a Delaware for Profit Corporation with a principal place of business at 7750 Wisconsin Avenue, Bethesda, MD 20814

14. STARWOOD HOTELS & RESORTS WORLDWIDE, LLC ("Starwood Worldwide"), is a Delaware for Profit Corporation with a principal place of business at 7750 Wisconsin Avenue, Bethesda, MD 20814.

15. The Hotel Defendants conduct continuous and systematic business is every state in America, including Florida, in addition to many countries globally.

## JURISDICTION AND VENUE

16. This Court has jurisdiction of the claims herein pursuant to 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction thereto, as this action involves federal questions regarding deprivation of Plaintiff Doe's rights under Section 1591 of the TVPA, and Title VII.

17. This Court has supplemental jurisdiction pursuant to 28 U.S.C. 1367 over all State causes of action.

18. Venue is proper in this Court under 28 U.S.C. §1391 because the sexual assault and associated conduct in violation of Federal Law was committed within the jurisdiction of the United States District Court for the Southern District of Florida. Defendants were located in this judicial district and a substantial part of the events or omissions giving rise to this action, including the unlawful practices alleged herein occurred in this district.

## ADMINISTRATIVE PREREQUISITES

19. Plaintiff has complied with all administrative requirements to file this action.

20. On or around December 5, 2024, Plaintiff timely dual-filed a charge of discrimination (Charge No. 510-2025-02389) against Defendant with the U.S. Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCHR").

21. On or around June 11, 2025, the EEOC issued Plaintiff's Notice of Right to Sue against Defendant.

22.     Plaintiff is timely commencing this action within ninety (90) days of receipt of the EEOC's Notice of Right to Sue.

23.     Plaintiff is timely commencing this action more than one-hundred eighty (180) days following the filing of her charge of discrimination.

24.     On or around December 5, 2024, Plaintiff timely-filed a complaint with the Maryland Commission on Civil Rights against the Hotel Defendants.

## FACTUAL ALLEGATIONS

25.     At all times material, Plaintiff was a female and was therefore a protected class member.

26.     At all times material, CARBONARA was an individual male who was employed by IBANERA as CEO and Owner. At all times material, CARBONARA held supervisory authority over Plaintiff, including the power to hire, fire, demote, and promote Plaintiff.

27.     At all times material, SNORRASON was an individual male who was employed by IBANERA as Owner. At all times material, SNORRASON held supervisory authority over Plaintiff, including the power to hire, fire, demote, and promote Plaintiff.

28.     At all times material, David PARR was an individual male who was employed by IBANERA as Owner. At all times material, David PARR held supervisory authority over Plaintiff, including the power to hire, fire, demote, and promote Plaintiff.

## PLAINTIFF BEGINS HER BUSINESS RELATIONSHIP WITH IBANERA

29.     IBANERA operated as a closely held company controlled by CARBONARA, PARR, and SNORRASON.

30.     Decisions regarding Plaintiff's role, travel, compensation, and app development were jointly made or ratified.

31.     In or around 2021, Plaintiff first became aware of IBANERA when she used its consulting services to develop her card-to-crypto payment purchasing widget and application.

32.     IBANERA provides a platform that simplifies global payments and compliance for businesses, with the added capability of handling both traditional and decentralized financial systems.

33.     To be clear, Plaintiff was a client of IBANERA, investing roughly $300,000.00 with the Company over two (2) years to develop her projects.

34.     Plaintiff collaborated with IBANERA to essentially create a marketable application (the "app") that was capable of processing high-volume cryptocurrency transactions and jointly agreed to split all commissions from the app.

35.     As Plaintiff worked alongside IBANERA in developing her app, IBANERA's management recognized her advanced skillset in the field and offered her employment with the company.

36.     In or around September of 2021, IBANERA brought Plaintiff in to perform work for the company.

37.     Plaintiff claims in the alternative that she was an independent contractor.

38.     In or around September of 2021, Plaintiff began to work alongside CARBONARA and PARR, two of three owners for IBANERA.

39.     Plaintiff did not meet SNORRASON, the third and final owner for IBANERA, until several years after conducting business with and performing work for IBANERA.

40.     SNORRASON, CARBONARA and PARR are the owners, agents, officers, and proxies for many businesses, corporations, and entities for which Plaintiff performed work.

41.     At all times material, IBANERA regularly required Plaintiff to fly to Miami, Florida, to perform work for IBANERA within the United States.

42.     IBANERA by and through its owners, SNORRASON, CARBONARA, and PARR regularly communicated with Plaintiff via internet, telephone, text messages, and company platforms to direct her work and travel.

43.     IBANERA by and through its owners, SNORRASON, CARBONARA, and PARR purchased flights, arranged lodging, and directed Plaintiff's international travel for business purposes.

44.     Plaintiff's travel was company-directed, company-controlled, and economically coercive because IBANERA by and through its owners, SNORRASON, CARBONARA, and PARR, issued pay and reimbursements contingent on attending the entire duration of the Singapore conference.

45.     SNORRASON, CARBONARA, and PARR compensated Plaintiff through commissions, transportation, event hosting, and future business with IBANERA.

46.     In or around early 2024, Plaintiff performed an extensive amount of work for IBANERA in addition to making significant advancements on her application.

47.     In or around March of 2024, IBANERA flew Plaintiff to San Francisco for the Game Developers Conference to represent IBANERA. IBANERA compensated Plaintiff's travel and accommodations, and IBANERA asked Plaintiff to interact with their clients and potential clients as a company representative.

48.     At all times material, Plaintiff maintained a record of positive performance for IBANERA.

49.     In or around March of 2024, IBANERA issued Plaintiff a company email address, business cards, a signature block, assigned Plaintiff two (2) assistants, informed the Company's other employees that she was now a client and employee, granted her access to the company's portals, and established a commission structure and stipend for Plaintiff.

50.     In or around July of 2024, IBANERA promoted Plaintiff to Client Relations and Success Manager and placed her on a salary.

51.     IBANERA used Plaintiff's Client Relations and Success Manager role and control over her app development as leverage to secure her presence at business events and conferences.

52.     However, once Plaintiff took on this more expansive role for IBANERA, things began to change for the worse.

53.     Unexpectedly, IBANERA informed Plaintiff that they needed to halt all work on her application and temporarily shut it down.

54.     Plaintiff was confused because she had spent years developing the application with the Company and invested hundreds of thousands of dollars into the project, and all metrics indicated the application was almost complete.

55.     Plaintiff's application completed all testing phases and successfully processed tens of thousands of dollars to this point.

56.     After IBANERA suspended work on Plaintiff's application, the Company began inconsistently paying Plaintiff her owed compensation, failing to complete due payments and paying Plaintiff lesser amounts than what was agreed to.

57.     Plaintiff's continued employment, compensation, commissions, and app development were conditioned—explicitly or implicitly—on compliance with the demands of

IBANERA by and through IBANERA's owners, CARBONARA, PARR, and SNORRASON., including but not limited to attending business trips.

58.     In or around early September of 2024, Plaintiff discussed her frustration with PARR. PARR stated that he needed Plaintiff to go to Singapore for a business trip to attend the Crypto convention, TOKEN2024.

59.     Plaintiff was hesitant to fly to Singapore, but PARR insisted that IBANERA was requiring her to go to Singapore to meet with SNORRASON and conduct business meetings to entertain existing and potential clients.

60.     Plaintiff's assignment to SNORRASON was not accidental, but part of her job duties as Client Relations and Success Manager.

61.     PARR and CARBONARA knew Plaintiff was being sent to SNORRASON.

62.     PARR confirmed that Plaintiff would be compensated for this business trip and reimbursed for any expenses incurred.

63.     PARR further purchased Plaintiff's plane ticket to Singapore to ensure she would attend the conference.

64.     Plaintiff contacted CARBONARA to ask if she could be paid prior to leaving for Singapore, which he agreed. However, Plaintiff never received this payment.

65.     Several days before IBANERA sent Plaintiff to Singapore, PARR virtually introduced Plaintiff and SNORRASON via a telephone call, and PARR stated over the phone, "Bjorn, this is the sexiest and most knowledgeable person with the most class *that I can send you* for this trip."

66.     Plaintiff was disturbed by this inappropriate comment but she decided to ignore it.

## IBANERA TRAFFICKED PLAINTIFF TO SINGAPORE

67.     In or around September 14, 2024, Plaintiff flew in Singapore.

68.     PARR told Plaintiff that he booked her a room at the Sheraton Towers in Singapore, located at 39 Scotts RD, Singapore 228230 (the "Sheraton").

69.     The Sheraton is owned and/or operated by the Hotel Defendants.

70.     Upon arrival to the Sheraton, Plaintiff attempted to check into the hotel, but the front desk agent informed her that the room was not paid for. Plaintiff called PARR, who in-turn instructed her to call SNORRASON to ask for assistance.

71.     Shortly thereafter, SNORRASON appeared at the front desk. Plaintiff was surprised by SNORRASON's stature, as he was very tall and muscular.

72.     The very first thing SNORRASON said to Plaintiff was that "[PARR] told me he was sending the sexiest employee to Singapore *for me*, and he wasn't lying."

73.     Plaintiff was disgusted, as she had just met SNORRASON who was supposed to assist her in checking into her hotel room. Plaintiff became frustrated that this was the second time her physical appearance was sexualized by an Owner of IBANERA and she felt uncomfortable by the remarks.

74.     When Plaintiff and SNORRASON spoke to the front desk agent while checking Plaintiff into the room, SNORRASON told Plaintiff, "You have a nice ass too, you should stay in my room."

75.     Again, Plaintiff was repulsed to hear that her boss, the owner of IBANERA, was making sexual advances and sexually harassing comments to her.

76.     Regardless, Plaintiff tried her best to disregard the unwelcome introduction and focus on the upcoming business meetings.

77.     Plaintiff proceeded to pay for her own room as she refused to share a bed with SNORRASON, despite his advances.

78.     Later that evening, Plaintiff arrived to what she believed would be a standard business dinner. Plaintiff, SNORRASON, the client, William Low ("William"), and William's wife and three children were present for the extravagant twelve-course meal.

79.     During the meal, SNORRASON introduced Plaintiff to William as "the Enforcer" who would straighten the Company out in both Singapore and the United States.

80.     After the meal concluded, the client's wife and children left, and SNORRASON stated that he and William needed to give Plaintiff a "proper Singaporean welcome," to the Company's Singapore team.

81.     SNORRASON took Plaintiff to a strip club/brothel where other Company employees were waiting for them. After entering the strip club, SNORRASON grabbed Plaintiff's hand and held onto her as he introduced Plaintiff to the IBANERA's Singapore team as his "girlfriend." The Singapore team included Tuck [Last Name Unknown], Chan [Last Name Unknown], and Johnson [Last Name Unknown].

82.     Plaintiff tried to pull away, but SNORRASON squeezed her hand and pulled her closer to him. Plaintiff was in shock and feared for her wellbeing as she was isolated in a foreign country with the owner of her Company who made his intentions clear: SNORRASON wanted to have a sexual relationship with Plaintiff.

83.     While at the strip club, SNORRASON ordered endless bottles of alcohol and explicitly demanded Plaintiff to drink. SNORRASON ordered two bottles of champagne and told Plaintiff that she needed to take one. Plaintiff, suspicious of SNORRASON's intentions, made sure to drink water and limit her alcohol consumption.

84.     By the end of the night, SNORRASON had become extremely intoxicated and complained to the team about how Japman Kharbanda ("Japman"), an employee for IBANERA, accused him of trying to sleep with her. SNORRASON explained to the entire team that Japman was flown to Singapore for work and made accusations of sexual assault against him, which had been previously reported to IBANERA.

85.     SNORRASON continued to say that he would never sleep with Japman because "she was a ugly fat bitch," but proceeded to state that he brought Plaintiff to Singapore because she "has nice tits."

86.     Plaintiff became overwhelmed with anxiety and fear as she realized that she was no longer safe.

87.     Moments later, SNORRASON grabbed Plaintiff's face and forcefully kissed her on the lips, before saying, "you're going to be my perfect work girlfriend."

88.     Plaintiff pulled away from SNORRASON as he fought to continue kissing her, explaining that she had no feelings for him and was not an escort, rather she was a professional who was simply trying to perform her job duties. SNORRASON said that was going to take care of Plaintiff for the rest of her life and that he was going to have "Viking babies" with Plaintiff.

89.     SNORRASON discussed at length that Plaintiff's blonde hair and blue eyes made her genetically superior and a perfect candidate to procreate with.

90.     Plaintiff was in shock and did not feel safe leaving by her own volition. Plaintiff was further deterred from leaving as IBANERA had not paid her for her work at the conference, nor had they reimbursed her for the hotel room. SNORRASON was extremely intoxicated, and Plaintiff did not know how he would react if she left, or if he would become violent with her.

91.     Upon returning to the Sheraton around 5:00 A.M., SNORRASON lured Plaintiff into his hotel. SNORRASON told Plaintiff that he needed her help to find and administer his heart medication. Plaintiff, feeling trapped and vulnerable in a foreign country, complied with his demands. SNORRASON brought Plaintiff into his hotel room, where she found and gave him the heart medicine.

92.     As Plaintiff began to leave the room, SNORRASON begged her to have sex with him. Plaintiff, disgusted and revolted by SNORRASON's advanced, declined. SNORRASON continued begging Plaintiff to stay and asked her to stay the night even if he could not have sex with her.

93.     Plaintiff felt extremely uncomfortable, but she feared for her safety and was concerned about her financial stability, so she spent the night in SNORRASON's room. Plaintiff slept fully clothed, set up a row of pillows to separate her from her boss, and left before SNORRASON woke up.

94.     To this point, Plaintiff had known SNORRASON for less than 24 hours.

95.     The next day, on or around September 15, 2024, SNORRASON slept in late, but informed Plaintiff that he was taking her to a business dinner that evening.

96.     When Plaintiff arrived to the restaurant for dinner, she discovered that the "business meeting" was simply a dinner for SNORRASON and herself – no prospective or active clients were present.

97.     At dinner, SNORRASON bragged to Plaintiff about his various "baby mamas" and asked Plaintiff about her past romantic relationships. SNORRASON ordered many alcoholic drinks for himself and pressured Plaintiff to drink alcohol, which she limited to one drink at dinner.

98.     After dinner, SNORRASON insisted on taking Plaintiff for drinks, and he became increasingly intoxicated as the night progressed. SNORRASON continued to make inappropriate comments to Plaintiff about her genetics, his desire to procreate with her, and for her to be his girlfriend.

99.     Plaintiff was in shock by these comments and believed that her best way to make it back home safely from her work trip was to keep her head down, decline any sexual advances, and focus on the business aspect of her trip.

100.     SNORRASON further demanded Plaintiff take pictures with him and smile, explaining that he needed to "send a good one over to [PARR]."

101.     For a second night in a row, SNORRASON asked Plaintiff to come back to his room and give him his medication. Plaintiff complied, but after giving SNORRASON his medication, he began begging again for Plaintiff to have sex with him.

102.     Similar to the night before, Plaintiff refused SNORRASON's request, but laid in his bed fully clothed, laid the pillows down the middle of the bed, and left before he awoke.

103.     On or around September 16, 2024, Plaintiff spent most of her day trying to work, despite SNORRASON's constant demands for her to be with him and spend time together.

104.     Later that day, SNORRASON informed her that they would be having a client meeting that evening.

105.     At the client meeting, SNORRASON grabbed Plaintiff's hand when walking into the meeting. Plaintiff was humiliated as she intended to introduce herself as a professional member of IBANERA, however SNORRASON introduced Plaintiff as his girlfriend and explained that she could do whatever she wanted at the Company because she was sleeping with him. SNORRASON continued that because he was the "top guy" for IBANERA, Plaintiff would get whatever she

wanted.

106.    That night was very similar to the previous nights, as it ended with Plaintiff being taken out for drinks and being forced to sleep in SNORRASON's bed. Again, Plaintiff refused to engage in sexual activity with SNORRASON, laid in his bed fully clothed with the pillows dividing them, and left as soon as she could.

## SNORRASON'S SEXUAL ABUSE OF PLAINTIFF ESCALATES

107.    On or around September 17, 2024, Plaintiff snuck out of SNORRASON's room early, believing she would be safe, but little did she know she would have the worst night of her life.

108.    Throughout the day, SNORRASON dragged Plaintiff around by the hand through the work conference, in front of clients and IBANERA's Singapore team.

109.    SNORRASON attempted to ply Plaintiff with wine during client meetings. Plaintiff did her best to decline the drinks, but SNORRASON told her he wanted her to keep drinking. Plaintiff drank approximately two (2) glasses of wine during the day with food, but then SNORRASON informed her that he would be taking her out to another bar with a client named John Williams ("John").

110.    Plaintiff's sales assistant, Daniel Baron ("Daniel") also arrived in Singapore that night and went out with SNORRASON and Plaintiff.

111.    SNORRASON took Plaintiff and Daniel to a dive bar in Clarke Quay, Singapore. The dive bar was dark and smokey, with loud music playing.

112.    SNORRASON instructed Plaintiff to invite John to the bar.

113.    In addition to the two (2) glasses of wine that Plaintiff consumed during the day, she drank one (1) singular drink that night.

114.   SNORRASON then brought Plaintiff a second drink. By the time Plaintiff took a sip of the second drink at the bar, she knew something was very wrong. Plaintiff suddenly felt incredibly ill.

115.   Upon information and belief, SNORRASON put a date rape drug into her second drink of the night.

116.   SNORRASON started to consume more and more alcohol, and he became increasingly frustrated that Plaintiff was talking to John and not him. SNORRASON began ignoring the group they came with and eventually walked up to Plaintiff and grabbed her from behind, placing his penis against her butt. SNORRASON whispered into Plaintiff's ear, "I didn't bring you here to flirt with the fucking client. I want something no one else can have."

117.   SNORRASON stormed out, and John asked Plaintiff if she was okay. Plaintiff explained that she was not feeling well, so John took her outside to get some air. While they were outside, Plaintiff broke down and told John about SNORRASON's disgusting behavior during her trip.

118.   During this conversation with John, Plaintiff's vision became blurry and she developed difficulty hearing. SNORRASON approached Plaintiff and John. John was offering to put Plaintiff up in a hotel room for her safety, but SNORRASON demanded that Plaintiff go inside the bar with him immediately.

119.   SNORRASON was clearly intoxicated and Plaintiff was terrified of him, especially in her debilitated state where she could barely hold herself up, see, or hear. Plaintiff considered John's offer, but worried about what would happen if John, a man she knew for less than 12 hours, was somehow worse than SNORRASON.

120.     As SNORRASON dragged Plaintiff back into the bar, she realized that she did not have control over her body because of the drug that SNORRASON put into her drink. Plaintiff tripped and stumbled her way onto a bar seat as she could barely see or hear, and she developed a horrible headache.

121.     Plaintiff asked her assistant, Daniel, to take her back to the hotel because she did not have control over her body. Daniel agreed, and as he assisted Plaintiff to the exit, SNORRASON stood up, squeezed Plaintiff's arm and yanked her towards him, telling everybody that Plaintiff would not be leaving without him. John stood up and warned SNORRASON, "do not touch her like that." Daniel further attempted to intervene to assist Plaintiff.

122.     Another customer in the bar, a British woman, witnessed Plaintiff being pulled in three different directions by three different men, Daniel, John, and SNORRASON. This lady was able to fend off SNORRASON and escort Plaintiff to a taxi with John and Daniel.

123.     Plaintiff returned to the Sheraton, and her temporary disability of blindness and deafness grew. Upon entering the hotel, Plaintiff screamed for help. The hotel manager and staff members from the Sheraton guided Plaintiff to her room to assist her recovery.

124.     Hotel Defendants' staff personally observed Plaintiff screaming for help; crying and begging staff not to leave her alone with SNORRASON; stating explicitly that SNORRASON drugged her and was dangerous.

125.     Shortly thereafter, with the Sheraton staff present, SNORRASON arrived to her room, falsely stating that he was Plaintiff's boyfriend, Plaintiff was merely drunk, and the hotel staff should leave so he could take care of her. Plaintiff was screaming out of fear, begging the Sheraton staff not to SNORRASON into her room as he drugged her.

126.    Hotel Defendants' staff knew Plaintiff objected to SNORRASON being allowed into the room.

127.    The Hotel Defendants' staff ignored their duty to Plaintiff and allowed SNORRASON into the room over her objections. The Sheraton staff was suggesting that paramedics be called.

128.    Hotel Defendants' overrode Plaintiff's express refusal to be alone with SNORRASON.SNORRASON whispered into Plaintiff's ear, "you are delusional, you do not want the paramedics to come, I will have them commit you to a mental institution." Plaintiff was terrified. Plaintiff continued screaming for help, stating she did not know who SNORRASON was, they were not romantically involved, SNORRASON was dangerous, and that she could not be left alone with him. SNORRASON grew even more frustrated before yelling, "you are delusional, I love you," in front of the Sheraton staff.

129.    The hotel manager called the paramedics, who promptly arrived and tested Plaintiff's Blood Alcohol Content ("BAC"). SNORRASON told the hotel staff and the paramedics that Plaintiff was simply drunk and that they could leave.

130.    The paramedics had Plaintiff perform a breathalyzer test, which proved SNORRASON was lying, as she received a BAC result of nearly 0.00, indicating that almost no alcohol was present in her system. The paramedics then pricked Plaintiff's finger and tested her blood for substances. Plaintiff drank water at the recommendation of the paramedics, who believed she was having an asthma-induced panic attack and awaited her results.

131.    Hotel Defendants' staff witnessed paramedics confirm Plaintiff had a near-zero BAC.

132.    The paramedics asked Plaintiff to come to the hospital, but she stated she had no money and could not afford medical care.

133.    SNORRASON informed the paramedics and hotel managers that he would watch over her while she rested to make sure she was safe. Plaintiff again protested and told the Sheraton staff that they were not a couple and she could not be left alone with him. Despite her pleas, the Sheraton staff left SNORRASON alone with Plaintiff in her room instead of protecting her.

134.    The Hotel Defendants' staff failed to protect Plaintiff and effectively gave SNORRASON unrestricted access to Plaintiff in Plaintiff's hotel room.

135.    The Hotel Defendants' staff that left Plaintiff alone with SNORRASON knew or should have know that there was a likelihood of Plaintiff sustaining harm as a result of being left alone with SNORRASON, after she begged them not to leave her alone with SNORRASON, that she did not know SNORRASON and that he was dangerous.

136.    The Hotel Defendants' staff willfully exited Plaintiff's room while she was alone with SNORRASON despite Plaintiff's pleas and protests.

137.    Hotel Defendants' staff left Plaintiff incapacitated and alone with her trafficker.

138.    Plaintiff became incredibly drowsy and started falling asleep.

139.    This was the only night Plaintiff spent in her room during the Singapore trip.

### SNORRASON BEATS AND RAPES PLAINTIFF

140.    On or around the morning of September 18, 2024, Plaintiff woke up from what felt like a horrible nightmare.

141.    Plaintiff turned her head to the side and saw SNORRASON laying naked next to her.

142.    Plaintiff looked down and realized that although she went to sleep fully clothed, she was completely naked, and her entire body was covered in bruises. Below is a photograph of some of these bruises.



143.    Plaintiff's breasts, buttocks, and vagina were extremely sore and in pain. Plaintiff struggled to get up, walk, or position herself without severe discomfort.

144.    Plaintiff defeatedly recognized that SNORRASON raped her.

145.    SNORRASON raped Plaintiff while she was asleep and recovering from a date rape drug that he slipped into her system.

146.    Plaintiff went into the bathroom to wash herself off and escape from SNORRASON, and went she came out, he was gone, and he had taken one of her room keys.

147.   Plaintiff, stunned by trauma, did not get out of bed for the rest of the day. SNORRASON came to Plaintiff's room twice to check on Plaintiff, but she did not answer.

148.   SNORRASON entered her room on one occasion and informed her that he had told PARR and CARBONARA that she had become very ill. SNORRASON further informed her to tell her colleagues that she had food poisoning and to postpone her meetings.

149.   On or around September 19, 2024, Plaintiff messaged her mother and best friend to inform them of what SNORRASON had done to her.

150.   Plaintiff was solely focused on returning home, and her flight to leave Singapore was scheduled for the following day. Plaintiff kept telling herself that she only had to hold on for one more day before this everlasting nightmare would be over.

151.   However, SNORRASON told Plaintiff that he decided to extend her trip because she had missed her business meetings the day before and was therefore required to stay longer.

152.   Plaintiff was prevented from leaving through threats, intimidation, financial control, and fear of violence.

153.   At the instruction of SNORRASON, Plaintiff was forced to stay in SNORRASON's hotel room after her own lodging lapsed.

154.   SNORRASON further made sick, twisted remarks to Plaintiff on several occasions, "**so, are you going to keep the baby? You're definitely pregnant.**" SNORRASON did not even attempt to hide the fact that he raped Plaintiff's unconscious body.

155.   Plaintiff was mortified that SNORRASON would hurt her, maybe kill her, if she tried to leave, so she complied with his demands for the next few days.

156.   The night of September 19, 2024, SNORRASON left Plaintiff alone, telling her that she "looked like shit."

157.    As Plaintiff did not anticipate extending her trip, her room was not booked, and she had to look for another room.

158.    While trying to schedule a new room at the Sheraton, SNORRASON demanded she not book a room for herself, rather she needed to stay in his room.

159.    During Plaintiff's stay in SNORRASON's room, he told her that she was supposed to be with him at all times, and that he was not supposed to feel alone. SNORRASON even required Plaintiff to keep the restroom door open when she needed to use the restroom. Plaintiff could not fall asleep, because she was completely terrified and was sleep-deprived as a result.

160.    For the next few days, Plaintiff complied with SNORRASON's demands to survive.

161.    SNORRASON raped Plaintiff again on September 20.

162.    On or around the night of September 21, 2024, SNORRASON took Plaintiff for another business dinner with two Irish businessmen named, Brendan [Last Name Unknown] and Peter [Last Name Unknown]. During the dinner, SNORRASON introduced Plaintiff as IBANERA's "Deputy Director" while holding Plaintiff's hand.

163.    During this dinner, SNORRASON told Plaintiff that he had fixed her app that IBANERA had previously halted work on, and that her app would be running by the following week. Defendant SNORASSON confidently stated, "see, sleeping with the boss has its perks."

164.    SNORRASON expressly linked continued app development, Plaintiff's salary, title, influence within IBANERA, and her job security to Plaintiff engaging in sexual activity with him.

165.    SNORRASON repeatedly told Plaintiff words to the effect of "sleeping with the boss has its perks" and made clear that Plaintiff's professional success depended on her sexual

compliance.

166.     IBANERA by and through SNORRASON, CARBONARA, and PARR stood to benefit by Plaintiff's ability to manage and retain existing clients; secure new clients at conferences; and generate commissions and transaction fees.

167.     IBANERA by and through SNORRASON, CARBONARA, and PARR also stood to benefit from the continued development and monetization of Plaintiff's app, which was explicitly tied to Plaintiff's continued sexual compliance.

168.     When SNORRASON went to the bathroom, Peter asked what her situation was with SNORRASON, and she said that she did not know and was trying to figure it out. SNORRASON returned, and the conversation ceased.

169.     Again, SNORRASON forced Plaintiff to spend the night in his room and raped Plaintiff.

170.     On or around September 22, 2024, Plaintiff went to the pool area to try relaxing. SNORRASON slept most of the day and later followed Plaintiff to the pool area. Plaintiff decided to ask SNORRASON about her role with the company. Plaintiff asked about her position, salary, application, and other financial aspects of her role.

171.     SNORRASON explained that he spoke to PARR and CARBONARA, and they agreed Plaintiff would get whatever she wanted now that she was SNORRASON's "girlfriend." SNORRASON continued to state that, "you're sleeping with the boss, so your title would not be important."

172.     Plaintiff asked for clarification, and SNORRASON grew more and more upset. As Plaintiff saw SNORRASON's anger and aggression increasing, she knew she had to leave as soon as possible.

173.     SNORRASON made it clear that so long as Plaintiff engaged in sexual activity with SNORRASON, he would ensure IBANERA continued to develop her app and employ her as a more-highly-compensated employee with a higher status in the company

174.     Plaintiff texted her friend  in Miami, explaining the situation and that she was not safe, so he purchased her a flight home for the next morning on September 23, 2024.

175.     Plaintiff decided she could not suffer another night at the hands of SNORRASON, so after dinner she packed up her things and called a taxi to the airport. At this point, SNORRASON returned and became so angry, stood in between Plaintiff and the hotel room door, and threatened "if you leave now, this will be the last thing you do." Plaintiff used her suitcases as a shield to create space between the two of them and threatened to scream if he touched her again.

176.     Plaintiff refused to heed SNORRASON's instructions to stay in the room, and as she was leaving, he begged her not to leave.

177.     In the taxi, Plaintiff was clearly distraught, and the taxi driver asked if she was hurt. When Plaintiff confirmed she was hurt, he decided to help Plaintiff and take her to the closest police station so she could file a report. Plaintiff agreed and the driver took her to the police station.

178.     After filing a police report, Plaintiff checked her phone and saw that she had missed messages from SNORRASON as well as missed messages from PARR.

179.     PARR messaged Plaintiff, stating, "Bjorn told me that you've got your flights mixed up you can't s[t]ay in the airport… Bjorn said he would like for you to come back to the hotel so your flight's ready. **We are concerned about your personal safety**."

180.     PARR actively messaged Plaintiff during Plaintiff's attempted escape from Singapore, directing her to go back to SNORRASON after she fled.

181.    Plaintiff disregarded these messages and took her flight to Miami as she knew she needed to escape.

## IBANERA CEASES ALL COMMUNICATIONS
## WITH PLAINTIFF BEFORE TERMINATING HER

182.    In the days following Plaintiff's escape from SNORRASON, she contacted CARBONARA to inform him of what happened. CARBONARA did not take any steps to assist Plaintiff.

183.    After CARBONARA was informed of the rape and drugging, he knew Plaintiff had been harmed.

184.    CARBONARA took affirmative steps to isolate Plaintiff from the company.

185.    CARBONARA allowed SNORRASON to continue operating unchecked.

186.    CARBONARA knowingly failed to intervene.

187.    Plaintiff was denied future work opportunities and compensation she otherwise would have received.

188.    As a result of Plaintiff reporting SNORRASON's unlawful, criminal activity, CARBONARA ignored Plaintiff and removed her from all of IBANERA's communication platforms.

189.    CARBONARA never responded to a single one of Plaintiff's messages after she fled Singapore, including messages that directly alluded to SNORRASON's sexual assault.

190.    CARBONARA controlled Plaintiff's pay, access, platforms, and termination.

191.    CARBONARA ratified the venture by cutting Plaintiff off.

192.    Work on Plaintiff's application ceased or was abandoned entirely.

193.    Plaintiff was not staffed on future projects and was removed from client-facing roles. Her compensation streams were cut off.

194.    IBANERA, by and through its agents, terminated Plaintiff as a result of her reports of rape, drugging, discrimination, and other unlawful activity.

195.    Male employees were not treated similarly.

196.    SNORRASON and PARR, as agents for IBANERA and with CARBONARA's knowledge and approval, engaged in and conspired in a common scheme and enterprise of recruiting, enticing, transporting, soliciting, and forcing Plaintiff and individuals similarly situated to Plaintiff, with the intent that Plaintiff engage in sexual activities with SNORRASON, in exchange for continued employment and business with IBANERA, including but not limited to commission-based payment, managerial status, and the development of her cryptocurrency app.

197.    Upon knowledge and belief, for years, IBANERA conspired and engaged in this pattern and practice of sexually harassing, forcing, recruiting, enticing, transporting, soliciting, and harboring females trying to work in the cryptocurrency industry, including associates and managers seeking professional opportunities from IBANERA.

198.    In fact, upon information and belief, IBANERA have a pattern and practice of engaging in trafficking female employees across state lines and sexually assaulting and exploiting these individuals.

199.    In or around late September of 2024, IBANERA unlawfully terminated Plaintiff for opposing unlawful, discriminatory conduct.

200.    The events described above are just some of the examples of unlawful discrimination, harassment, and retaliation that Defendant subjected Plaintiff to on a continuous and on-going basis throughout her employment.

201.    Defendant unlawfully discriminated against Plaintiff because of her sex, and no male individuals were subjected to the same conduct as Plaintiff.

202.    Defendant retaliated against Plaintiff for asserting her rights and for opposing sex discrimination, harassment, and rape.

203.    Defendant violated the Title VII and the FCRA by subjecting Plaintiff to a hostile work environment, disparate treatment, and retaliation.

204.    Defendant exhibited a continuous practice of discrimination, and Plaintiff therefore makes all claims herein under the continuing violations doctrine.

205.    As a result of the acts and conduct complained herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits, and other compensation which such employment entails, and Plaintiff has also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff has further experienced severe emotional and physical distress.

206.    As a result of Defendant's actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

## CAUSES OF ACTION
### COUNT I
### Trafficking Victims Protection Act
**(As Against Defendants IBANERA, CARBONARA, PARR AND SNORRASON)**

207.    Plaintiff reincorporates the factual allegations in Paragraphs 25 through 206.

208.    In addition to what is stated above, Defendants IBANERA, CARBONARA, PARR, AND SNORRASON engaged in interstate commerce as described herein through, inter alia, their use of the internet, telephones, text messages, and interstate business events. Defendants IBANERA, CARBONARA, PARR, AND SNORRASON used the Client Relations and Success Manager position, and agreement to develop Plaintiff's app, to recruit, entice, harbor, solicit, and transport Plaintiff for sex acts that were forced upon her by Defendants IBANERA, CARBONARA, PARR, AND SNORRASON.

209.    Defendants IBANERA, CARBONARA, PARR, AND SNORRASON, in effecting interstate commerce by conducting business and soliciting prospective clients, and through the enticement, transportation, harboring, solicitation, and recruitment of clients, enticed, solicited, and recruited Plaintiff to appear at Defendants' business conference and be sexually assaulted and battered.

210.    Thereafter, because Plaintiff was not a willing and enthusiastic participant in the sexual assault and battery, Defendants failed to place Plaintiff in any future endeavors, preventing Plaintiff from additionally being compensated for her work.

211.    Defendants IBANERA, CARBONARA, PARR, AND SNORRASON transported, solicited, harbored, enticed, and recruited Plaintiff, and committed sexual assault and battery of Plaintiff by force and/or coercion.

212.    Through their sexual assault and battery, Defendants IBANERA, CARBONARA, PARR, AND SNORRASON would have profited and obtained revenue from Plaintiff if she had performed work for existing clients or signed up additional clients.

213.    Plaintiff brings this claim pursuant to all applicable sections of 18 U.S.C.A. §§ 1591, 1595 in that "[a]n individual who is a victim of a violation of Section 1589, 1590, or 1591 of title 18, United States Code, may bring a civil action in any appropriate district court of the United States. The court may award actual damages, punitive damages, reasonable attorneys' fees, and other litigation costs reasonably incurred." 18 U.S.C.A. §1595(a).

214.    18 U.S.C. 1591, entitled "Sex trafficking of children or by force, fraud, or coercion," states:

a.    Whoever knowingly—
i. in or affecting interstate or foreign commerce […] recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person;  or

    ii.   benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1)

b.    knowing, […] that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act […].

c.    The term "coercion" means—

    i.   threats of serious harm to or physical restraint against any person;

    ii.   any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or

   iii.   the abuse or threatened abuse of law or the legal process.

d.    The term "commercial sex act" means any sex act, on account of which anything of value is given to or received by any person.

e.    The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

215.    18 U.S.C. 1591 § (e)(3) defines a "commercial sex act" as "any sex act, on account of which anything of value is given to or received by any person."

216.    Additionally, 18 USCA § 1595. Civil remedy states as follows:

a.    An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

    i.   Any civil action filed under subsection (a) shall be stayed during the pendency of any criminal action arising out of the same occurrence in which the claimant is the victim.

    ii.   In this subsection, a "criminal action" includes investigation and prosecution and is pending until final adjudication in the trial court.

b.    No action may be maintained under subsection (a) unless it is commenced not later than the later of—

    i.   10 years after the cause of action arose; or

    ii.   10 years after the victim reaches 18 years of age, if the victim was a minor at the time of the alleged offense.

217.    Broad, expansive language is employed in Trafficking Victims Protection Act (TVPA) and its remedial provision, which permits civil actions for damages. *See Noble v. Weinstein*, 335 F. Supp. 3d 504 (SDNY 2018).

218.    Defendants subjected Plaintiff to commercial sex acts by force and coercion, including both physical and financial.

219.    A commercial sex act means any sex act, on account of which anything of value is given to or received by any person. The specific conditions are the use of force, fraud, or coercion, or conduct involving persons under the age of 18. See the Department of Justice's definition:

> https://www.justice.gov/crt/involuntary-servitude-forced-labor-and-sex-trafficking-statutesenforced. "Section 1591 criminalizes sex trafficking, which is defined as causing a person to engage in a commercial sex act under certain statutorily enumerated conditions. A commercial sex act means any sex act, on account of which anything of value is given to or received by any person. The specific conditions are the use of force, fraud, or coercion, or conduct involving persons under the age of 18."

220.    Defendants IBANERA, CARBONARA, PARR, AND SNORRASON, knowingly, in or affecting interstate and foreign commerce, solicited, recruited, enticed, harbored and/or obtained Plaintiff knowing the fact that the means of force, threats of force, and coercion would be used to cause Plaintiff to engage in a commercial sex act.

221.    Defendants IBANERA, CARBONARA, PARR, AND SNORRASON violated the sections cited hereto and Plaintiff suffered damage as a result.

### COUNT II
### Participating in a Venture in Violation of 18 U.S.C. §1591
### (As Against Defendants IBANERA, CARBONARA, PARR AND SNORRASON)

222.    Plaintiff reincorporates the factual allegations in Paragraphs 25 through 206.

223.    In addition to what is stated above, Defendants IBANERA, CARBONARA, PARR, AND SNORRASON engaged in interstate commerce as described herein through, inter alia, their

use of the internet, telephones, text messages, and interstate business events. Defendants IBANERA, CARBONARA, PARR, AND SNORRASON used the Client Relations and Success Manager position, and agreement to develop Plaintiff's app, to recruit, entice, harbor, solicit, and transport Plaintiff for sex acts that were forced upon her by Defendants IBANERA, CARBONARA, PARR, AND SNORRASON.

224.    Defendants IBANERA, CARBONARA, PARR, AND SNORRASON, in effecting interstate commerce by conducting business and soliciting prospective clients, and through the enticement, transportation, harboring, solicitation, and recruitment of clients, enticed, solicited, and recruited Plaintiff to appear at Defendants' business conference and be sexually assaulted and battered.

225.    Thereafter, because Plaintiff was not a willing and enthusiastic participant in the sexual assault and battery, Defendants failed to place Plaintiff in any future endeavors, preventing Plaintiff from additionally being compensated for her work.

226.    Defendants IBANERA, CARBONARA, PARR, AND SNORRASON transported, solicited, harbored, enticed, and recruited Plaintiff, and committed sexual assault and battery of Plaintiff by force and/or coercion.

227.    Through their sexual assault and battery, Defendants IBANERA, CARBONARA, PARR, AND SNORRASON would have profited and obtained revenue from Plaintiff if she had performed work for existing clients or signed up additional clients.

228.    18 U.S.C. 1591, entitled "Sex trafficking of children or by force, fraud, or coercion," states:

> (1) Whoever knowingly—
>    i.   benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1)

ii. knowing […] that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act […].

229. All Defendants benefitted financially, or by receiving something of value, from participating in a venture which has engaged in sex trafficking by force and coercion.

230. Defendants IBANERA, CARBONARA, PARR, AND SNORRASON violated the sections cited hereto and Plaintiff suffered damage as a result.

**COUNT III**
**Conspiracy in Violation of 18 U.S.C §1594**
**(As Against Defendants PARR, AND SNORRASON)**

231. Plaintiff reincorporates the factual allegations in Paragraphs 25 through 206.

232. 18 U.S.C. § 1594 further provides liability for "[w]hoever conspires with another to violate section 1591."

233. As stated above and herein, Defendants PARR and SNORRASON each further conspired with the other to violate 18 U.S.C. § 1591 by entering into a joint enterprise with consciousness of its general nature and extent.

234. Defendants PARR and SNORRASON engaged and conspired in a common scheme and enterprise of recruiting, enticing, providing, transporting, soliciting, and forcing Plaintiff and individuals similarly situated to Plaintiff, with the intent that Plaintiff engage in sexual activities with Defendants PARR and SNORRASON, in exchange for access to employment with Defendants, including but are not limited to developing an app, performing work for existing customers, and procuring new clientele.

235. Defendants PARR and SNORRASON are liable to Plaintiffs under 18 U.S.C. §§ 1591, 1594, and 1595.

236.    Plaintiff is entitled to damages as a result of Defendants' conduct, in amounts to be proven at trial.

<u>COUNT IV</u>
<u>Trafficking Victims Protection Act</u>
**(As Against Defendants MARRIOTT, STARWOOD MANAGEMENT, STARWOOD WORLDWIDE)**

237.    Plaintiff reincorporates the factual allegations in Paragraphs 25 through 206.

238.    In addition to what is stated above, Defendants MARRIOTT, STARWOOD MANAGEMENT, STARWOOD WORLDWIDE (hereinafter the "Hotel Defendants") engaged in interstate commerce as described herein through, inter alia, their use of the internet, telephones, text messages, hosting interstate business events, and lodging individuals attending business conferences. The Hotel Defendants used the Client Relations and Success Manager position, and agreement to develop Plaintiff's app, to recruit, entice, harbor, solicit, and transport Plaintiff for sex acts that were forced upon her by Defendants IBANERA, CARBONARA, PARR, AND SNORRASON.

239.    The Hotel Defendants, in effecting interstate commerce by conducting business and soliciting prospective clients, and through the enticement, harboring, solicitation, and recruitment of clients, enticed, solicited, and recruited Plaintiff to appear at Defendants' business conference and be sexually assaulted and battered.

240.    Thereafter, because Plaintiff was not a willing and enthusiastic participant in the sexual assault and battery, Defendants failed to place Plaintiff in any future endeavors, preventing Plaintiff from additionally being compensated for her work.

241.    The Hotel Defendants solicited, harbored, enticed, and recruited Plaintiff, and committed sexual assault and battery of Plaintiff by force and/or coercion.

242.     Through the sexual assault and battery of Plaintiff, the Hotel Defendants would have profited and obtained revenue from Plaintiff. IBANERA sent many employees, workers, and individuals to attend business conferences at the Sheraton Towers in Singapore, located at 39 Scotts RD, Singapore 228230 (the "Sheraton"). The Sheraton generated a substantial amount of revenue from the renting rooms, food and beverage sales, valet services, tips, and more, as a result of IBANERA's attendance.

243.     Plaintiff brings this claim pursuant to all applicable sections of 18 U.S.C.A. §§ 1591, 1595 in that "[a]n individual who is a victim of a violation of Section 1589, 1590, or 1591 of title 18, United States Code, may bring a civil action in any appropriate district court of the United States. The court may award actual damages, punitive damages, reasonable attorneys' fees, and other litigation costs reasonably incurred." 18 U.S.C.A. §1595(a).

244.    18 U.S.C. 1591, entitled "Sex trafficking of children or by force, fraud, or coercion," states:

a.     Whoever knowingly—
  i.  in or affecting interstate or foreign commerce […] recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person;  or
  ii. benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1)
b.     knowing, […] that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act […].
c.      The term "coercion" means—
  i.  threats of serious harm to or physical restraint against any person;
  ii. any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or
  iii. the abuse or threatened abuse of law or the legal process.
d.     The term "commercial sex act" means any sex act, on account of which anything of value is given to or received by any person.
e.     The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same

background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

245.    18 U.S.C. 1591 § (e)(3) defines a "commercial sex act" as "any sex act, on account of which anything of value is given to or received by any person."

246.    Additionally, 18 USCA § 1595. Civil remedy states as follows:

a.    An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.
   i.    Any civil action filed under subsection (a) shall be stayed during the pendency of any criminal action arising out of the same occurrence in which the claimant is the victim.
   ii.    In this subsection, a "criminal action" includes investigation and prosecution and is pending until final adjudication in the trial court.
b.    No action may be maintained under subsection (a) unless it is commenced not later than the later of—
   i.    10 years after the cause of action arose; or
   ii.    10 years after the victim reaches 18 years of age, if the victim was a minor at the time of the alleged offense.

247.    Broad, expansive language is employed in Trafficking Victims Protection Act (TVPA) and its remedial provision, which permits civil actions for damages. *See Noble v. Weinstein*, 335 F. Supp. 3d 504 (SDNY 2018).

248.    Defendants subjected Plaintiff to commercial sex acts by force and coercion, including both physical and financial.

249.    A commercial sex act means any sex act, on account of which anything of value is given to or received by any person. The specific conditions are the use of force, fraud, or coercion, or conduct involving persons under the age of 18. See the Department of Justice's definition:

https://www.justice.gov/crt/involuntary-servitude-forced-labor-and-sex-trafficking-statutesenforced. "Section 1591 criminalizes sex trafficking, which is defined as causing a person to engage in a commercial sex act under certain statutorily enumerated conditions. A commercial sex act means any sex act, on

account of which anything of value is given to or received by any person. The specific conditions are the use of force, fraud, or coercion, or conduct involving persons under the age of 18."

250.     The Hotel Defendants, knowingly, in or affecting interstate and foreign commerce, solicited, recruited, enticed, harbored and/or obtained Plaintiff knowing the fact that the means of force, threats of force, and coercion would be used to cause Plaintiff to engage in a commercial sex act.

251.     The Hotel Defendants violated the sections cited hereto and Plaintiff suffered damage as a result.

**COUNT V**
**42 U.S.C. § 2000e-2**
**Title VII Discrimination**
**(As Against Defendant IBANERA)**

252.     Plaintiff reincorporates the factual allegations in Paragraphs 25 through 206.

253.     Title VII provides, in relevant part, that "it shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of his race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

254.     Title VII further provides that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

255.     Plaintiff was an individual female and was therefore a protected class member.

256.     The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

36

257.    Defendant subjected Plaintiff to discriminatory treatment on the basis of her sex. Defendant's discriminatory treatment included, but was not limited to, 1) making inappropriate remarks about Plaintiff's physical appearance, including but not limited to, "this is the sexiest and most knowledgeable person with the most class *that I can send you* for this trip," "[PARR] told me he was sending the sexiest employee to Singapore *for me*, and he wasn't lying," "you have a nice ass too, you should stay in my room," " you're going to be my perfect work girlfriend," "you're sleeping with the boss, so your title would not be important," "so, are you going to keep the baby," SNORRASON referring to Plaintiff as his, "girlfriend" at work events and telling her that they would make "Viking babies", among others, 2) repeatedly sexually assaulting and battering Plaintiff at a business conference, 3) drugging Plaintiff, 4) demanding Plaintiff sleep in SNORRASON's room, 5) threatening Plaintiff not to leave Singapore, 6) halting the development of Plaintiff's app unless she allowed SNORRASON to continue sexually assaulting and battering her, 7) ceasing all communications with Plaintiff after she returned to Miami from Singapore, and 8) unlawfully terminating Plaintiff's employment, among others.

258.    Defendant targeted Plaintiff because of her sex. No similarly situated male employees endured the discriminatory conduct that Plaintiff was forced to endure.

259.    The discriminatory actions of the Defendant against Plaintiff, as described and set forth above, constitute an adverse employment action for the purposes of Title VII. In subjecting Plaintiff to adverse employment actions, the Defendant intentionally discriminated against Plaintiff with respect to the compensation, terms, conditions, or privileges of her employment.

260.    Even if Defendant could assert legitimate reasons for its adverse actions taken against Plaintiff, her protected class status, at a minimum, was a motivating factor for Defendant's

discriminatory conduct and Plaintiff explicitly reserves the right to pursue a mixed-motive theory against Defendant.

261.   As a direct and proximate result of the Defendant's intentional discriminatory conduct in violation of Title VII, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Plaintiff has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. Plaintiff accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

262.   Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's rights under Title VII, warranting the imposition of punitive damages, in addition to compensatory damages.

263.   The conduct of the Defendant deprived Plaintiff of her statutory rights guaranteed under Title VII.

264.   Plaintiff further requests that her attorney's fees and costs be awarded as permitted by law.

## COUNT VI
### 42 U.S.C. § 2000e-3
### Title VII Hostile Work Environment
### (As Against Defendant IBANERA)

267.   Plaintiff reincorporates the factual allegations in Paragraphs 25 through 206.

268.   Title VII also prohibits hostile work environment harassment, defined as unwanted comments or conduct regarding the plaintiff's protected characteristics that have the purpose or effect of unreasonably interfering with the terms and conditions of the plaintiff's employment.

269.   Plaintiff was a woman and is therefore a protected class member.

270.     Defendant's harassment and discrimination was severe or pervasive enough to make any reasonable person of the same legally protected class believe that the conditions of employment were altered, and that the working environment was intimidating, hostile, or abusive.

271.     Defendant's severe and pervasive conduct included, but was not limited to, 1) making inappropriate remarks about Plaintiff's physical appearance, including but not limited to, "this is the sexiest and most knowledgeable person with the most class *that I can send you* for this trip," "[PARR] told me he was sending the sexiest employee to Singapore *for me*, and he wasn't lying," "you have a nice ass too, you should stay in my room," " you're going to be my perfect work girlfriend," "you're sleeping with the boss, so your title would not be important," "so, are you going to keep the baby," SNORRASON referring to Plaintiff as his, "girlfriend" at work events and telling her that they would make "Viking babies", among others, 2) repeatedly sexually assaulting and battering Plaintiff at a business conference, 3) drugging Plaintiff, 4) demanding Plaintiff sleep in SNORRASON's room, 5) threatening Plaintiff not to leave Singapore, 6) halting the development of Plaintiff's app unless she allowed SNORRASON to continue sexually assaulting and battering her, 7) ceasing all communications with Plaintiff after she returned to Miami from Singapore, and 8) unlawfully terminating Plaintiff's employment, among others.

272.     Defendant targeted Plaintiff because she was a woman. No similarly situated male employees endured the harassing conduct that Plaintiff was forced to endure.

273.     Defendant's harassment was unwelcomed by Plaintiff, who had no choice but to endure the discriminatory treatment.

274.     Defendant's harassment and discrimination of Plaintiff negatively and significantly impacted Plaintiff's life. Defendant's conduct made Plaintiff feel isolated, embarrassed, and ashamed.

275.     As a direct and proximate result of the Defendant's intentional discriminatory conduct in violation of Title VII, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Plaintiff has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. Plaintiff accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

276.     Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's rights under Title VII, warranting the imposition of punitive damages in addition to compensatory damages.

277.     The conduct of Defendants deprived Plaintiff of her statutory rights guaranteed under Title VII.

278.     Plaintiff further requests that her attorney's fees and costs be awarded as permitted by law.

## COUNT VII
### 42 U.S.C. § 2000e-3
### Title VII Retaliation
### (As Against Defendant IBANERA)

279.     Plaintiff reincorporates the factual allegations in Paragraphs 25 through 206.

280.     Title VII prohibits retaliation in any manner against a person who has opposed a discriminatory practice, or who has participated in any investigation, proceeding or hearing related to an unlawful discriminatory practice. 42 U.S.C. § 2000e-3(a).

281.     Plaintiff was an individual female and was therefore a protected class member.

282.     Plaintiff engaged in a protected activity when she opposed Defendant's discriminatory and unlawful conduct, including but not limited to Defendant, 1) making

inappropriate remarks about Plaintiff's physical appearance, including but not limited to, "this is the sexiest and most knowledgeable person with the most class *that I can send you* for this trip," "[PARR] told me he was sending the sexiest employee to Singapore *for me*, and he wasn't lying," "you have a nice ass too, you should stay in my room," " you're going to be my perfect work girlfriend," "you're sleeping with the boss, so your title would not be important," "so, are you going to keep the baby," SNORRASON referring to Plaintiff as his, "girlfriend" at work events and telling her that they would make "Viking babies", among others, 2) repeatedly sexually assaulting and battering Plaintiff at a business conference, 3) drugging Plaintiff, 4) demanding Plaintiff sleep in SNORRASON's room, 5) threatening Plaintiff not to leave Singapore, 6) halting the development of Plaintiff's app unless she allowed SNORRASON to continue sexually assaulting and battering her, 7) ceasing all communications with Plaintiff after she returned to Miami from Singapore, and 8) unlawfully terminating Plaintiff's employment, among others.

283.    Plaintiff explicitly told Defendant that its actions were discriminatory and unlawful, and she complained about Defendant's actions to PARR, CARBONARA, and SNORRASON.

284.    In response to Plaintiff asserting her right to enjoy the same employment benefits as every other employee, Defendant retaliated against Plaintiff.

285.    Defendant retaliated against Plaintiff by ceasing communications with Plaintiff and ultimately terminating her employment.

286.    Defendant took the above-mentioned materially adverse action, among others, against Plaintiff because of her protected activities, including her report of unlawful discrimination on the same day Defendant unlawfully terminated her employment.

287.    Any reasonable employee in Plaintiff's position would be dissuaded from opposing discriminatory conduct if they knew that they would be subjected to the kind of treatment that Plaintiff was forced to endure.

288.    Defendant's alleged basis for its adverse employment actions against Plaintiff are pretextual and have been asserted only to cover up the retaliatory nature of Defendant's conduct.

289.    As a direct and proximate result of the Defendant's retaliatory conduct in violation of Title VII, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Plaintiff has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. Plaintiff accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

290.    Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of the Plaintiff's rights under Title VII, warranting the imposition of punitive damages in addition to compensatory damages.

291.    The conduct of the Defendant deprived Plaintiff of her statutory rights guaranteed under Title VII.

292.    Plaintiff further requests that her attorney's fees and costs be awarded as permitted by law.

**<u>COUNT VIII</u>**
**§ 760.10(1), Fla. Stat.**
**FCRA Sex Discrimination**
**(As Against Defendant IBANERA)**

293.    Plaintiff reincorporates the factual allegations in Paragraphs 25 through 206.

294.     The FCRA prohibits employment discrimination against an individual with respect to compensation, terms, conditions, or privileges of employment because of the individual's sex or pregnancy. § 760.10(1)(a), Fla. Stat.

295.     Plaintiff was an individual female and was therefore a protected class member.

296.     The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

297.     Defendant subjected Plaintiff to discriminatory treatment on the basis of her sex. Defendant's discriminatory treatment included, but was not limited to, 1) making inappropriate remarks about Plaintiff's physical appearance, including but not limited to, "this is the sexiest and most knowledgeable person with the most class *that I can send you* for this trip," "[PARR] told me he was sending the sexiest employee to Singapore *for me*, and he wasn't lying," "you have a nice ass too, you should stay in my room," " you're going to be my perfect work girlfriend," "you're sleeping with the boss, so your title would not be important," "so, are you going to keep the baby," SNORRASON referring to Plaintiff as his, "girlfriend" at work events and telling her that they would make "Viking babies", among others, 2) repeatedly sexually assaulting and battering Plaintiff at a business conference, 3) drugging Plaintiff, 4) demanding Plaintiff sleep in SNORRASON's room, 5) threatening Plaintiff not to leave Singapore, 6) halting the development of Plaintiff's app unless she allowed SNORRASON to continue sexually assaulting and battering her, 7) ceasing all communications with Plaintiff after she returned to Miami from Singapore, and 8) unlawfully terminating Plaintiff's employment, among others.

298.     Defendant targeted Plaintiff because of her sex. No similarly situated male employees endured the discriminatory conduct that Plaintiff was forced to endure.

299.     The discriminatory actions of the Defendant against Plaintiff, as described and set forth above, constitute an adverse employment action for the purposes of the FCRA. In subjecting Plaintiff to adverse employment actions, the Defendant intentionally discriminated against Plaintiff with respect to the compensation, terms, conditions, or privileges of her employment.

300.     Even if Defendant could assert legitimate reasons for its adverse actions taken against Plaintiff, her protected class status, at a minimum, was a motivating factor for Defendant's discriminatory conduct and Plaintiff explicitly reserves the right to pursue a mixed-motive theory against Defendant.

301.     As a direct and proximate result of the Defendant's intentional discriminatory conduct in violation of the FCRA, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Plaintiff has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. Plaintiff accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

302.     Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's rights under the FCRA, warranting the imposition of punitive damages, in addition to compensatory damages.

303.     The conduct of the Defendant deprived Plaintiff of her statutory rights guaranteed under the FCRA.

304.     Plaintiff further requests that her attorney's fees and costs be awarded as permitted by law.

<u>COUNT IX</u>
**§ 760.10(7), Fla. Stat.**
**FCRA Hostile Work Environment**
**(As Against Defendant IBANERA)**

305.    Plaintiff reincorporates the factual allegations in Paragraphs 25 through 206.

306.    The FCRA prohibits employment discrimination in an individual's terms, conditions, and privileges of employment because of the individual's sex. § 760.10(1), Fla. Stat.

307.    Plaintiff was a woman and is therefore a protected class member.

308.    Defendant's harassment and discrimination was severe or pervasive enough to make any reasonable person of the same legally protected class believe that the conditions of employment were altered, and that the working environment was intimidating, hostile, or abusive.

309.    Defendant's severe and pervasive conduct included, but was not limited to, 1) making inappropriate remarks about Plaintiff's physical appearance, including but not limited to, "this is the sexiest and most knowledgeable person with the most class *that I can send you* for this trip," "[PARR] told me he was sending the sexiest employee to Singapore *for me*, and he wasn't lying," "you have a nice ass too, you should stay in my room," " you're going to be my perfect work girlfriend," "you're sleeping with the boss, so your title would not be important," "so, are you going to keep the baby," SNORRASON referring to Plaintiff as his, "girlfriend" at work events and telling her that they would make "Viking babies", among others, 2) repeatedly sexually assaulting and battering Plaintiff at a business conference, 3) drugging Plaintiff, 4) demanding Plaintiff sleep in SNORRASON's room, 5) threatening Plaintiff not to leave Singapore, 6) halting the development of Plaintiff's app unless she allowed SNORRASON to continue sexually assaulting and battering her, 7) ceasing all communications with Plaintiff after she returned to Miami from Singapore, and 8) unlawfully terminating Plaintiff's employment, among others.

310. Defendant targeted Plaintiff because she was a woman. No similarly situated male employees endured the harassing conduct that Plaintiff was forced to endure.

311. Defendant's harassment was unwelcomed by Plaintiff, who had no choice but to endure the discriminatory treatment.

312. Defendant's harassment and discrimination of Plaintiff negatively and significantly impacted Plaintiff's life. Defendant's conduct made Plaintiff feel isolated, embarrassed, and ashamed.

313. As a direct and proximate result of the Defendant's intentional discriminatory conduct in violation of the FCRA, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Plaintiff has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. Plaintiff accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

314. Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's rights under the FCRA, warranting the imposition of punitive damages in addition to compensatory damages.

315. The conduct of Defendants deprived Plaintiff of her statutory rights guaranteed under the FCRA.

316. Plaintiff further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT X**
**§ 760.10(7), Fla. Stat.**
**FCRA Retaliation**
**(As Against Defendant IBANERA)**

317.    Plaintiff reincorporates the factual allegations in Paragraphs 25 through 206.

318.    The FCRA prohibits retaliation in any manner against a person who has opposed a discriminatory practice, or who has participated in any investigation, proceeding or hearing related to an unlawful discriminatory practice. § 760.10(7), Fla. Stat.

319.    Plaintiff was an individual female and was therefore a protected class member.

320.    Plaintiff engaged in a protected activity when she opposed Defendant's discriminatory and unlawful conduct, including but not limited to Defendant, 1) making inappropriate remarks about Plaintiff's physical appearance, including but not limited to, "this is the sexiest and most knowledgeable person with the most class *that I can send you* for this trip," "[PARR] told me he was sending the sexiest employee to Singapore *for me*, and he wasn't lying," "you have a nice ass too, you should stay in my room," " you're going to be my perfect work girlfriend," "you're sleeping with the boss, so your title would not be important," "so, are you going to keep the baby," SNORRASON referring to Plaintiff as his, "girlfriend" at work events and telling her that they would make "Viking babies", among others, 2) repeatedly sexually assaulting and battering Plaintiff at a business conference, 3) drugging Plaintiff, 4) demanding Plaintiff sleep in SNORRASON's room, 5) threatening Plaintiff not to leave Singapore, 6) halting the development of Plaintiff's app unless she allowed SNORRASON to continue sexually assaulting and battering her, 7) ceasing all communications with Plaintiff after she returned to Miami from Singapore, and 8) unlawfully terminating Plaintiff's employment, among others.

321.    Plaintiff explicitly told Defendant that its actions were discriminatory and unlawful, and she complained about Defendant's actions to PARR, CARBONARA, and SNORRASON.

322.     In response to Plaintiff asserting her right to enjoy the same employment benefits as every other employee, Defendant retaliated against Plaintiff.

323.     Defendant retaliated against Plaintiff by ceasing communications with Plaintiff and ultimately terminating her employment.

324.     Defendant took the above-mentioned materially adverse action, among others, against Plaintiff because of her protected activities, including her report of unlawful discrimination on the same day Defendant unlawfully terminated her employment.

325.     Any reasonable employee in Plaintiff's position would be dissuaded from opposing discriminatory conduct if they knew that they would be subjected to the kind of treatment that Plaintiff was forced to endure.

326.     Defendant's alleged basis for its adverse employment actions against Plaintiff are pretextual and have been asserted only to cover up the retaliatory nature of Defendant's conduct.

327.     As a direct and proximate result of the Defendant's retaliatory conduct in violation of the FCRA, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Plaintiff has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. Plaintiff accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

328.     Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of the Plaintiff's rights under the FCRA, warranting the imposition of punitive damages in addition to compensatory damages.

329.     The conduct of the Defendant deprived Plaintiff of her statutory rights guaranteed under the FCRA.

330.     Plaintiff further requests that her attorney's fees and costs be awarded as permitted by law.

## COUNT XI
### Negligence
### (As Against Defendant IBANERA)

331.     Plaintiff reincorporates the factual allegations in Paragraphs 25 through 206.

332.     Plaintiff pleads in the alternative, that if she is not declared to have been an employee of IBANERA, she was an independent contractor for IBANERA during all times relevant.

333.     IBANERA had a duty to exercise reasonable care to protect the safety, care, well-being, and health of Plaintiff while she performed work for IBANERA during work-related activities.

334.     IBANERA owed a duty to Plaintiff to create and maintain a safe and secure environment in which Plaintiff could perform work free from sexual assault, abuse, harassment, and discrimination by IBANERA's members or employees.

335.     IBANERA had a duty to exercise reasonable care in hiring, training, supervising, and retaining employees, including owners, to ensure they did not pose a threat of harm to employees or independent contractors.

336.     As detailed above, Plaintiff was subjected to sexual abuse and battery, and sexual harassment by SNORRASON.

337.     IBANERA breached the aforesaid duties of care in one or more of the following ways, including without limitation:

            a)       failing to protect Plaintiff from sexual harassment and abuse while she was under the care and custody of IBANERA during work hours and IBANERA-related activities;

b)       failing to provide adequate oversight or supervision over Plaintiff;

c)       failing to provide a safe environment for Plaintiff while on a business trip for IBANERA;

d)       failing to adequately train its owners in the supervision of employees and independent contractors, and in protecting its workers from sexual misconduct by an owner of the company;

e)       failing to provide reasonable measures or procedures to guard against or prevent harm such as that suffered by Plaintiff;

f)       failing to adequately supervise SNORRASON while he was interacting with employees and independent contractors, including Plaintiff;

g)       failing to respond appropriately to warning signs, reports, and/or patterns of misconduct by SNORRASON, which should have put IBANERA on notice of a risk of harm to employees and independent contractors;

h)       failing to institute and enforce adequate policies and procedures designed to prevent and detect abuse, despite the known risks of such abuse occurring in workplace environments;

i)       failing to take corrective action against SNORRASON;

j)       failing to address, report, or investigate evidence of inappropriate relationships between SNORRASON and female subordinates, including Plaintiff;

k)       failing to remove SNORRASON from his position despite knowing or having reason to know of his dangerous and inappropriate conduct;

l)       failing to act timely to protect Plaintiff from future potential sexual harm or to mitigate the known risk of future sexual harm to Plaintiff;

m)     failing to act timely in response to known harm to Plaintiff; and

n)     failing to deter SNORRASON.

338.    As a direct and proximate result of IBANERA's negligent acts and omissions, SNORRASON was enabled and permitted to engage in sexual abuse of Plaintiff.

339.    IBANERA's failure to take reasonable steps to prevent or stop the abuse caused Plaintiff to suffer severe emotional distress, psychological trauma, and other damages.

340.    As a direct and proximate result of IBANERA's negligent acts and omissions, SNORRASON was enabled and permitted to engage in sexual abuse of Plaintiff.

341.    As a direct and proximate result of IBANERA's negligence, Plaintiff was sexually assaulted by SNORRASON and exposed to repeated harm, and suffered damages.

342.    As a direct and proximate result of IBANERA's violations of law detailed herein, Plaintiff has suffered and will continue to suffer physical injury, psychological trauma, severe emotional distress, insult, shame, humiliation, emotional pain, suffering, inconvenience, loss of dignity, and other intangible damages.

343.    Plaintiff further requests that her attorney's fees and costs be awarded as permitted by law.

### COUNT XII
### Negligent Retention
### (As Against Defendant IBANERA)

344.    Plaintiff reincorporates the factual allegations in Paragraphs 25 through 206.

345.    Plaintiff pleads in the alternative, that if she is not declared to have been an employee of IBANERA, she was an independent contractor for IBANERA during all times relevant.

346.    Plaintiff alleges negligent retention against IBANERA.

347.    At all times material, IBANERA employed SNORRASON.

348.   As detailed above, during the course of his employment, SNORRASON engaged in inappropriate, abusive, and unlawful sexual conduct with Plaintiff.

349.   IBANERA knew or should have known that SNORRASON posed a danger to subordinates based on indicators including without limitation: (a) evidence of inappropriate conduct by SNORRASON involving Plaintiff and other subordinates and (b) warning signs, reports, patterns of inappropriate behavior, or other red flags indicating that SNORRASON was unfit to remain in a position of authority over subordinates.

350.   Despite knowing or having reason to know that SNORRASON was a risk to employees, IBANERA negligently retained SNORRASON as an owner, thereby allowing him continued and unfettered access to Plaintiff and other subordinates.

351.   IBANERA had a duty to exercise reasonable care in retaining employees who interacted with its workers, ensuring that they were fit to carry out their professional responsibilities without posing a threat to the workers' safety and well-being.

352.   IBANERA breached its duty by retaining SNORRASON despite knowing or having reason to know of his dangerous and inappropriate conduct, making it foreseeable that workers, including Plaintiff, could be harmed as a result.

353.   IBANERA's decision to retain SNORRASON without investigating or acting upon prior warnings, reports, and/or evidence of inappropriate conduct by SNORRASON directly contributed to the harm suffered by Plaintiff.

354.   As a direct and proximate result of IBANERA's negligent retention of SNORRASON, SNORRASON was able to engage in sexual abuse of Plaintiff.

355.     IBANERA's failure to remove SNORRASON from his position created a dangerous environment for Plaintiff, which resulted in the emotional and psychological harm experienced by Plaintiff.

356.     As a result of IBANERA's negligent retention of SNORRASON, Plaintiff was sexually assaulted by SNORRASON and exposed to repeated harm and suffered damages.

357.     As a result of IBANERA's negligent retention of SNORRASON, Plaintiff has suffered and will continue to suffer physical injury, psychological trauma, severe emotional distress, insult, shame, humiliation, emotional pain, suffering, inconvenience, loss of dignity, and other intangible damages.

358.     Plaintiff further requests that her attorney's fees and costs be awarded as permitted by law.

<u>**COUNT XIII**</u>
**Negligent Supervision**
**(As Against Defendant IBANERA)**

359.     Plaintiff reincorporates the factual allegations in Paragraphs 25 through 206.

360.     Plaintiff pleads in the alternative, that if she is not declared to have been an employee of IBANERA, she was an independent contractor for IBANERA during all times relevant.

361.     Plaintiff alleges negligent supervision against IBANERA.

362.     IBANERA had a duty to exercise reasonable care in the supervision of its employees, particularly owners who interact with vulnerable workers, to prevent foreseeable harm.

363.     IBANERA breached its duty by failing to adequately supervise SNORRASON, allowing SNORRASON to engage in sexual misconduct with Plaintiff.

364.    IBANERA failed to exercise reasonable care in supervising SNORRASON in one or more of the following ways, including without limitation:

a.    failing to monitor SNORRASON during his interactions with subordinates, including Plaintiff, in workplace environments, business meetings, or other business-related settings;

b.    failing to implement and enforce appropriate safeguards, policies, and procedures to ensure proper oversight of SNORRASON;

c.    failing to act on warnings, red flags, or concerns related to SNORRASON and/or patterns of inappropriate behavior by SNORRASON, which should have alerted IBANERA to the risk posed by this owner;

d.    failing to address, report, or investigate evidence of inappropriate conduct by SNORRASON against workers, including Plaintiff; and

e.    failing to take reasonable steps to prevent inappropriate, unsupervised interactions between SNORRASON and workers, including Plaintiff.

365.    IBANERA knew or should have known that SNORRASON posed a risk of harm to workers due to (a) prior warnings, reports, and/or evidence of inappropriate behavior by SNORRASON and (b) observations of warning signs, suspicious conduct, or other red flags indicating that SNORRASON was unfit for unsupervised access to workers.

366.    By failing to properly supervise SNORRASON, IBANERA negligently allowed Plaintiff to be subjected to sexual abuse and the resulting emotional and psychological harm.

367.    As a direct and proximate result of IBANERA's negligent supervision, SNORRASON was able to engage in sexual abuse of Plaintiff.

368.     IBANERA's failure to exercise proper oversight directly caused Plaintiff to suffer emotional distress, psychological trauma, and other injuries.

369.     As a result of IBANERA's negligent supervision, Plaintiff was sexually assaulted by SNORRASON and exposed to repeated harm and suffered damages.

370.     As a direct and proximate result of IBANERA's negligent supervision, Plaintiff has suffered and will continue to suffer physical injury, psychological trauma, severe emotional distress, insult, shame, humiliation, emotional pain, suffering, inconvenience, loss of dignity, and other intangible damages.

371.     Plaintiff further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT XIV**
**Negligent Failure to Train**
**(As Against Defendant IBANERA)**

372.     Plaintiff reincorporates the factual allegations in Paragraphs 25 through 206.

373.     Plaintiff alleges negligent failure to train against IBANERA.

374.     IBANERA had a duty to exercise reasonable care in training its employees, particularly owners who have frequent interactions with workers, to prevent foreseeable harm, including sexual abuse.

375.     IBANERA breached its duty by failing to properly train SNORRASON and other members, which allowed SNORRASON to engage in unlawful and abusive conduct with Plaintiff.

376.     IBANERA breached its fiduciary duty to Plaintiff by engaging in conduct including without limitation:

(1)     failing to provide adequate training on identifying the warning signs of inappropriate behavior or potential grooming by owners;

(2)     failing to train owners on the proper procedures for reporting suspected abuse, boundary violations, or other misconduct involving subordinates; failing to provide sufficient education on the professional and ethical responsibilities of owners, particularly regarding interactions with workers;

(3)     failing to implement and enforce policies requiring mandatory training sessions on the prevention of sexual abuse and misconduct within the workplace; and

(4)     failing to train staff on monitoring and supervising interactions between workers and supervisors to prevent the risk of sexual misconduct.

377.   IBANERA's failure to provide adequate training on how to prevent, detect, and respond to sexual misconduct by its employees created a foreseeable risk of harm to workers, including Plaintiff.

378.   As a direct and proximate result of IBANERA's negligent failure to train its employees, SNORRASON was able to engage in sexual abuse of Plaintiff.

379.   IBANERA's failure to provide appropriate training programs directly caused Plaintiff to suffer severe emotional distress, psychological trauma, and other injuries.

380.   As a result of IBANERA's negligent failure to train, Plaintiff was sexually assaulted by SNORRASON and exposed to repeated harm and suffered damages.

381.   As a result of IBANERA's negligent failure to train, Plaintiff has suffered and will continue to suffer physical injury, psychological trauma, severe emotional distress, insult, shame, humiliation, emotional pain, suffering, inconvenience, loss of dignity, and other intangible damages.

382.   Plaintiff further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT XV**
**Sexual Assault and Battery**
**(As Against Defendant SNORRASON)**

383.     Plaintiff reincorporates the factual allegations in Paragraphs 25 through 206.

384.     SNORRASON repeatedly sexually assaulted and battered Plaintiff on or around September 17, 2024, through September 23, 2024, as set forth above.

385.     SNORRASON engaged in illegal and improper touching of Plaintiff, against her will and without her consent.

386.     SNORRASON illegally and without Plaintiff's knowledge, drugged her to ensure she was incapacitated and unable to rebuke his sexual advances, against her will and without her consent.

387.     SNORRASON forcibly, repeatedly inserted his erect penis inside Plaintiff's vagina, against her will and without her consent.

388.     As a result of SNORRASON's assaults and batteries, Plaintiff suffered serious and permanent injuries as set forth above.

389.     As a result of SNORRASON's conduct, Plaintiff was placed in apprehension and fear for her physical well-being.

390.     SNORRASON did the aforementioned acts with the intent to cause a harmful or offensive contact with an intimate part of Plaintiff's person that would offend a reasonable person's sense of personal dignity. Further, said acts did cause a harmful or offensive contact with an intimate part of Plaintiff's person such as would offend a reasonable person's sense of personal dignity.

391.     Because of SNORRASON's position of authority over Plaintiff, and her mental and emotional state, Plaintiff was unable to, and did not, give legal consent to such acts.

392.    As a direct and proximate result of the acts of SNORRASON's acts, Plaintiff sustained serious and permanent injuries to her person and other damage in an amount to be shown according to proof and within the jurisdiction of the Court.

393.    Defendants violated the sections cited hereto and Plaintiff suffered damage as a result.

## COUNT XVI
### False Imprisonment
### (As Against Defendant SNORRASON)

394.    Plaintiff reincorporates the factual allegations in Paragraphs 25 through 206.

395.    The elements of a cause of action for false imprisonment include: (1) the unlawful detention and deprivation of liberty of a person; (2) against that person's will; (3) without legal authority or 'color of authority'; and (4) which is unreasonable and unwarranted under the circumstances.

396.    On or around September 17 through 24, 2024, SNORRASON repeatedly sexually assaulted and battered Plaintiff.

397.    On the night of September 17, 2024, SNORRASON confined Plaintiff to her hotel room before forcefully having sex with her, without her consent.

398.    SNORRASON repeatedly held Plaintiff down while he inserted his penis inter her vagina, even leaving bruises over her legs and body.

399.    As Plaintiff attempted to pull away from SNORRASON and break free from his grasp, SNORRASON tightened his grip and did not allow her to leave.

400.    Plaintiff was powerless and could not escape SNORRASON's grasp no matter how hard she tried.

401.    By detaining Plaintiff and depriving Plaintiff of her liberty as described above, SNORRASON falsely imprisoned Plaintiff, against her will, without legal authority nor color of authority and was unwanted, unreasonable, and unwarranted under the circumstances.

402.    SNORRASON's false imprisonment described above directly and proximately caused Plaintiff to sustain injuries in that it directly, and in a natural and continuous sequence, produced or contributed to such injuries.

403.    As a direct and proximate result of SNORRASON's false imprisonment, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Plaintiff has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages Plaintiff accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

404.    SNORRASON's actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's rights, warranting the imposition of punitive damages in addition to compensatory damages.

405.    Plaintiff further requests that her attorney's fees and costs be awarded as permitted by law.

### COUNT XVII
**Intentional Infliction of Emotional Distress**
**(As Against Defendant SNORRASON)**

406.    Plaintiff reincorporates the factual allegations in Paragraphs 25 through 206.

407.    To establish a claim of intentional infliction of emotional distress, the plaintiff must present evidence of: (1) the defendant's extreme and outrageous conduct, (2) the defendant's intent

or recklessness, (3) causation, and (4) the severe emotional distress of the plaintiff." *Walsh v. Taylor*, 263 Mich. App. 618, 634 (2004) (citation omitted).

408.    The conduct of the Defendant was intentional, personal in nature, retaliatory, extreme and outrageous so as to go beyond all possible bounds of decency.

409.    Such intentional, extreme and outrageous conduct caused Plaintiff to suffer humiliation, extreme embarrassment, fear for her well-being and safety, and other severe emotional distress and damages.

410.    As a result of SNORRASON's actions in purposefully traumatizing her and taking absolute autonomy over her body, Plaintiff suffered serious and permanent injuries as set forth above.

411.    SNORRASON did the aforementioned acts with the intent to cause a harmful or offensive contact with an intimate part of Plaintiff's person that would offend a reasonable person's sense of personal dignity. Further, said acts did cause a harmful or offensive contact with an intimate part of Plaintiff's person such as would offend a reasonable person's sense of personal dignity.

412.    Because of SNORRASON's position of authority over Plaintiff, and her mental and emotional state, Plaintiff was unable to, and did not, give legal consent to such acts.

413.    As a direct and proximate result of the acts of SNORRASON's acts, Plaintiff sustained serious and permanent injuries to her person and other damage in an amount to be shown according to proof and within the jurisdiction of the Court.

## COUNT XVIII
### Negligent Infliction of Emotional Distress
### (As Against Defendant PARR and CARBONARA)

414.    Plaintiff reincorporates the factual allegations in Paragraphs 25 through 206.

415.    Plaintiff is informed and believes that PARR and CARBONARA knew or should have known that they were creating a culture and environment wherein Plaintiff would be sexually assaulted by SNORRASON.

416.    Plaintiff is informed and believes that PARR and CARBONARA failed to take appropriate and/or preventative action against SNORRASON.

417.    Defendants PARR and CARBONARA owed Plaintiff a duty of care to act in a reasonable and ordinary manner so as not to cause Plaintiff any foreseeable harm.

418.    Defendants PARR and CARBONARA failed to use ordinary and reasonable care in order to avoid injury to Plaintiff.

419.    Defendants PARR and CARBONARA released or failed to take reasonable measures to stop SNORRASON from drugging Plaintiff without her knowledge or consent, and thereafter subjecting her to repeated violence and sexual assault, causing Plaintiff severe emotional distress.

420.    As a result of SNORRASON's negligent and intolerable treatment and conduct, Plaintiff suffered and continues to suffer from anxiety, worry, mental anguish, loss of sleep, stress, depression, and severe emotional distress.

421.    As a direct and proximate result of Defendants' acts or omissions, Plaintiff has suffered, without limitation, emotional distress, fear, embarrassment, anxiety, shame, humiliation, distress, shock, and severe emotional distress.

### COUNT XIX
**Negligence**
**(As Against Defendants MARRIOTT, STARWOOD MANAGEMENT, STARWOOD WORLDWIDE)**

422.    Plaintiff reincorporates the factual allegations in Paragraphs 25 through 206.

423. Plaintiff was an invitee of Defendants MARRIOTT, STARWOOD MANAGEMENT, STARWOOD WORLDWIDE (hereinafter the "Hotel Defendants"), as she stayed in the Sheraton Towers in Singapore, located at 39 Scotts RD, Singapore 228230 (the "Sheraton").

424. The Hotel Defendants collectively own and operate the Sheraton.

425. At all relevant times, the Hotel Defendants actively marketed the Sheraton as a premiere resort that was secure and sage.

426. At all relevant times, the Hotel Defendants, through its agents and employees had the ability and duty to solicit, screen, investigate, and select adequate security guards for the safety of its guests and invitees at the Sheraton.

427. At all relevant times, the Hotel Defendants, through its agents and employees had the ability and duty to solicit, screen, investigate and install adequate security cameras and personnel for monitoring its security cameras for the safety of its guests and invitees at the Sheraton.

428. The Hotel Defendants, through its agents and employees, owed a duty to its business invitees, and the public, including Plaintiff, to use reasonable care to provide a safe and secure environment, so as to avoid injury or harm to him while Plaintiff was at the Sheraton.

429. The Hotel Defendants owed a duty to Plaintiff of reasonable care concerning her safety and well-being, including taking precautions reasonably necessary to protect its business invitees, and the public, to protect them from reasonably foreseeable sexual abuse while on the premises.

430. The Hotel Defendants, through its agents and employees, knew or in the exercise of reasonable care, should have known that sexual abuse was reasonably likely to be perpetrated

on the Hotel Defendants' business invitees and the public unless the Defendant took steps to prevent them, enforce its own rules and to provide proper security for such individuals, including, but not limited to Plaintiff.

431.    The Hotel Defendants owed a duty to of reasonable care to Plaintiff, including but not limited to the following:

     a.  To provide a safe environment for Plaintiff while business invitees of the Sheraton resided;

     b.  To enforce its own rules against sexual abuse or misconduct in the hotel;

     c.  To provide security measures to ensure appropriate and adequate security to business invitees and the public, including Plaintiff;

     d.  To adequately warn, protect, instruct Plaintiff;

     e.  To adequately warn, protect, instruct, or advise instruct Plaintiff and others, of the Defendant's lack of adequate security and protection of its business invitees and of the public;

     f.  To instruct, train and teach their employees, agents, apparent agents, representatives, officers, servants, contractors and others under the direction, authority, control or right of control of the Defendant how to properly protect business invitees and the public and to properly monitor individuals with known or discoverable dangerous propensities, so as to protect other individuals from harm, including Plaintiff and others;

     g.  To hire an adequate number of qualified security personnel to deter crimes and sexual abuse from being committed upon business invitees, including Plaintiff;

h.  To effectuate an adequate security plan to warn and protect business invitees, including Plaintiff and others;

i.  To police, patrol, guard, deter and otherwise provide adequate protection for its business invitees, and the public, when Defendant knew or should have known of foreseeable criminal acts;

j.  To hire and/or retain private security personnel and/or off duty police officers to patrol and/or monitor the Sheraton, to protect its business invitees and the public, including Plaintiff and others;

k.  To implement adequate security policies, security measures, and security procedures necessary to protect Plaintiff and other business invitees and members of the public;

l.  To use reasonable care in training its employees, agents, and representatives to ensure that they were adequately monitoring the Tijuana Marriott to deter, prevent and stop crimes and sexual abuse from occurring, including but not limited to SNORRASON's repeated sexual assault and battery of Plaintiff;

m.  To use reasonable care in training its employees, agents, and representatives to ensure that they were properly reporting to their managers and the authorities any suspicious behavior and individuals at the Sheraton; and,

n.  To otherwise use reasonable care to adapt its premises to reasonably reduce the risk of harm to business invitees and the public, including Plaintiff and others.

432.     The Hotel Defendants knew or should have known that its acts or omissions, as set forth above, created a dangerous hazard to its business invitees and the public, including Plaintiff.

433.     The Hotel Defendants knew or should have known that its acts and omissions would cause serious injury to Plaintiff.

434.     Plaintiff's damages were a direct and proximate result of the Hotel Defendants' negligence.

435.     As a direct and proximate cause of the Hotel Defendants' acts and omissions, Plaintiff sustained serious physical injuries and has suffered and will in the future continue to suffer resulting pain and suffering, disability, mental pain, suffering and anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical treatment, loss of earnings, loss of ability to earn money, and loss of earning capacity. The losses and damages are permanent and continuing and Plaintiff will suffer the losses and damages in the future.

## JURY DEMAND

Plaintiff requests a jury trial on all issues to be tried.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment against Defendant for all damages suffered by Plaintiff, including economic damages, lost wages (back pay and front pay) and benefits, liquidated damages, statutory damages, compensatory damages, emotional distress damages, interest, attorney's fees and costs, disbursements of action, and any other remedies (monetary and/or equitable) allowable by law as a result of the Defendant's conduct in violation of the TVPA, Title VII, the FCRA, and all other applicable federal and state law.

[THIS SPACE INTENTIONALLY LEFT BLANK]

Dated: Miami, Florida                    **DEREK SMITH LAW GROUP, PLLC**
     February 2, 2026,                *Counsel for Plaintiff*

                                           */s/ Derek T. Smith*
                                           Derek T. Smith, Esq.
                                           Florida Bar No.: 1014216
                                           Derek Smith Law Group, PLLC
                                           520 Brickell Key Drive, Suite O-301
                                           Miami, FL 33131
                                           Tel: (305) 946-1884
                                           Derek@dereksmithlaw.com

                                           */s/ Daniel J. Barroukh*
                                           Daniel J. Barroukh, Esq.
                                           Florida Bar No.: 1049271
                                           Derek Smith Law Group, PLLC
                                           520 Brickell Key Drive, Suite O-301
                                           Miami, FL 33131
                                           Tel: (305) 946-1884
                                           Danielb@dereksmithlaw.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document is being served on February 2, 2026, on all counsel of record on the service list below via CM/ECF.

By: */s/ Daniel J. Barroukh*
Daniel J. Barroukh, Esq.

## SERVICE LIST

| | |
|---|---|
| **COLE SCHOTZ P.C.**<br>Scott J. Topolski<br>Florida Bar No. 0006394<br>2255 Glades Road, Suite 300E<br>Boca Raton, Florida 33431<br>Telephone: (561) 609-3856<br>Facsimile: (561) 423-0392<br>Email: stopolski@coleschotz.com<br>*Co-Counsel for Defendants Ibanera LLC,*<br>*Michael Carbonara, and David Parr*<br>**VIA CM/ECF** | **CARLTON FIELDS, P.A.**<br>Aaron S. Weiss<br>Florida Bar No. 48813<br>2 Miami Central<br>700 NW 1st Avenue, Ste. 1200<br>Miami FL, 33136-4118<br>Telephone: (305) 530-0050<br>Email: aweiss@carltonfields.com<br>*Counsel for Defendant Bjorn Snorrason*<br>**VIA CM/ECF** |
| **COGENT LAW GROUP, LLP**<br>Evan Ronald Smith<br>2001 L St. NW, Suite 500<br>Washington, DC 20036<br>Telephone: 202.644.8880<br>Email: esmith@cogentlaw.com<br>*Co-Counsel for Defendants Ibanera LLC,*<br>*Michael Carbonara, and David Parr*<br>**VIA CM/ECF** | **DLA PIPER LLP (US)**<br>Virginia Regis Callahan<br>Florida Bar No. 1058943<br>3111 W. Dr. Martin Luther King Jr. Blvd.,<br>Suite 200<br>Tampa, Florida 33607<br>Telephone: (410) 580-4328<br>Facsimile: (410) 580-3011<br>Email: Virginia.Callahan@us.dlapiper.com<br>*Counsel for Marriott International, Inc,*<br>*Starwood Hotels & Resorts Management*<br>*Company, LLC, and Starwood Hotels &*<br>*Resorts Worldwide, LLC*<br>**VIA CM/ECF** |
| **CARLTON FIELDS, P.A.**<br>Naomi M. Berry<br>Florida Bar No. 69916<br>2 Miami Central<br>700 NW 1st Avenue, Ste. 1200<br>Miami FL, 33136-4118<br>Telephone: (305) 530-0050<br>Email: nberry@carltonfields.com<br>*Counsel for Defendant Bjorn Snorrason*<br>**VIA CM/ECF** | |